Adam B. Gottlieb
Russell J. Feldman
W. Bradley Ney (*pro hac vice* to be filed)
Jason D. Schall (*pro hac vice* to be filed)
Jocelyn Berteaud (*pro hac vice* to be filed)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
Telephone: (202) 551-8299 (Gottlieb)
Email: gottlieba@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| Plaintiff, | |
| -against- | **1:25-cv-4245** |
| **UNICOIN, INC. f/k/a TransparentBusiness, Inc., ALEXANDER KONANYKHIN, MARIA SILVINA MOSCHINI, ALEJANDRO DOMINGUEZ, and RICHARD DEVLIN,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Unicoin, Inc. f/k/a Transparent Business, Inc. ("Unicoin" or "the Company"), Alexander Konanykhin ("Konanykhin"), Maria Silvina Moschini ("Moschini"), Alejandro Dominguez ("Dominguez") (collectively, the "Promoting Defendants"), and Richard Devlin ("Devlin," and together with the Promoting Defendants, the "Defendants"), alleges as follows:

## SUMMARY

1.      From February 2022 to the present (the "Relevant Period"), the Promoting Defendants have engaged in a massive securities offering fraud through which they have raised more than $100 million from investors in the United States and abroad.

1

2.      Through false and misleading statements and material omissions that they repeated in multiple public forums, the Promoting Defendants convinced more than 5,000 investors to purchase certificates ("Unicoin Rights Certificates") that purportedly conveyed rights to receive crypto assets they called Unicoins ("Unicoin tokens"), if and when the Company minted and distributed the Unicoin tokens.  The Company offered and sold the Unicoin Rights Certificates as securities.

3.      The Promoting Defendants' false statements were part of a multi-pronged fraudulent scheme to portray Unicoin Rights Certificates as investments in safe, stable, profitable, and highly-sought-after "next-generation" crypto assets.  The Promoting Defendants' false statements included four categories of misrepresentations.

4.      *First*, the Promoting Defendants misled investors about the fundamental attributes of Unicoin tokens and Unicoin Rights Certificates—the very attributes that they claimed made these investments so attractive.

5.      Specifically, the Promoting Defendants falsely claimed in numerous public forums that the Unicoin tokens underlying the Unicoin Rights Certificates were asset-backed by billions of dollars in real estate and equity interests in promising pre-IPO companies.  In reality, as the Promoting Defendants knew, the Company's assets were never worth more than a small fraction of the values that the Promoting Defendants attributed to those assets and, in any event, the Company did not intend to back the Unicoin tokens or Unicoin Rights Certificates with any such assets.

6.      The Promoting Defendants also falsely and repeatedly touted Unicoin tokens and Unicoin Rights Certificates as "SEC-compliant," "SEC-registered" or "U.S. registered" when, in fact, neither Unicoin tokens, nor the Company's offer and sale of Unicoin Rights Certificates, was registered with the Commission.

7.    *Second*, the Promoting Defendants repeatedly and falsely claimed that real estate Unicoin had purportedly acquired to "back" the Unicoin tokens was worth billions of dollars.  In fact, not only did Unicoin never take title to most of the properties they claimed to have acquired, but the Promoting Defendants also vastly overstated the values of the properties.

8.    For example, between September 2023 and January 2024, the Promoting Defendants announced acquisitions of properties in Argentina, Thailand, Antigua, and the Bahamas, purportedly with appraised values totaling more than of $1.4 billion; in fact, the majority of those transactions never closed and the actual combined value of the four properties was no more than $300 million.

9.    *Third*, throughout the Relevant period, the Promoting Defendants repeatedly overstated the Company's sales of Unicoin Rights Certificates, creating the illusion of robust investor interest.  Among other things, the Promoting Defendants made dozens of statements on social media and in investor communications, paid advertisements, and speaking engagements touting fundraising "milestones," each of which substantially overstated the Company's Unicoin Rights Certificate sales and fundraising success.

10.    For example, in November 2022, Unicoin, Konanykhin, and Moschini announced that the Company had "reached the milestone of $200 million in sales of unicoins to individual and corporate investors."  Subsequent announcements touted ever-increasing sales figures, with the Promoting Defendants claiming that the Company had sold "half a billion" dollars of Unicoin tokens by June 2023, $2 billion by March 2024, and more than "$3B in Unicoin sales" by June 2024.

11.    These statements were all false or misleading.  At each purported "milestone," Unicoin's actual proceeds totaled far less than the Company claimed.  In fact, during the entire Relevant Period, Unicoin sold no more than $110 million in Unicoin Rights Certificates.

12.     *Fourth*, the Promoting Defendants misrepresented the Company's financial condition, claiming it had a "runway" (or cash flow to continue operating) measured in "decades" or even "centuries."

13.     In fact, as the Promoting Defendants knew, throughout the Relevant Period the Company's assets were insufficient to sustain its operations for more than a few months to a year absent additional financing or capital raises.

14.     The Promoting Defendants repeated these and other false or misleading statements while promoting Unicoin Rights Certificates at speaking engagements, investor meetings, and public appearances at financial industry and crypto community conferences, as well as in paid advertisements and hundreds of tweets and posts to Instagram, Facebook, LinkedIn, and Unicoin's website—all of which were publicly accessible worldwide.

15.     Defendant Devlin made and repeated certain of the Promoting Defendants' false and misleading statements in private placement memoranda ("PPMs") Unicoin used to offer and sell both Unicoin Rights Certificates and Unicoin common stock.

16.     Defendants' misstatements were material to actual and potential purchasers of the Unicoin Rights Certificates because they went to the very heart of the value proposition the Promoting Defendants repeatedly touted: that the Unicoin tokens, to which the Unicoin Rights Certificates purportedly conveyed rights, would be safer, more stable, and more profitable than other crypto assets because they were backed by assets worth billions of dollars.  Defendants' misstatements were also material to actual and potential purchasers of Unicoin's common stock because the Company's incoming "cash flows" during the Relevant Period came mainly through sales of Unicoin Rights Certificates.

17.     In addition to the fraudulent conduct described above, Defendants Unicoin and Konanykhin violated the federal securities laws by engaging in unregistered offers and sales of

4

Unicoin Rights Certificates.  Unicoin and Konanykhin thus deprived prospective investors of the protections of the registration requirements of the federal securities laws, which require, among other things, that companies offering and selling securities to the public disclose material information about the securities offering and the Company's financial condition.

## VIOLATIONS

18.     By virtue of the foregoing conduct and as alleged further herein, Defendants Unicoin and Konanykhin violated Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Additionally, Konanykhin is jointly and severally liable as a control person pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for Defendant Unicoin's violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

19.     By virtue of the foregoing conduct and as alleged further herein, Defendants Moschini and Dominguez violated Securities Act Section 17(a) [15 U.SC. § 77q(a)], and Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

20.     By virtue of the foregoing conduct and as alleged further herein, Defendant Devlin violated Securities Act Section 17(a)(2) and 17(a)(3) [15 U.S.C. §§77q(a)(2), (a)(3)].

21.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

22.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

23.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering the Promoting Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged herein and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) holding Konanykhin jointly and severally liable for the Company's violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder as a controlling person pursuant Exchange Act Section 20(a) [15 U.S.C. § 78t(a)]; (d) ordering the Promoting Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (e) ordering Devlin to pay civil monetary penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)]; (f) permanently prohibiting Defendants Konanykhin, Moschini, and Dominguez from serving as officers or directors of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (g) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], and Exchange Act Section 27 [15 U.S.C. § 78aa].

25.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

26.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], and Exchange Act Section 27 [15 U.S.C. § 78aa].  Defendants may be found in or transact business in

the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred in this District, including that: the Company's principal executive office is located in this District; Konanykhin, Moschini, and Dominguez made false and misleading statements in paid promotional interviews conducted in this District; the Company conducted promotional activity targeting investors in this District, including via advertisements on taxi cabs and buses and in airports and bars located within this District; and Konanykhin and Moschini used meetings at national securities exchanges located in this District to entice investors to purchase the Company's Unicoin Rights Certificates and common stock.

## DEFENDANTS

27. **Unicoin, Inc., f/k/a TransparentBusiness, Inc.,** was incorporated in 2015 in Delaware. As of December 31, 2024, Unicoin's principal executive office was located at 228 Park Avenue South, New York, New York. Although Unicoin's common stock is registered pursuant to Section 12(g) of the Exchange Act, it is not and has never been publicly traded over the counter or on any national securities exchange.

28. **Alexander Konanykhin (also known as "Alex Konanykhin")**, age 58, was a resident of Sunny Isles Beach, Florida, during the Relevant Period, including from at least 2023 to at least June 2024; his current residence is unknown. From 2015 to the present, Konanykhin has been chief executive officer ("CEO") of Unicoin. From March 2024 to the present, he has been chairman of Unicoin's board of directors. Konanykhin owns 36% of Unicoin's common stock and controls the Company's operations and decision-making. He was previously married to Moschini, and they divorced in 2022.

29. **Maria Silvina Moschini (also known as "Silvina Moschini")**, age 53, was a resident of Miami Beach, Florida, during the Relevant Period, including from at least 2021 until January 2025; her current residence is unknown. From 2015 to March 2024, Moschini was

Unicoin's president and chairwoman of Unicoin's board of directors. She left Unicoin's board of directors in March 2024 and rejoined Unicoin's board of directors on or about June 28, 2024. Since 2021, Moschini has been CEO of Unicorns, Inc., an operating subsidiary of Unicoin. Moschini owns 36.6% of Unicoin's common stock. She was married to Konanykhin until 2022.

30.     **Alejandro Dominguez (also known as "Alex Dominguez")**, age 55, is currently, and was throughout the Relevant Period, a resident of Miami, Florida. From December 2023 through about August 17, 2024, Dominguez was Unicoin's chief investment officer. Prior to that, from April 2022 to December 2023, Dominguez served as Unicoin's investor relations officer and from March 2022 to April 2022 he served as its vice president of corporate development.

31.     **Richard Devlin**, age 53, is a resident of Atglen, Pennsylvania. From June 2020 through the present, Devlin was senior vice president and general counsel of Unicoin. In February 2023, Devlin was also named secretary of Unicoin.

## FACTS

## I.    BACKGROUND ABOUT UNICOIN

32.     Unicoin was formerly known as TransparentBusiness, Inc. ("TransparentBusiness"), which was incorporated in Delaware on June 22, 2015.

33.     On October 6, 2022, TransparentBusiness changed its name to "Unicoin, Inc."

34.     For the sake of clarity, this Complaint refers to both Unicoin, Inc. and TransparentBusiness as "Unicoin" or "the Company."

35.     According to its SEC filings, Unicoin was initially a "software-as-a-service" business that provided remote workforce monitoring and management software. Unicoin later acquired companies related to freelance workers and acquired a majority ownership interest in a regional staffing agency.

36.     In April 2021, Unicoin acquired a 66.67% ownership interest in Unicorns, Inc., a media company founded by Konanykhin, which produced a streaming reality series called "Unicorn Hunters."

37.     "Unicorn Hunters" showcased private companies seeking publicity for their private securities offerings by appearing on the show.  In return for featuring these private companies on the show, Unicorns, Inc. received equity, stock options, or warrants in certain of those companies.

38.     Through "Unicorn Hunters," the Company acquired minority interests in seven private companies that appeared on the show between November 2, 2021, and December 4, 2023. Unicoin valued the private company interests it acquired through the show at $8,163,528 on its annual report on Form 10-K for the year ended December 31, 2024 ("2024 10-K").[1]  Unicoin has never valued these interests at more than $10,136,528 on any Form 10-K or quarterly report on Form 10-Q.

39.     In or around February 2022, Unicoin pivoted to focus primarily on offering and selling rights to to-be-issued digital assets or "security tokens" it called "Unicoins."

40.     At all times during the Relevant Period, Konanykhin controlled and managed Unicoin's operations, and all senior Unicoin executives directly or indirectly reported to him.

## II.    UNICOIN BEGINS OFFERING AND SELLING UNICOIN RIGHTS CERTIFICATES AS SECURITIES

41.     In or before March 2022, Unicoin posted to its publicly accessible website a private placement memorandum ("PPM"), dated February 7, 2022, entitled "Initial Coin Offering" (the "February 7, 2022, PPM").

---

[1]     Hereinafter, all Forms 10-K will be denoted by the year to which they pertain, e.g., "2024 10-K" for the year ended December 31, 2024.  Likewise, all Forms 10-Q will be denoted by the fiscal quarter and year to which they pertain, e.g., "1Q2024 10-Q" for the first quarter of 2024.

42.     The February 7, 2022, PPM detailed the terms of the Company's offer and sale of Unicoin Rights Certificates.  These Unicoin Rights Certificates purportedly entitled buyers to "pre-purchase and reserve . . . UniCoins, which are securities tokens being developed for future issuance."

43.     The February 7, 2022, PPM, which set the selling price of Unicoin Rights Certificates at $0.05 per Unicoin, was the first of many nearly identical PPMs that Unicoin issued.  As Unicoin arbitrarily increased the price at which it was selling Unicoin Rights Certificates, it issued updated PPMs reflecting these price increases.  Each PPM also purported to limit participation to a specific group of investors, i.e., accredited U.S. investors, non-U.S. persons, or existing Unicoin shareholders.

44.     Notwithstanding minor pricing and eligibility differences, the PPMs set forth nearly identical terms, granting to all Unicoin Rights Certificate purchasers the same rights to receive fungible Unicoin tokens if and when they were minted and distributed.

45.     The Company's February 7, 2022, PPM made the following representations to investors:

- UniCoins will be used to develop a diversified portfolio of equity positions in numerous emerging growth and other early- or growth-stage companies, the best out of the numerous applicants to our Unicorn Hunters show.  Coin holders will, therefore, be stakeholders of a major global fund of innovations and will receive dividends when distributed by UniCoins, Inc., our to-be-formed subsidiary that will be issuing the UniCoins.

- We believe that as a value-backed superior alternative to Bitcoin and other cryptocurrencies not backed by any assets, UniCoin will be less volatile, and this lack of volatility may also cause UniCoins' value to rise even when the more volatile coins fall.  When the broader cryptocurrency markets rise, UniCoin is expected to also rise with the market.

- We plan to use the reach and the credibility of Unicorn Hunters and its media partners to create high name recognition of Unicoin.

- When funds and/or securities or other assets are available for distribution as dividends, TransparentBusiness, as the creator of UniCoins and manager of the UniCoins ecosystem, will be paid 20% of the funds available for

10

distribution, as a management fee.  TransparentBusiness or its Unicoins subsidiary shall be required . . . to distribute dividends to UniCoin holders in an amount that is not less than 10% of the liquid assets generated by our diversified portfolio of equity positions per year.  Some of the investment profits will be used to purchase massive brand visibility for UniCoin and cover the operational costs of the UniCoin ecosystem.  Any remaining profits shall be held and used for general corporate purposes and growth, or higher distribution amounts to UniCoin holders, at the discretion of the Company's board and management.

46.    The Company made similar claims in its subsequent PPMs for its offering of Unicoin Rights Certificates.

47.    From the beginning of its Unicoin Rights Certificate offering, each of the Company's PPMs expressly stated that the Unicoin Rights Certificates were "securities."

48.    For example, the February 7, 2022, PPM stated:

- CERTIFICATES ARE OFFERED UNDER THE PROVISIONS OF REGULATION D OF THE SECURITIES ACT OF 1933 AND AMENDMENTS THERETO.

- THE SECURITIES DESCRIBED HEREIN, (i) HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE, (ii) ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND SUCH STATE LAWS, AND (iii) ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT, AS AMENDED, AND UNDER APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO REGISTRATION OR EXEMPTION.

- Although the UniCoin is expected to be deemed an equity security, as such term is defined in Section 3(a)(11) of the Exchange Act, the rights that attach to a UniCoin are materially different than the rights that are typically associated with equity securities such as common shares.

- We intend to issue UniCoins as a security token fully compliant with U.S. securities laws, both state and federal, which will be an extensive and costly process that could potentially take a year or more, and there is no guaranty that we will be successful in so registering UniCoins.

49.     The Company made similar representations in future versions of PPMs for Unicoin Rights Certificates.

50.     For Example, a February 27, 2024, PPM that offered Unicoin Rights Certificates for $0.50 per Unicoin included the following representations:

- UNICOIN RIGHTS ARE OFFERED UNDER THE PROVISIONS OF REGULATION D AND REGULATION S OF THE SECURITIES ACT OF 1933 AND AMENDMENTS THERETO.

- Unicoin Inc., a Delaware corporation ("Unicoin" or the "Company"), is offering the unicoins on the terms and conditions set forth in this confidential private placement memorandum and conducted pursuant to an exemption from U.S. securities registration requirements provided by Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act") and Rule 506(c) thereunder.  Each investor in the Company must be an 'accredited investor,' as defined in Rule 501 of the Securities Act.

- Unicoin Tokens are deemed to be securities under the laws of the United States and the issuer intends to treat them as such globally.  Purchasers should purchase Unicoin Tokens only as an investment in the Unicoin business of the issuer.

- We intend to issue unicoins as a security token fully compliant with U.S. securities laws, both state and federal, which will be an extensive and costly process that could potentially take a year or more, and there is no guaranty that we will be successful in so registering unicoins.

51.     The "Unicoins Presale Certificate" that each investor was required to complete and submit stated on its face, "THIS CERTIFICATE IS A SECURITY AND HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933."

52.     To date, Unicoin has not publicly distributed the Unicoin tokens and has offered for sale only Unicoin Rights Certificates.

53.     Defendant Devlin was primarily responsible for drafting the PPMs that Unicoin disseminated to the public to promote both the Unicoin Rights Certificates and Unicoin's common stock to potential investors.

54.     Devlin and Konanykhin shared authority over the content of Unicoin's PPMs.

55.     During the Relevant Period, the Company broadly marketed Unicoin Rights Certificates to the public through extensive advertising and promotional efforts aimed at potential investors in the United States and abroad.

56.     Some of the Company's efforts to market Unicoin Rights Certificates specifically targeted potential investors in major U.S. metropolitan areas, including New York City.  For example, the Company's paid marketing included, among other things:

- advertisements on thousands of taxi cabs, wrapped buses and ride-share cars, New York Waterway ferries, LinkNYC public wi-fi kiosks, and office building elevator screens in New York City, including in Manhattan;

- high-visibility digital billboards in public spaces such as Times Square, the entrance to New York's Holland Tunnel, and airports in New York, San Francisco, Los Angeles, Denver, and Miami;

- coasters in "upscale bars" in New York City, including Manhattan;

- television ads on CNBC, Bloomberg, Fox Business, and CNN;

- advertisements on high-traffic news media websites such as The New York Times, The Dallas Morning News, the Chicago Tribune, the Los Angeles Times, the Inquirer, the Wall Street Journal, Bloomberg, Axios, CNN, MarketWatch, USA Today, and Fox Business;

- paid advertisements on social media platforms such as Facebook, Instagram, and X; and

- paid promotional interviews produced and distributed by a digital media firm ("Firm 1").

57.     In 2024 alone, Unicoin's "sales and marketing expenses"—which consisted of "third-party marketing, advertising, and branding in addition to compensation and benefits of the

Company's own marketing personnel"—exceeded $14 million.  Unicoin spent approximately $6 million on sales and marketing in 2023 and approximately $17.8 million in 2022.

58.     The Promoting Defendants also promoted the Company's offer and sale of Unicoin Rights Certificates through speaking engagements and appearances at financial industry and crypto community conferences and shareholders' meetings, which they recorded and posted to Unicoin's website.

59.     The Promoting Defendants also made hundreds of promotional tweets and posts to Instagram, Facebook, LinkedIn, and the Company's own website—all of which were publicly accessible worldwide.

60.     In addition, Defendants Unicoin and Konanykhin regularly issued so-called "Investor Updates" ("Investor Updates").  Investor Updates were periodic promotional communications that Konanykhin authored, posted on one of the Company's public unrestricted websites, and disseminated to the Company's large email distribution list of actual and potential investors, as well as others who signed up for updates and provided Unicoin with their contact information.

61.     Konanykhin was responsible for the content of these Investor Updates, and he signed each one with his name and title, "CEO, Unicoin, Inc." (or TransparentBusiness, depending on the date).

62.     Throughout the Relevant Period, investors paid fiat currency and crypto assets to the Company to purchase Unicoin Rights Certificates.

63.     Throughout the Relevant Period, the Promoting Defendants marketed Unicoin Rights Certificates as profitable investments as set forth in sections III through VI, below, such that actual and potential investors had a reasonable expectation of profits.  Additional examples of the Promoting Defendants' statements include: (a) social media and website posts that touted potential

returns of 9,000,000% based on bitcoin's 9,000,000% growth in the past 10 years and told investors to "take advantage of the early days of Unicoin and get them today," highlighting that "Bitcoin experienced a tremendous rise in value, transforming early adopters into millionaires, and even billionaires"; (b) February and March 2022 Investor Updates that pitched Unicoin tokens (and therefore Unicoin Rights Certificates) as opportunities to invest in a token "backed by a growing portfolio of equity stakes in emerging growth companies"; and (c) advertisements and website posts that touted "potential values" and "potential returns" commensurate with the purported $1 trillion market value of bitcoin at the time, including advertisements on coasters distributed at New York City bars specifically touting a "potential value" of $4,000, or $40 per coin, when Unicoin Rights Certificates had never sold for even $1.00.

64.    Throughout the Relevant Period, the Promoting Defendants repeatedly told actual and potential investors that they were using their expertise to select and acquire interests in valuable real property and promising "pre-IPO" companies that would increase the value of their Unicoin Rights Certificates and the underlying Unicoin tokens.

65.    Throughout the Relevant Period, the Promoting Defendants offered and sold identical Unicoin Rights Certificates to investors.  The Unicoin Rights Certificates promised investors equivalent rights to underlying Unicoin tokens backed by a common pool of assets, including real estate and interests in private companies.

66.    During the Relevant Period, each of the Defendants was awarded Unicoin Rights Certificates indistinguishable from those sold to investors, which provided the Defendants with equivalent rights to underlying Unicoin tokens purportedly backed by a common pool of assets, including real estate and interests in private companies.  The value of the Defendants' Unicoin Rights Certificates rose and fell along with those sold to other investors.

67. Throughout the Relevant Period, in addition to selling Unicoin Rights Certificates, Unicoin also sold its common stock.

68. Since at least April 2020, Unicoin has repeatedly described itself as a "pre-IPO" company, and the Promoting Defendants have repeatedly announced, both before and during the Relevant Period, imminent plans to conduct an initial public offering ("IPO") of its common stock, only to repeatedly delay those plans into the future.

69. The Promoting Defendants took various actions during the Relevant Period to maintain the illusion of an impending IPO, including posting pictures of themselves at the Nasdaq and NYSE stock exchanges on Unicoin's and their own social media accounts; and conducting paid interviews at the Nasdaq and NYSE exchanges in front of backgrounds displaying the Nasdaq and NYSE logos.

70. At a shareholder meeting on or about March 26, 2024, Konanykhin falsely told investors that the Company could be prepared to conduct an IPO in a matter of days when, in fact, the Company had taken minimal steps toward a potential public offering—a process that would likely take many months to complete even with diligent efforts. To date, Unicoin has not conducted an IPO.

71. Similarly, since issuing the February 7, 2022, PPM, Unicoin has repeatedly announced and advertised the initial offering of Unicoin tokens in an "initial coin offering" ("ICO"). An ICO is commonly understood to refer to the public distribution of digital assets similar to an IPO for stock. To date, Unicoin has not conducted an ICO of Unicoin tokens.

72. The representations regarding Unicoin tokens, detailed below in paragraphs 74-348, were material to actual and potential investors in both the Company's Unicoin Rights Certificates and Unicoin's common stock during the Relevant Period because, among other things, they significantly misstated Unicoin's assets, cash flows and working capital, all of which were (and

objectively would be) important metrics to someone considering whether to invest in Unicoin Rights Certificates or Unicoin common stock.

73.    Throughout the Relevant Period, Defendants received money or property through their offer and sale of Unicoin Rights Certificates and Unicoin common stock, including compensation and discretionary bonuses the Company paid and/or awarded to each of the individual Defendants.

## III.   THE PROMOTING DEFENDANTS MISREPRESENTED FUNDAMENTAL CHARACTERISTICS OF UNICOIN TOKENS AND UNICOIN RIGHTS CERTIFICATES

74.    Throughout the Relevant Period, the Promoting Defendants materially misrepresented key attributes of the to-be-distributed Unicoin tokens, claiming Unicoin tokens were, or would be, "asset-backed" or "equity-backed," and "SEC-registered," "U.S. registered" or "SEC-compliant" when they were not.

75.    These misrepresentations were particularly significant because the Promoting Defendants expressly pointed to them as selling points that purportedly distinguished Unicoin tokens from so-called "first-generation" crypto assets like bitcoin.

76.    The Promoting Defendants repeated and amplified these false claims in an effort to entice investors to purchase Unicoin Rights Certificates and thereby reserve future Unicoin tokens.

### A.  The Promoting Defendants Falsely Claimed Unicoin Tokens Would Be "Asset-Backed" or "Equity-Backed"

77.    During the Relevant Period, the Promoting Defendants repeatedly and falsely claimed that Unicoin tokens were, or would be, "asset-backed" or "equity-backed."

78.    For example, in a February 2022 Investor Update, Konanykhin described Unicoin tokens as "equity-backed" and included a graphic calling Unicoin tokens "dividend-paying and backed by a Global Innovation Fund."

79.     The February 7, 2022, PPM for Unicoin Rights Certificates provided more detail, stating, "Unicoin tokens will be used to develop a diversified portfolio of equity positions in numerous emerging growth and other early- or growth-stage companies, the best out of the numerous applicants to our Unicorn Hunters show.  Coin holders will, therefore, be stakeholders of a major global fund of innovations and will receive dividends when distributed by UniCoins, Inc., our to-be-formed subsidiary that will be issuing the UniCoins."

80.     Unicoin repeated the misrepresentations from its February 7, 2022, PPM discussed in paragraphs 45 and 79, above, in its subsequent PPMs, including, but not limited to, PPMs pertaining to the offer and sale of Unicoin Rights Certificates dated March 5, 2022, September 1, 2022, November 15, 2022, March 1, 2023, and April 1, 2024.

81.     The Company similarly described Unicoin tokens as "asset-backed" in PPMs pertaining to the offer and sale of Unicoin's common stock, including in PPMs dated April 26, 2024, May 21, 2024, and April 1, 2025.  For example, an April 26, 2024, PPM explained that "Unicoin Inc. is developing a security token called Unicoin ('Unicoins' or 'Tokens'), whose value is intended to be supported by the equity positions purchased from Unicorn Hunters show participants, as well as equity positions acquired from non-show participants for other services, and by other assets, such as real estate.  Such equity positions may be held in a to-be-created investment fund (the 'Fund'), to facilitate proper management of the asset portfolio."

82.     On multiple occasions, the Promoting Defendants referred to companies showcased on the Unicorn Hunters show as "Unicorns" or "potential Unicorns," meaning private companies that have or potentially will achieve billion-dollar valuations.  However, the Promoting Defendants never obtained valuation opinions or other evidence sufficient to value any of the companies showcased on Unicorn Hunters at anywhere close to $1 billion.

83.     The Company also characterized Unicoin tokens as "asset backed" in paid advertisements.

84.     For example, on March 15, 2022, Konanykhin disseminated an Investor Update announcing that Unicoin had "started to advertise Unicoin extensively in all three major New York City area airports: JFK, LaGuardia, and Newark." Konanykhin included two photographs of these airport advertisements, both of which described Unicoin tokens as "backed by a Global Innovation Fund."

85.     On March 29, 2022, a paid Unicoin video advertisement appeared at the end of a Washington Post online article headlined, "The Evolution of Money: Cryptocurrency." The promotional video featured an interview with one of Unicoin's then-directors, who stated, "[F]or the first time, you'll be able to actually invest in a crypto securitized coin that will actually be used to create a Global Innovation Fund . . . . When you buy Unicoin, in essence you are getting a sliver of a portfolio of emerging growth companies, of an equity stake I should say, in these emerging growth companies."

86.     Dominguez, as Unicoin's chief investment officer, also falsely promoted Unicoin tokens as "asset backed." For example, on August 9, 2022, at a blockchain-focused conference (the "Blockchain Conference"), Dominguez delivered a speech in which he claimed that Unicoin tokens are "going to be the first coin that's actually equity-backed and pays dividends like a traditional stock would." Dominguez' speech was made publicly available on YouTube.

87.     During Dominguez's speech to the Blockchain Conference, he displayed a graphic on a screen behind him that stated, "Unicoin is an equity-backed, dividend-paying cryptocurrency."

88.     Dominguez claimed in his Blockchain Conference speech:

We're going to be asset backed by different global emerging growth companies from all over the world that we're going to take equity stakes in. And we're going to create a bunch of different funds in different industries, which are going to back Unicoin. Our target, if you go on our website, if you guys have

cell phones, you're going to see that our target in 2026 will be to have over 200 different companies in our funds, which are going to back the actual coin and pay dividends. So it will have a backing. It won't just be thin air based on supply and demand. It will be regulated by the SEC. Our financial audited statements are already on there. Once the coin comes out in the first quarter of 2023, which is our plan, it'll also be registered with the SEC.

89.     Near the conclusion of his speech, Dominguez stated, "If bitcoin continues to grow in value and the market continues to go higher, we should go higher with them, and on top of that, we have the assets to back up the coin."

90.     Konanykhin continued to describe Unicoin tokens in numerous Investor Updates throughout 2023 as "asset-backed" or "equity-backed"; "U.S.-registered" or "SEC-compliant"; "publicly reporting"; "regulations compliant"; "dividend-paying"; and "audited."

91.     In a December 20, 2023, paid promotional interview with Firm 1 that was posted to Firm 1's public website, Konanykhin again claimed that "Unicoin is assets-backed, dividend-paying, regulations-compliant, publicly reporting, and audited," which Konanykhin asserted distinguished Unicoin tokens from bitcoin. Neither Firm 1 nor Konanykhin disclosed that the interview was a paid advertisement. This interview was also posted to one of Unicoin's websites and circulated by Konanykhin in an Investor Update.

92.     In another interview with Firm 1 posted to Firm 1's website on February 23, 2024, Moschini described Unicoin as "backed by real word assets." Like other promotional interviews with Firm 1, neither Moschini nor Firm 1 disclosed that the interview was actually a paid advertisement. This interview was also posted to one of Unicoin's websites.

93.     During the February 23, 2024, interview, a graphic appeared on screen describing Unicoin tokens as "regulations compliant" and "backed by a diversified asset portfolio that includes real estate, equity in high-growth companies."

94.     On February 29, 2024, Konanykhin and Dominguez participated in another paid promotional interview with Firm 1 (the "Konanykhin and Dominguez Interview") in which

Konanykhin claimed that bitcoin's "volatility" was the reason "we introduced Unicoin as a cryptocurrency, which is likely to be much more stable and profitable." Konanykhin continued, "Unicoin is assets-backed, dividend-paying, audited, publicly reporting and regulations-compliant. We believe that it's going to be a better choice for institutional and traditional investors than volatile and asset-less cryptocurrencies like bitcoin." This interview was posted to Firm 1's website and circulated by Konanykhin in an Investor Update.

95.    In response, the interviewer from Firm 1 asked, "You mentioned asset-backed. So what assets? Do you want to explain how it's backed?" Dominguez replied, "Sure. To date, we have already sold over $2 billion worth of Unicoins. Asset-backed, we're at about 1.4 billion in real estate that we have actually swapped pre-ICO Unicoins for real estate all over the world."

96.    Dominguez's statement in the preceding paragraph falsely asserted not only that the Company had acquired real estate worth $1.4 billion, but also that this real estate was among assets that "backed" Unicoin tokens. Again, neither Konanykhin nor Dominguez nor Firm 1 disclosed that the Konanykhin and Dominguez Interview was actually a paid advertisement.

97.    The next day, March 1, 2024, in another paid promotional interview with Firm 1, Konanykhin again described Unicoin tokens as "assets-backed, dividend-paying, regulations-compliant, audited, and publicly reporting."

### B. Neither Unicoin Tokens nor Unicoin Rights Certificates Were Asset-Backed

98.    The Promoting Defendants' statements in paragraphs 78-97, above, claiming that Unicoin tokens were or would be "asset-backed"—by interests in private start-up companies and/or other valuable assets like real estate—were false and materially misleading.

99.    By stating that Unicoin tokens were "asset-backed," the Promoting Defendants intentionally created the false impression that the Unicoin tokens were secured by, or otherwise

granted investors interests in, a portfolio of real-world assets, rendering them safer and more stable investments than other existing crypto assets.

100.    However, when the Promoting Defendants made the statements contained in paragraphs 78-97, above, they knew or recklessly disregarded that neither Unicoin tokens nor Unicoin Rights Certificates were asset-backed, and that the Promoting Defendants did not intend and never had intended that they would be asset-backed.

101.    In fact, no steps have been taken during the Relevant Period to securitize (or otherwise "back") Unicoin tokens with real world assets.  Unicoin's chief financial officer ("CFO") identified this issue as early February 2022, when he advised Konanykhin, Moschini, and Devlin (as well as certain Unicoin board members) not to "say [Unicoin tokens are] backed by a find [sic] since a fund has not been technically set up."

102.    Despite their numerous statements that Unicoin would be "asset-backed," the Promoting Defendants also never actually intended for Unicoin tokens to be backed by any assets. Konanykhin, Moschini, and Dominguez have each admitted in sworn testimony that they never intended that any assets would "back" Unicoin tokens.  Comparing cryptocurrency to a physical product like a bottle of water, Konanykhin testified that it "cannot be backed by something or reporting, et cetera."

103.    Moschini testified under oath that when she called Unicoin "asset-backed," she meant only that the Company owned assets.

104.    And contrary to his many public statements about Unicoin, Dominguez testified under oath, "So we don't say, you know, the coin [Unicoin] is backed by assets."

105.    Consistent with the Promoting Defendants' sworn testimony that they did not intend Unicoin tokens to be backed by assets, a draft version of the smart contract (a digital program stored on a blockchain (or distributed ledger system) that is executed automatically when

certain predefined conditions are satisfied, with the outcome of any execution recorded to the blockchain) that purportedly was to govern the Unicoin tokens contained no feature or indication that its functionality would be tied to real-world triggering events, such as a liquidation of a real world asset.

### C. The Promoting Defendants Falsely Represented that Unicoin Tokens and Unicoin Rights Certificates Are "SEC-Registered" or "U.S.-Registered" and "SEC-Compliant"

106.    In an effort to paint Unicoin tokens and Unicoin Rights Certificates as safer investments than other existing crypto assets, the Promoting Defendants repeatedly and falsely claimed that Unicoin tokens were "SEC-registered" or "U.S.-registered" and "SEC-compliant."

107.    For example, a December 16, 2022, Unicoin press release quoting Konanykhin described the Unicoin token as "an SEC-registered security token [that] offers a transparent, legitimate, and positive outlook for the future of the crypto market."

108.    A January 26, 2025, International Business Times online article that Moschini disseminated in a LinkedIn post on February 10, 2025, described the Unicoin token as "the only cryptocurrency that is U.S.-registered, U.S.-based, U.S.-regulated, U.S.-audited, and U.S.-publicly reporting."

109.    Similarly, a January 16, 2025, Investor Update circulated by Konanykhin linked to an Investing.com article that said, "Konanykhin said that Unicoin is uniquely positioned as a U.S.-registered, U.S.-audited, and U.S.-regulated cryptocurrency."

110.    On February 21, 2025, Konanykhin issued an Investor Update advocating for inclusion in any future U.S. crypto stockpile "U.S.-registered, U.S.-based, U.S.-regulated, U.S.-audited, and U.S.-publicly-reporting cryptocurrencies (like Unicoin) over foreign cryptocurrencies like Bitcoin."

111.    In fact, neither Unicoin tokens nor Unicoin Rights Certificates were ever "registered" with the Commission or any other U.S. regulator.

112.    Unicoin never filed a Securities Act registration statement with the Commission to register its offering of Unicoin Rights Certificates or to register the Unicoin Rights Certificates as a class of securities under Section 12 of the Exchange Act.

113.    As a result of their senior executive positions within the Company, the Promoting Defendants knew or recklessly disregarded that their statements that Unicoin had registered Unicoin tokens or Unicoin Rights Certificates were false.

114.    Further, as explained in paragraphs 349-388, below, Unicoin Rights Certificates were not "SEC-compliant," as they were offered for sale in violation of the registration requirements of the federal securities laws.

115.    Specifically, Konanykhin, Dominguez, and Unicoin knew or recklessly disregarded that Konanykhin's sales of Unicoin Rights Certificates to investors were not being conducted pursuant to a valid exemption from the registration requirements of the federal securities laws, as described in paragraphs 349-388, below, and that Unicoin's sales of Unicoin Rights Certificates were therefore not SEC-compliant.

116.    Additionally, as noted in paragraphs 74-348, the Promoting Defendants knew or recklessly disregarded that their conduct violated the antifraud provisions of the federal securities laws—namely Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder—as part of a massive securities offering fraud involving the offer and sale of Unicoin Rights Certificates.

## IV.    THE PROMOTING DEFENDANTS GROSSLY OVERSTATED THE AMOUNT AND VALUE OF UNICOIN RIGHTS CERTIFICATES SOLD

117.    In addition to misrepresenting the fundamental characteristics of the Unicoin Rights Certificates and underlying Unicoin tokens, the Promoting Defendants repeatedly overstated the

Company's Unicoin Rights Certificate sales figures to create the illusion of high public interest and a "growing demand" for Unicoin Rights Certificates. Unicoin then relied on this purportedly "growing demand" to justify repeated price increases and boost their offering proceeds.

118.    In fact, Unicoin included within its publicly stated sales figures "deferred" sales of Unicoin Rights Certificates for which investors were not obligated to pay and, as the Promoting Defendants were aware, for which many investors did not intend to pay.

### A. The Promoting Defendants' Funding "Milestone" Announcements Overstated Sales of Unicoin Rights Certificates

119.    As discussed in more detail in paragraphs 120-136, below, since October 2022 the Promoting Defendants have made dozens of announcements on social media and in Investor Updates, promotional interviews, and speaking engagements, touting Unicoin's purported fundraising "milestones," each of which substantially overstated the Company's sales of Unicoin Rights Certificates and materially inflated its fundraising success.

120.    For example, in an Investor Update he circulated on October 10, 2022, Konanykhin announced that "investors have purchased over $100 million of unicoins, [ ] an important milestone reached by only a few cryptocurrencies."

121.    In a subsequent Investor Update on October 17, 2022, Konanykhin announced that Unicoin had reached the "$150 million milestone"—specifically stating that "we've sold over $150 million worth of unicoins!"

122.    On November 1, 2022, Unicoin issued a press release announcing that the Company had "reached the milestone of $200 million in sales of unicoins to individual and corporate investors" and claiming that "more than 2 billion unicoins have been purchased by investors from around the world." A similar statement posted the next day to the "news" page on Unicoin's website stated, "Unicoin Presale Exceeds $200 Million"; and a public tweet sent that day from the Company's X account touted, "We have OFFICIALLY reached the milestone of $200 million in

sales." Less than two hours later, Moschini sent a similar tweet from her X account, with a link to Unicoin's press release.

123.    Konanykhin repeated the Company's November 1, 2022, claim in a January 11, 2023, Investor Update that he emailed to Unicoin's email distribution list and posted to one of Unicoin's websites. Konanykhin wrote, "In November, we reported reaching $200M in sales" and claimed that "many investors recognize that Unicoin is a solution to the extreme volatility of the early crypto coins," which is "why our sales have greatly accelerated."

124.    On December 16, 2022, Unicoin disseminated a number of announcements claiming that it had sold $250 million worth of Unicoin tokens: it announced on X that it had "surpassed the milestone of $250 million in sales of unicoins, with 50 million sold in less than two months"; Moschini tweeted about this purported milestone, writing, "A quarter of a billion dollars invested in @Unicoin_news, our official Crypto, an assets-backed coin that is designed for stability and profitability"; and a press release that Unicoin posted to the "news" page on its website "announced today that its pre-sale of unicoins purchased by individual and corporate investors has reached $250 million . . . an increase of $50 million in less than two months, demonstrating that the crypto market can thrive with next-generation, assets-backed, and regulated coins that provide investors with real value."

125.    Konanykhin also touted Unicoin's $250 million sales claim in a December 15, 2022, Investor Update that he sent to Unicoin's email distribution list and posted to one of Unicoin's websites.

126.    Beginning with the Company's 1Q2022 10-Q, each of the periodic reports that the Company filed with the SEC reported a liability—a so-called "Unicoin Rights Financing Obligation"—which Unicoin defined as "representing the amount that management believes the Company would be obligated to pay or refund (i.e., the amount holders have a right to claim and

would likely be awarded in settlement) for fair value exchanged (i.e., in the form of cash or services) for rights to receive Unicoins in the future in the event the Unicoin is never developed and launched."

127.    The Unicoin Rights Financing Obligation approximated the total cash and other consideration Unicoin received from purchasers of Unicoin Rights Certificates as of the end of any given fiscal quarter or year.

128.    Following each fiscal quarter during the Relevant Period, the Company reported a Unicoin Rights Financing Obligation that amounted to only a fraction of the "milestones" the Promoting Defendants were touting publicly.

129.    For example, Unicoin's 2022 10-K reported a total Unicoin Rights Financing Obligation of approximately $37.5 million—nowhere near the $250 million milestone that Unicoin, Konanykhin and Moschini had announced in December 2022; the $200 million milestone that Unicoin, Konanykhin and Moschini had announced in November 2022; or the $150 million and $100 million milestones that Konanykhin had announced in October 2022.

130.    The Promoting Defendants' false and misleading "milestone" announcements continued throughout 2022, 2023, and 2024.  For example, Unicoin, Konanykhin and Moschini made the following announcements in the first quarter of 2023:

- On January 4, 2023, Unicoin tweeted, "🔺New Year, New Milestone🔺 $275 million dollars worth of Unicoin sold!" Moschini tweeted a similar announcement and Konanykhin repeated this claim in an Investor Update.

- On January 11, 2023, Unicoin tweeted and posted to Instagram, "Remember the $300 million?  Nah, that's old news already!  😁  Today, merely two days later, we're pleased to announce that we've reached the $350M milestone in Unicoin sales! 🚀

We're skyrocketing to greatness with all of you!"  Moschini tweeted a similar announcement and Konanykhin repeated this claim in an Investor Update.

- On March 3, 2023, Unicoin tweeted, "We're pleased to announce that we've reached the $375M milestone in Unicoin sales!"  Moschini tweeted a similar announcement and Konanykhin repeated this claim in an Investor Update.  Unicoin also repeated this claim in a press release.

- On March 15, 2023, Unicoin tweeted, "[W]e've reached a new milestone: $400M in Unicoin sales!"  Moschini tweeted a similar announcement and Konanykhin repeated this claim in an Investor Update.  Unicoin and Konanykhin posted similar announcements on their LinkedIn pages.

131.    Unicoin's, Konanykhin's and Moschini's statements in paragraph 130, above, were false, or at least misleading.  Contrary to those statements, Unicoin's 1Q2024 10-Q—which, like all of the Company's Forms 10-Q and Forms 10-K was signed by Konanykhin—reflected a total Unicoin Rights Financing Obligation of only $39.7 million and only $2.2 million in "proceeds from sales of Unicoin rights" that quarter.

132.    Unicoin, Konanykhin and Moschini made similar "milestone" announcements in the second quarter of 2023, including the following:

- On April 4, 2023, Unicoin tweeted, "We're thrilled to announce that we've hit $425 million in @Unicoin_News sales!"  Konanykhin repeated this claim in an Investor Update.  Unicoin also posted this announcement on its LinkedIn page.

- On April 26, 2023, Unicoin tweeted, "Our Unicoin sales have surged past the $450 million mark!"  Moschini tweeted a similar announcement and Konanykhin repeated this claim in an Investor Update.

- On May 8, 2023, Unicoin tweeted, "Another monday, another milestone! We've hit another significant milestone on our journey to democratize wealth creation and transform the investing and transacting landscape. Our Unicoin sales have skyrocketed and surpassed the $475 million mark." Moschini tweeted a similar announcement and Konanykhin repeated this claim in an Investor Update. Unicoin also posted this announcement on its LinkedIn page.

- On June 8, 2023, Unicoin tweeted, "Half a BILLION worth of Unicoin has successfully been sold! 🎉 After months of hard work, dedication, and the unwavering support from our community, we are thrilled to announce that we have sold a staggering $500 million worth of Unicoin!" Moschini tweeted a similar announcement, and Konanykhin repeated this claim in an Investor Update. Unicoin also posted this announcement on its LinkedIn page.

133. Unicoin's, Konanykhin's and Moschini's statements in paragraph 132, above, were false, or at least misleading. Contrary to those statements, Unicoin's 2Q2023 10-Q reflected a total Unicoin Rights Financing Obligation of only $48.4 million and only $7.8 million in "proceeds from sales of Unicoin rights" that quarter.

134. Subsequent announcements claimed ever-higher sales figures, with Unicoin Rights Certificates sales purportedly reaching $2 billion by March 2024. By June 2024, the Promoting Defendants claimed to have "exceeded $3B in Unicoin sales." Specifically, on June 9, 2024, Moschini announced on her LinkedIn page, "I am pleased to share with you that we have achieved $3 billion in Unicoin sales! . . . Our record-breaking pre-ICO sales enabled us to start a massive branding campaign using a wide range of advertising options, including TV, online, print, events, and OOH advertising . . . prior to our ICO." Konanykhin and Dominguez similarly touted the purported $3 billion milestone on LinkedIn the same day.

135.    These statements were also false, or at least misleading.  At each purported "milestone," the Unicoin Rights Financing Obligation Unicoin reported in the Company's corresponding periodic SEC filing showed that it had raised far less than the Promoting Defendants claimed.

136.    Far from the $3 billion in Unicoin Rights Certificates the Promoting Defendants claimed to have sold by June 2024, the Company's reported Unicoin Rights Financing Obligation shows that it had raised, at most, $110 million by that point.

**B.  "Milestone" Announcements Included Incomplete Sales**

137.    One way that Unicoin overstated its sales milestones was by improperly including, among other things, unpaid balances from deferred "sales" of Unicoin Rights Certificates; they did so under a program by which investors could secure a five-year option to purchase Unicoin Rights Certificates by pledging as collateral 20% of the total anticipated purchase price (the "Five Year Plan").

138.    More than 75% of participants in the Five Year Plan pledged their previously received Unicoin Rights Certificates or Unicoin stock as collateral, meaning the Company received no additional cash from the pledged collateral.

139.    Pursuant to the Five Year Plan agreements memorializing the terms of the Five Year Plan, after pledging 20% as collateral, investors could then pay for their investments in five annual installments of 20% each, starting either one year after they signed the agreement or, for agreements entered into after December 2022, within ten days of tokenization of Unicoin tokens.

140.    With each installment payment under the Five Year Plan, investors would be awarded a corresponding number of Unicoin Rights Certificates, which would be added to their pledged collateral and held by Unicoin until the investors paid all amounts due under their Five Year Plan agreements.  Investors who failed to make one or more requisite annual payments would forfeit

their collateral (including all Unicoin Rights Certificates already awarded to them under the agreement).

141.    However, under the Five Year Plan, investors' investment risk was limited to their initial 20% collateral deposit—investors were not obligated to make any of the annual installment payments.  Unicoin's website prominently advertised that investors' "risks at signing are limited to 20% of the deal value" and that investors had "no credit risk: pay only if satisfied with our progress."

142.    Each of the Company's purported fundraising "milestones" was false and misleading by, among other things, including as purported "sales" of Unicoin Rights Certificates amounts that investors were not obligated to pay under the Five Year Plan.

143.    In fact, at the time of each purported funding "milestone," most investors had yet to make a single annual installment payment under the Five Year Plan agreement.

144.    Notwithstanding that, under the Five Year Plan agreement, Unicoin could be assured only of receiving investors' collateral—and only after default and foreclosure—the Promoting Defendants nonetheless included the full Five Year Plan agreement amounts in calculating Unicoin Rights Certificates sales figures, thus claiming sales five times larger than what Unicoin had actually sold.

145.    Most of the Promoting Defendants "milestone" announcements falsely and misleadingly failed to disclose that the claimed sales figures included significant purported sales for which Unicoin had not been paid, did not hold a valid receivable, and investors were not obligated to pay.

### C.  The Promoting Defendants Knew or Recklessly Disregarded that "Milestone" Announcements Were False and Misleading

146.    The Promoting Defendants knew, as stated on the Company's website, that Five Year Plan investors' risk was limited to the 20% collateral they pledged.

147.    The Promoting Defendants received regular briefings from Unicoin's CFO regarding Unicoin Rights Certificate sales in which they were told how many investors had exercised their options under the Five Year Plan agreements.

148.    In a July 26, 2023, WhatsApp chat, Unicoin's vice president of investor experience (the "VP") informed the Promoting Defendants that first annual installment payments on 38% of all "Five Year Plan" agreements were due in September or October 2023, but that investors were not planning to make most of these payments. The VP then stated, "That means we could be looking at an unrecovered debt of $117,886,905."

149.    The Promoting Defendants continued to make false and misleading claims about the Company's Unicoin Rights Certificate sales even after receiving clear information that investors did not intend to make their first payments under the Five Year Plan.

150.    For example, in the Konanykhin and Dominguez Interview on February 29, 2024 (described at paragraphs 94-95, above), Dominguez claimed, "To date, we have already sold over $2 billion worth of Unicoins," despite knowing that many investors had not made even their first payments under the Five Year Plan.

151.    Konanykhin agreed with Dominguez, stating, "As Alex [Dominguez] has mentioned, investors have already invested $2 billion in Unicoin."

152.    Neither Konanykhin nor Dominguez disclosed that the $2 billion figure included amounts for which investors were not obligated to pay or had already failed to pay.

## V.    DEFENDANTS MISREPRESENTED UNICOIN'S ACQUISITION OF REAL ESTATE ASSETS

153.    During the Relevant Period, Defendants grossly overstated the value of the Company's purported real estate assets that were supposedly backing Unicoin tokens.

154.    Under its "140% program," Unicoin sought to entice investors to swap their real estate assets in exchange for Unicoin Rights Certificates that, the Company claimed, were valued at 140% of the purported appraised value of such real estate.

155.    Between mid-2023 and early 2024, the Company announced a series of purported record-breaking real estate acquisitions pursuant to its 140% program, claiming that at least several of the transactions were the "largest crypto for real estate" deals ever conducted.

156.    However, as set forth below, Defendants: (a) greatly overstated the value of Unicoin's purportedly acquired real properties; (b) claimed as closed real-property transactions that continued to have contingencies outstanding; and (c) ignored, and failed to disclose to potential investors, significant red flags suggesting that the purported sellers of certain of the real properties did not hold title to them.

157.    Defendants repeatedly piled together these false and misleading statements to falsely claim, by the end of 2023, that Unicoin had acquired more than a hundred million dollars of real estate when, in fact, it had acquired no such assets; and by the end of the first quarter of 2024 that Unicoin had acquired more than $1 billion of real estate when, in fact, the true figure was less than $1 million.

### A.  Unicoin's 140% Program

158.    In an April 12, 2023, Investor Update, Konanykhin announced Unicoin's new "140% program."  He explained that, under the program, Unicoin would "offer you an opportunity to trade for unicoins your real estate, at 140% of its appraised value."

159.    After the April 12, 2023, announcement, the 140% program was featured on Unicoin's website, where a dedicated page explained its basic terms: namely, that Unicoin would offer to pay 140% of the appraised value of real estate in Unicoin Rights Certificates, at the current price at which Unicoin was selling those rights certificates.

160.    In an April 18, 2023, Investor Update, Konanykhin further explained that "[t]he objective of developing a large real estate portfolio is to provide backing of Unicoin by assets of unquestionable value," which would "further differentiat[e] [Unicoins] from . . . assetless cryptocurrencies." Defendants repeated numerous times the claim that they acquired properties for 140% of the appraised value.

161.    For example, Unicoin's February 27, 2024, April 1, 2024, and December 3, 2024, PPMs, which were drafted by Devlin and approved by Devlin and Konanykhin, stated:

> In July 2023 we began our '140%' program to acquire real estate assets using unicoin rights as consideration.  To incentivize investors to invest in unicoin rights using real estate, we offer 140% of the appraised value of the real estate, payable in unicoins or unicoin rights at $0.50 each.

162.    In a March 2024 interview, Dominguez claimed, "For every deal we have done [through the 140% program], we actually get an appraiser to appraise these properties.  They need to be certified in their respective countries, and we'll add on 140 percent to the value of that appraisal."

163.    On or about April 15, 2024, Moschini stated in an interview, "we are also providing an incentive, providing 40% more of [sic] the appraised value," when swapping real estate for Unicoin Rights Certificates.

164.    Dominguez, Konanykhin, Devlin, and Moschini all played key roles in the 140% program.

165.    As the Company's chief investment officer, Dominguez oversaw the 140% program and was primarily responsible for reviewing proposed real estate transactions, tracking the status of such transactions, and ensuring receipt of all required documentation (including appraisals and deeds).

166.    During the Relevant Period, Dominguez led regular meetings at the Company to discuss its 140% program, including the status of potential real estate transactions.  Dominguez was

also one of the key executives consulted on the final decision of whether to enter into large real estate transactions under the 140% program.

167.    As the Company's CEO, Konanykhin was also actively involved in Unicoin's proposed real estate transactions.  He frequently reviewed acquisition-related documents and had final approval over whether Unicoin entered into a proposed transaction.

168.    Konanykhin also attended regular 140% program meetings where the status of potential real estate transactions was discussed.  Konanykhin frequently updated investors about Unicoin's purported real estate transactions through his Investor Updates.

169.    As Unicoin's General Counsel, Devlin was one of the key executives who evaluated and consulted on the final decision of whether to enter into large real estate transactions pursuant to the 140% program.

170.    Devlin supervised the legal team that reviewed and was responsible for conducting diligence on several of Unicoin's large purported real estate transactions; he was typically aware of all proposed real estate transactions.

171.    As the executive in charge of Unicoin's branding and marketing strategy, Moschini was involved in disseminating information about Unicoin's purported real estate transactions: she oversaw Unicoin's social media strategy; reviewed the majority of Unicoin's social media posts; and was ultimately responsible for those posts and posts made on her personal social media accounts.

172.    In addition, the Promoting Defendants all participated in media and paid-promotional interviews, as well as investor presentations and shareholder meetings, where they touted Unicoin's purported real estate transactions and the benefit they purportedly would provide to Unicoin and Unicoin Rights Certificate holders.

**B. Defendants Made Serial Misrepresentations and Omissions Regarding Unicoin's Purported Real Estate Acquisitions**

173.    During the Relevant Period, Defendants repeatedly misrepresented Unicoin's ownership of and/or the value of real estate assets that Unicoin claimed to have acquired pursuant to the 140% program.

174.    In particular, Defendants made numerous misrepresentations or material omissions regarding four large property transactions between August 2023 and January 2024—in Argentina, Antigua, Thailand, and the Bahamas.

175.    The Promoting Defendants publicly claimed that these four properties had appraised values ranging from $150 million dollars to $680 million dollars, for a combined total of more than $1.4 billion dollars.

176.    As they knew or recklessly disregarded, however, the Promoting Defendants had no reasonable basis to represent that the properties were worth as much as they claimed; in fact, the properties were worth only a small fraction of the amounts the Promoting Defendants claimed.

177.    The Promoting Defendants also claimed that Unicoin had acquired the real properties at issue—and Devlin claimed that Unicoin had acquired the Bahamas properties—when, in fact, Unicoin had not (and, in all but one case, still has not) acquired the properties.

**1. The Purported Argentine Mining Rights Acquisition**

178.    Between August 2023 and May 2024, Defendants Unicoin and Konanykhin made numerous false and misleading statements about mining rights concessions that Unicoin purportedly acquired in Argentina (the "Argentine Mining Rights").

179.    Unicoin and Konanykhin repeatedly represented to the public that the Argentine Mining Rights were valued at $150 million when, in fact, they knew or recklessly disregarded that the Company had not received an appraisal at the time it announced the acquisition and had no reasonable basis to publicly claim the Argentine Mining Rights were worth $150 million.

180.    In the August 16, 2023, press release announcing the transaction, Unicoin claimed, "Unicoin, an assets-backed cryptocurrency that addresses the extreme volatility of the crypto market, announced today that it signed an agreement with . . . an Argentine corporation, to acquire from [it] the rights to explore and exploit mineral rights located in Argentina, primarily copper."

181.    The August 16, 2023, press release continued, "The purchase price shall be paid in unicoins. The acquisition is structured pursuant to Unicoin's program of acquiring real estate assets at 140% of their appraised value for unicoins, at an agreed value of $0.50 per unicoin. Unicoin Inc. agreed to pay [the Argentine company] 420,000,000 unicoins for the acquisition, a $210M value at the 50¢/ú [Unicoin token] price investors currently pay for unicoins."

182.    Following the announcement of the Argentine Mining Rights transaction, Unicoin and Konanykhin repeatedly touted the purported total value of the transaction.

183.    For example, on February 23, 2024, Unicoin posted a video to its LinkedIn page claiming that the Argentine Mining Rights were "part of our portfolio," had a "$150M investment value," and were part of the "$1.4Bn in assets" that "backed" Unicoin tokens.

184.    On May 8, 2024, during a presentation Konanykhin delivered to a family office wealth management conference in New York City, Konanykhin discussed the Argentine Mining Rights transaction. He claimed that one of the "many deals in millions, tens of millions, and even hundreds of millions of dollars" that Unicoin had done was for a "copper mine, $210M." Konanykhin also showed a slide characterizing the acquisition as "[t]he second largest property-for-crypto deal" that was for "[a] copper mine known as the Barda Gonzalez Project, in the Neuquen Province of Argentina," in "a deal worth $210M dollars."

185.    And on May 22, 2024, during a presentation at a digital assets conference in San Francisco, Unicoin's CFO claimed that in his role he was "focused on the actual asset values, or the appraisal values," of the properties Unicoin was acquiring through its "140% program," and

highlighted Unicoin's acquisition of "$150 million mining rights in Argentina," showing a slide claiming that those rights had an "[a]ppraised value [of] $150M."

186.    The statements in paragraphs 179-185, above, about the Argentine Mining Rights transaction were false for at least two reasons: (1) at that time, Unicoin had not obtained an appraisal of the Argentine Mining Rights; and (2) in fact, the Argentine Mining Rights were worth just a fraction of the value that Unicoin announced.

187.    First, at the time Unicoin claimed to have acquired the Argentine Mining Rights, Defendants had not received any appraisal for the property. Defendants would not receive an appraisal for the property until more than a year later, in November 2024.

188.    Second, the only information Defendants possessed regarding the Argentine Mining Rights' value was a seller-provided report prepared by a geologist in 2014 that suggested a much lower valuation.

189.    The report, self-styled as an "economic valuation," analyzed the value of the copper ore contained in the mining concessions without accounting for the significant infrastructure improvements required to initiate mining operations. This report supported a hypothetical value for the underlying ore of $76 million.

190.    On November 4, 2024, nearly 15 months after Unicoin announced the Argentine mining rights acquisition, the Company received for the first time an appraisal of the Argentine Mining Rights. This appraisal valued the Argentine Mining Rights at $7.1 million—less than 5% of the $150 million that Unicoin had announced in August 2023 and repeatedly touted through mid-2024.

191.    Unicoin's balance sheet in its 3Q2024 10-Q—which Unicoin filed with the SEC on November 14, 2024—listed the Argentine Mining Rights at a value of only $7.1 million.

192.     When Unicoin filed its 2024 10-K, the Company valued the Argentine Mining Rights on its audited balance sheet at just $580,000 based on a review by a mining-rights specialist retained by Unicoin's auditor in connection with its audit of Unicoin's 2024 financial statements.  Unicoin's auditor's work papers indicated that the Company agreed with the revised valuation.

### 2.  The Purported Thailand Property Acquisition

193.     Between September 2023 and May 2024, Unicoin and Konanykhin made numerous false and misleading statements about a property that Unicoin purportedly had acquired in Thailand (the "Thailand Property").

194.     Unicoin and Konanykhin repeatedly represented to the public that the Thailand Property was valued at $241 million when, in fact, they knew or recklessly disregarded that the Company had not yet received an as-is appraisal of the Thailand Property, and the Thailand Property was actually worth far less than $241 million.

195.     In fact, at the time of Unicoin's statements the Thailand Property was worth no more than $15 million as-is.

### a.  Unicoin and Konanykhin Negotiated the Acquisition of Property in Thailand Without Receiving a Valid Appraisal

196.     In April 2023, Unicoin began negotiating with a Thailand-based developer for the acquisition of eight villas in Chonburi, Thailand, pursuant to its "140% program."  While Dominguez was primarily responsible for negotiating with the seller, Dominguez kept Konanykhin and Moschini apprised of the negotiations in a group chat that also included the seller.

197.     During negotiations, the seller offered Unicoin a much larger to-be-developed resort property in the same location—the Thailand Property.

198.     On July 26, 2023, after several months of discussions with Dominguez, the seller gave a presentation on the Thailand Property to several Unicoin executives, including Konanykhin and Dominguez.

199.    On August 22, 2023, the seller provided Dominguez with a so-called "appraisal" for the Thailand Property, valuing it at $241 million (the "Seller's Appraisal"), which Dominguez shared with Konanykhin and Moschini.

200.    This $241 million valuation in the Seller's Appraisal, however, reflected the total anticipated cost of constructing the resort on the completely undeveloped Thailand Property, not an as-is market value for the property.

201.    In fact, in August 2023, the as-is market value of the Thailand Property was no more than $15 million.

202.    Indeed, the Seller's Appraisal itself stated that the market value of the undeveloped Thailand Property was less than $10 million.

203.    Konanykhin and Dominguez knew that the Seller's Appraisal was based on an expected future cost of the constructed project, not the then-current market value of the Thailand Property.

204.    In a July 26, 2023, WhatsApp conversation with Unicoin's CFO about the initial eight-villa deal entered into with the seller, Dominguez had complained that the appraisals for those villas did not reflect the properties' as-is market value, noting, "Appraisal for the villas is not even a market appraisal?  It looks like he gave us an appraisal on how much it costs to build?  I think we need to hire new appraiser and clearly state we need a simple appraisal for mkt value of the 8 villas!"

205.    On August 4, 2023, Dominguez shared with Konanykhin a WhatsApp message from the Thailand Property seller indicating that he expected that the "price [for the project] will be 375M [i]ncluding land and construction."

206.    Upon receipt of the Seller's Appraisal on August 22, 2023, Dominguez confirmed with the seller that the appraisal "includes land, cost of construction, and all villas and everything."

207.    Moreover, Dominguez knew that the Seller's Appraisal dramatically overstated the property's value, even under a cost-of-construction approach, because this was not the first appraisal Dominguez had received from the seller.

208.    On August 21, 2023, the day before Dominguez received the Seller's Appraisal, the Thailand Property seller had provided Dominguez with a cost-of-construction based "appraisal" that valued the property at less than $70 million (the "Initial Appraisal").

209.    Also on August 21, 2023, the Thailand Property seller spoke with Dominguez about the Initial Appraisal and, in a WhatsApp message immediately after that call, Dominguez suggested that the Initial Appraisal "probably excluded the market value of the 150 villas."  In response, the seller assured Dominguez that the person who provided the Initial Appraisal "told [him] to come to the office tomorrow morning" and that he would "come back tomorrow with some news."

210.    Other than the addition of a "shower bath" in the planned two-story underground parking area for the Thailand Property, the Seller's Appraisal was identical to the approximately $70 million Initial Appraisal provided a day earlier, except that the Seller's Appraisal valued the property at $241 million—more than three times the previous cost-of-construction valuation.

### b.  Unicoin and Konanykhin Made False and Misleading Statements About the Thailand Property

211.    Notwithstanding the $10 million as-is valuation stated in the Seller's Appraisal, Unicoin and Konanykhin announced—and, subsequently, repeatedly touted the Thailand Property transaction—as a $335 million acquisition, implying a $241 million valuation after accounting for Unicoin's "140% program."

212.    For example, on September 29, 2023, Unicoin issued a press release announcing its acquisition of the Thailand property headlined, "Unicoin Makes History with $335M Thailand Luxury Resort Acquisition, the Largest Ever Property-for-Crypto Deal."

213. The September 29, 2023, press release stated that Unicoin had "signed a landmark $335 million agreement to purchase Eden Grand Resort, a development project for a 64,000 square meter property and luxury resort in Chonburi, Thailand – the largest-ever real estate acquisition made with cryptocurrency."

214. The September 29, 2023, press release continued, "The purchase price shall be paid in unicoins. The acquisition is structured pursuant to Unicoin's program of acquiring real estate assets at 140% of their appraised value for unicoins. Unicoin Inc. agreed to pay [the Thailand Property seller] 671,206,755 unicoins for the acquisition, a $335.6M value at the 50¢/ú [Unicoin] price investors currently pay for unicoins."

215. On October 2, 2023, Unicoin filed with the SEC a current report on Form 8-K attaching the September 29, 2023, press release.

216. The same day, Konanykhin issued an Investor Update titled, "Unicoin makes a $335M purchase," in which he touted the acquisition. The Investor Update also shared an online Forbes article headlined, "Cryptocurrency company buys hotel in Thailand valued at 335.6 mmd," and a Facebook post by Unicoin's account that also highlighted its purported value.

217. Unicoin's September 29, 2023, Facebook post claimed that "Unicoin is expanding its global portfolio, acquiring the Eden Grand Resort in Thailand in the biggest-ever crypto-for-real estate deal at $335M!" It also included a video claiming, "Unicoin Makes History with $335M Thai Luxury Resort Acquisition."

218. And at his May 8, 2024, presentation at a family office conference in New York City, Konanykhin claimed that one of the "many deals, in millions, tens of millions, and even hundreds of millions of dollars" Unicoin had done was the acquisition of "[a] resort in Thailand, $335 million." He also showed a slide identifying the acquisition as the "largest Crypto-for-property deal in history" and as "[a] deal worth $335M dollars."

219.    Unicoin and Konanykhin's statements in paragraphs 211-218, above, about the Thailand Property acquisition were false and misleading because they materially inflated the stated value of the Thailand Property that Unicoin claimed to have acquired.  The inflated value was improperly based on the anticipated cost of constructing a large resort complex rather than the market value of the property at the time of the transaction.

220.    The Thailand Property still did not appear as a closed transaction in Unicoin's financial statements in its 2024 10-K, which was filed with the Commission on April 15, 2025.

### 3.  The Purported Antigua Properties Acquisition

221.    In October 2023, Unicoin and Konanykhin made multiple false and misleading statements about two properties Unicoin purportedly had acquired in Antigua (the "Antigua Properties").  Unicoin and Konanykhin represented that the Antigua Properties were valued at $680 million when, in fact—as they knew or recklessly disregarded—the Company had not received an appraisal at the time it announced the acquisition, and serious doubts existed about the seller's claimed $680 million valuation for the Antigua Properties.

### a.  Unicoin, Konanykhin, and Dominguez Negotiated the Antigua Acquisition Without Receiving a Valid Appraisal

222.    Beginning in September 2023, pursuant to its "140% program," Unicoin engaged in discussions about acquiring the Antigua Properties—two adjoining parcels of land in Antigua and Barbuda that together combined into a 394.6-acre property—in exchange for Unicoin rights Certificates.

223.    On September 16, 2023, the seller of the Antigua Properties pitched the properties to Konanykhin as a potential investment.

224.    Konanykhin and Dominguez contacted the seller's representative and engaged in negotiations regarding the Antigua Properties.  On September 19, 2023, Konanykhin and

Dominguez discussed by telephone with the seller the Company's potential acquisition of the Antigua Properties, and they continued to negotiate with the seller for the next few weeks.

225.    During his negotiation with Konanykhin and Dominguez, the seller's representative claimed that the Antigua Properties were worth $680 million.  Dominguez has acknowledged that he had doubts about that claimed value.

226.    Dominguez and Konanykhin were aware or quickly learned of numerous red flags regarding the reliability of the purported $680 million valuation.

227.    The only support Antigua Properties seller's representative provided Dominguez and Konanykhin for his $680 million valuation was a two-page list of comparable properties that the seller's representative himself had compiled.

228.    The two-page list provided by the seller's representative fell well short of a professional appraisal.  It did not claim to be an appraisal, did not reference any appraisal standards or methodology, cursorily claimed that "unique lands, such as these . . . will obviously capture additional value" over typical properties in Antigua, and included a list of purportedly comparable (but much smaller) properties.  On these bases, the two-page list concluded that "a reasonable preliminary estimate of the valuation range for the entire 394 acres is between $720M and $680M."

229.    On September 22, 2023, Konanykhin and Dominguez discussed in a WhatsApp chat other properties listed for sale in Antigua with much lower per-acre prices than the Antigua Properties.  Those other property listings suggested that the actual value of the Antigua Properties was less than $100 million.  Among other things, on or before September 22, 2023, Dominguez and Konanykhin had become aware that a real estate agency had created an online listing in 2020 purporting to sell for $40 million a 400-acre parcel of land in the same location in Antigua.

230.    During his September 22, 2023, discussion with Dominguez, Konanykhin noted that "the real value of what [the Antigua Properties seller's representative] offers may indeed be under $40M."

231.    And on September 25, 2023, Dominguez told Konanykhin that he had looked at additional listings and that he "can see maybe 400 – 450 million" but that "it would be best to contact a reputable broker on the island and get a 'price opinion.'"

232.    In or around late September 2023, prior to announcing the purported acquisition of the Antigua Properties, Unicoin, Konanykhin, and Dominguez also became aware of red flags regarding the character and business practices of the Antigua Properties' seller's representative.

233.    On September 27, 2023, Dominguez shared with Konanykhin links to New York and Grenada court opinions showing that, in 2002, the Antigua Properties seller's representative had been disbarred as an attorney in New York and had been found to pose "an immediate threat to the public interest" after failing to respond to ten complaints of professional misconduct; and, in 2014, had been disbarred as an attorney in Grenada for failing to disclose the New York disbarment in his Granada bar application.

234.    And, on October 15, 2023, Dominguez wrote to a real estate agent friend of his, "Looks [l]ike the Antigua deal for [$]680 million is going to happen," and shared a screenshot that included the seller's representative's name.  His friend replied, "I believe I know this guy and those people.  I do not trust them..."

### b.  Unicoin and Konanykhin Made False and Misleading Statements About the Antigua Properties

235.    Despite the red flags about the property's valuation and about the seller's representative, which had led Dominguez to contact an Antigua appraiser to obtain a price opinion (from whom he had not yet received a response), Konanykhin announced the acquisition of the Antigua Properties in an investor update on October 17, 2023.

236.    In the October 17, 2023, Investor Update, Konanykhin stated, "I just signed a deal for acquiring, in exchange for unicoins, 394.6 acres of premium coastal land in the Caribbean, valued at US$680M."

237.    Unicoin also promoted the acquisition on its various social media platforms.

238.    For example, on October 23, 2023, the Unicoin Instagram account made a post claiming, "We've done it again – our biggest deal yet: 394.6 acres of premium coastal land in the Caribbean, valued at US$680M!"  An accompanying video touted a "$680M Coastal Caribbean Paradise Added to Our Assets!"  The same post was made by the Company's LinkedIn and X accounts on the same day.

239.    That very same day, the local appraiser Dominguez had contacted in Antigua informed him that the Antigua Properties were worth only $50 million.  On October 30, 2023, Dominguez shared the $50 million price opinion with Konanykhin and also discussed with him a due diligence report that Konanykhin had separately requested, which, among other things, suggested a property value of between $59 and $392 million.  Dominguez commented, "Wow, seems like too many issues with [the seller's agent] and land seems iffy."

240.    Unicoin and Konanykhin's claims in paragraphs 236-238, above, that the Antigua Properties were worth $680 million were false, as its actual market value at the time was no more than $89 million, and misleading, because they did not disclose the red flags and lack of reasonable basis for the valuation.

241.    As indicated above, Konanykhin knew or recklessly disregarded that it was false or misleading to claim that the Antigua Properties were worth $680 million when the Company had not received any evidence to reasonably support that valuation.

242.    The Antigua Properties still did not appear as a closed transaction in Unicoin's financial statements in its 2024 10-K, which was filed with the Commission on April 15, 2025.

#### 4.   The Purported Bahamas Properties Acquisition

243.     Between January and June 2024, Defendants made multiple false and misleading statements about Unicoin's purported acquisition of the beneficial ownership in two entities that claimed to own three properties in the Bahamas purportedly valued at $396 million.

244.     The Promoting Defendants repeatedly touted Unicoin's acquisition of the Bahamas properties, although they knew of or recklessly disregarded serious red flags about the sellers' actual ownership of the properties.

245.     In addition, Dominguez represented to investors that Unicoin had closed its acquisition of the Bahamas properties while knowing or recklessly disregarding that the transaction had not closed.  Indeed, to date Unicoin still has not closed the acquisition.

246.     Devlin also highlighted the acquisition of the Bahamas properties in at least one PPM while omitting material information concerning the serious red flags about the sellers' actual ownership of the properties and the incomplete status of the acquisition, both of which Devlin knew or should have known when he drafted the PPM.

#### a.   Unicoin Negotiated for and Purportedly Acquired Beneficial Ownership of Bahamas Properties Despite Numerous Red Flags About the Acquisition

247.     In July 2023, Konanykhin and Dominguez began a series of extensive discussions and communications with the representative of sellers of property in the Bahamas regarding Unicoin's potential acquisition of those properties.

248.     Devlin and Moschini also participated in a WhatsApp group chat with the sellers' representative in which they were updated on the status of the acquisition as the negotiations progressed.

249.     The parties ultimately settled on Unicoin acquiring beneficial ownership in two entities, Long Island Investments Ltd. and Newport Harbour Ltd. (the "Bahamas Entities")—

which purportedly owned three parcels of land located on Long Island, Cat Island, and Andros Island in the Bahamas—for a total of 7,721 acres (collectively, the "Bahamas Properties"), in exchange for Unicoin Rights Certificates.

250.     As described below, at the outset of their discussions to acquire the Bahamas Properties, Konanykhin and Dominguez became aware of red flags about the potential transaction, including prior allegations of fraud regarding the sellers and doubts about the sellers' ownership of the Bahamas Properties.

251.     On July 20, 2023, Dominguez told Konanykhin in a WhatsApp conversation, "by the way [the sellers' representative's] dad went to jail for medical fraud.  I didn't like those . . . people.  They are friends with [Unicoin's COO] etc. but I wouldn't trust them too much."

252.     In a September 8, 2023 WhatsApp conversation following a telephone conference call among Konanykhin, Dominguez, Devlin, Unicoin's CFO, the Bahamas Entities' representative, and an associate of the representative working on the transaction (the "Associate"), Dominguez sent Konanykhin a WhatsApp message containing a link to a press release issued by the United States Department of Justice ("DOJ Press Release"), which identified the Associate as a convicted felon who had been sentenced in 2015 to 12.5 years in prison for defrauding more than 100 investors out of more than $8 million in a Bahamas land development scheme.

253.     Dominguez commented on the DOJ Press Release in an accompanying WhatsApp voice message to Konanykhin, stating, "[A]ll these guys sound pretty shady.  They don't want to be on video, etc.  And we already know [the Bahamas Entities' representative] is a little shady.  So I went ahead and Googled them and there you go.  Incredible.  But I don't know.  Definitely don't think we should do any business with these people. . . . They're gonna send us some proposition for $400 million worth of the land in the Bahamas.  Who knows if they even own it."

254.    Konanykhin replied in a WhatsApp message stating, "Let's see what they offer and do very thorough DD on the property IF it looks appealing.  If somebody served his sentence, he's not precluded from purchasing stock or cryptocurrency, but we must very carefully examine the cost/benefit balance there."

255.    In another September 8, 2023, WhatsApp message, Dominguez sent Unicoin's CFO the DOJ Press Release.  Unicoin's CFO replied, "Why would we want to do a[] land for tokens asset swap with a known felon that defrauded investors?  Why would we take that risk?"

256.    Despite the red flags described in paragraphs 250-255, above, Defendants continued to pursue an acquisition of the Bahamas Properties.

257.    By no later than November 2023, the Bahamas Entities' representative shared with Dominguez three separate appraisals for each of the three parcels that made up the Bahamas Properties.

258.    By no later than December 12, 2023, the Bahamas Entities' representative shared the appraisals for the Bahamas Properties with Konanykhin, Moschini, and Devlin.

259.    Information contained in the appraisals raised serious concerns about whether the Bahamas Entities held marketable title to the properties.

260.    For example, although the Bahamas Entities' representative claimed that the Cat Island property was a vacant parcel of land, the appraisal for that property stated there were "several residences[,] government offices, a bank[,] and convenience stores" already located on the Cat Island property; that "many of the residents" on the Cat Island parcel "claim[ed] that they had been given the land and resided on it for many years"; and that, "many roads were also cut into the property as if [it had] been sold for subdivision use."

261.    The appraisal for the Cat Island property concluded, "[the appraiser] c[ould] not validate the ownership of the said property or title, and thereby relie[d] only on the word of the

owners [i.e., the Bahamas Entities] and the old documents provided.  As a result, the land was appraised without these structures and valued as vacant land."

262.    The appraisal for the Long Island Property similarly noted that:

> [A]t the time of inspection of the said site, several residences were erected on the acreage area closest to the main road.  The appraiser cannot validate the ownership of the said property or title, and thereby relies only on the word of the [Bahamas Entities] and the old documents provided.  As a result, the land was appraised without these structures and valued as vacant land.

263.    And the appraisal for the Andros Island property noted that "[t]he subject [property] is currently considered vacant by the owners [i.e. the Bahamas Entities] despite the fact that there are some buildings on the properties."  Accordingly, the appraiser again indicated that "for purposes of this appraisal only land values of the subject property" would be considered.

264.    In a November 27, 2023, group chat with, among others, Konanykhin, Moschini, and Devlin, Dominguez alluded to the title issues discussed in paragraphs 260-263, above, stating, "[W]e have not received anything from a registry [i]n Bahamas showing true ownership of [l]and. They mentioned that doesn't exist in BAHAMAS.  I indeed find that hard to believe and a bit shady."

265.    Nonetheless, Unicoin conducted little or no additional investigation regarding who held title to the Bahamas Properties prior to announcing the transaction.

266.    In addition to the above red flags, publicly available information indicated that the Bahamas Entities had been involved in prior real estate fraud schemes.

267.    News articles from July 29, 2016, and March 6, 2017, identified Long Island Investments as having been involved in a real estate fraud scheme relating to property purportedly located in the same part of Long Island as the Bahamas Property.

268.    Furthermore, a news article from October 27, 2014, identified Newport Harbour as having been involved in the fraud scheme that resulted in the Associate of the Bahamas Entities'

representative receiving a 12.5-year prison sentence.  The same article indicated that one of the owners of the Bahamas Entities, with whom Unicoin executives had been in contact, had appeared as a witness for the defense at the Associate's trial.

269.    The three publicly available news articles described in paragraphs 267-268, above, also identified another individual associated with both the prior Long Island Investments and Newport Harbour fraud schemes, and that same individual signed conveyance documents that the Bahamas Entities provided to Unicoin to establish their ownership of the Bahamas Properties.

270.    On January 24, 2024, despite the red flags discussed in paragraphs 250-269, above, Unicoin signed an agreement with the Bahamas Entities to acquire the Bahamas Properties.

### b.  Defendants Made False and Misleading Statements About the Bahamas Properties

271.    On February 1, 2024, Unicoin issued a press release announcing that it had entered into an agreement to acquire beneficial ownership interests in the Bahamas Entities (and, in turn, beneficial ownership of the Bahamas Properties) (the "Bahamas Properties Press Release").

272.    The Bahamas Properties Press Release was entitled, "Unicoin Inc, Announces the Acquisition of Land Holdings in the Bahamas via the Largest-ever Crypto Deal in Real Estate, Valued at $554M."

273.    In fact, the market value of the Bahamas Properties at the time of the acquisition was no more than $132 million.

274.    The Bahamas Properties Press Release claimed, "Unicoin Inc., a publicly reporting company, cements its status as a trailblazing crypto leader today, announcing the successful execution of two significant deals for the acquisition of beneficial ownership interests in companies holding prime land holdings in the Bahamas."

275.    The Bahamas Properties Press Release further claimed that "[t]his represents the largest-ever cryptocurrency real estate deal.  The targeted properties span 7,721 acres across the coveted islands of Long Island and Andros Island in the Bahamas."

276.    The Bahamas Properties Press Release continued, "Unicoin Inc. has committed to a total payment of 1,108,863,283 unicoins for the Bahamas acquisitions, reflecting a total value of $554,431,641, at the current Unicoin fundraising price of 50¢/ú.  These groundbreaking transactions further represent a significant milestone for Unicoin, propelling the total value of its portfolio to $1.4 billion."

277.    The Bahamas Properties Press Release also claimed that the purported acquisitions "represent Unicoin's commitment to aggressively acquire tangible, income-generating assets.  As the company continues its remarkable rise, the possibilities remain boundless.  This record-shattering deal cements Unicoin's status as an unstoppable crypto pioneer, forging the future of finance."

278.    The Bahamas Properties Press Release failed to mention any of the numerous red flags, described above, concerning the sellers of the Bahamas Properties or the title to the Bahamas Properties.  Such red flags would have been material to a reasonable investor considering a purchase of Unicoin Rights Certificates or Unicoin common stock, given the size and significance of the purported transaction relative to Unicoin's assets.

279.    Konanykhin and Moschini approved the Bahamas Properties Press Release before the Company issued it.

280.    The Company's social media accounts also immediately began to tout Unicoin's purported acquisition of the Bahamas Properties.

281.    For example, a February 2, 2024, post on Unicoin's official Instagram account announced, "the acquisition of beneficial ownership interest in companies holding prime land holdings in the Bahamas," in what the post claimed was "the largest-ever cryptocurrency real estate

deal in history."  An accompanying video claimed that the deal "propell[ed] the total value of our portfolio to $1.4 billion."

282.    The same post appeared on Unicoin's official X account and its official LinkedIn account, which Dominguez reposted on his own LinkedIn page.

283.    Konanykhin also touted the Company's acquisition of the Bahamas Properties in his Investor Updates.

284.    For example, in a February 2, 2024, Investor Update entitled "Unicoin makes a $554M deal, setting a new record," Konanykhin stated that he was "pleased to share with you a news report about our new record-shattering deal."

285.    Devlin also highlighted the acquisition in an April 26, 2024, PPM he drafted relating to Unicoin's general sale of its common stock (the "April 26, 2024, PPM").  In the April 26, 2024, PPM, Devlin stated that "[o]n April 2, 2024, the Company indirectly acquired beneficial ownership of 7,721 acres of land located in the Bahamas, including Long Island and Andros Island, by purchasing all of the issued and outstanding shares of each of Long Island Investments Ltd. and Newport Harbour Ltd., the owners of the land."

286.    The statements contained in paragraphs 271-285, above, regarding Unicoin's acquisition of the beneficial ownership to the Bahamas Entities—and thus to the Bahamas Properties—failed to disclose that the Bahamas Entities were connected to prior land frauds; that several of the Defendants had doubts about whether the Bahamas Entities owned the Bahamas Properties; and that the appraisals provided to Unicoin for the Bahamas Properties raised serious questions about whether the Bahamas Entities held marketable title to the Bahamas Properties.

287.    Additionally, both Dominguez and Devlin falsely represented that the Bahamas Properties acquisition was closed, even as Dominguez knew or recklessly disregarded, and Devlin knew or should have known, that it was not.

288.    For his part, at the March 26, 2024, Unicoin annual shareholders' meeting, Dominguez told Unicoin shareholders that the acquisition of the Bahamas Entities was closed and that it would appear in Unicoin's financial statements in its 1Q2024 10-Q.

289.    In fact, as of March 26, 2024, Unicoin's purported acquisition of the Bahamas Properties had not closed. Indeed, the previous day (March 25, 2024), Dominguez had told Unicoin's CFO that the Bahamas acquisition had not yet closed.

290.    And, as discussed above in paragraph 285, Devlin represented in the April 26, 2024, PPM that on April 2, 2024, Unicoin had "indirectly acquired beneficial ownership of" the Bahamas Properties "by purchasing all of the issued and outstanding shares" of the Bahamas Entities.

291.    The statements contained in paragraphs 288-290, above, regarding Unicoin having purportedly completed its acquisition of the Bahamas Property were false because, as indicated in the Company's Forms 10-K and 10-Q, the acquisition had not—and still has not—closed.

292.    Dominguez was one of the Unicoin executives directly involved in negotiating the acquisition with the representatives of the Bahamas Entities and therefore knew, or recklessly disregarded, that the acquisition had not closed.

293.    Devlin was also involved in communications with the representatives of the Bahamas Entities and was kept appraised of the status of the transaction. He also reviewed the Company's Forms 10-K and 10-Q that showed the transaction was not closed.

294.    The Bahamas Properties still did not appear as a closed transaction in Unicoin's financial statements in its 2024 10-K, which was filed with the Commission on April 15, 2025.

### C. Defendants Falsely Claimed That Unicoin Had Acquired a Massive Real Estate Empire Worth More Than a Hundred Million, and at Times Billions, of Dollars

295.    Based largely on the real estate contracts detailed in paragraphs 173-294, above, Defendants misrepresented Unicoin's overall real estate holdings.

296.    At various points throughout the Relevant Period, Defendants falsely and misleadingly claimed that Unicoin had acquired from more than one hundred million to billions of dollars of real estate when, in fact, Unicoin had acquired real estate worth nowhere near this much.

297.    As Unicoin's 2023 10-K shows, as of the end of 2023, Unicoin had not acquired any real estate pursuant to the 140% program.

298.    Nonetheless, Unicoin, Konanykhin, Moschini, and Devlin repeatedly represented that Unicoin had already acquired substantial real estate assets.  For example:

- At a November 6, 2023, special meeting of Unicoin's shareholders, Moschini told investors, "We are now in a position to tokenize and list Unicoin [tokens], with a growth of over 4900%, sales that have exceeded over $500 million, and assets in real estate that are exceeding $1.2 billion."

- In a November 14, 2023, presentation at a digital assets conference in New York City, Konanykhin told attendees that Unicoin had "done $1.2 billion worth of swaps of Unicoin [tokens] for real estate and other assets, equity, primarily real estate, which gives investors a very convenient opportunity to enter in crypto without using any cash, instead by utilizing, by using underutilized real estate properties."

- In its February 15, 2024, and February 27, 2024, PPMs offering Unicoin Rights Certificates—which Devlin drafted, and which he and Konanykhin approved— Unicoin told investors, "As of December 31, 2023, we had fully closed two acquisitions having a combined value of approximately $151 million" and "As of December 31, 2023, we have sold . . . approximately $211,820,000 through our real estate acquisition program."

299.    As Unicoin's 1Q2024 10-Q (which Konanykhin signed) shows, by the end of the first quarter of 2024, Unicoin had acquired no more than about $624,000 of real estate pursuant to the 140% program.

300.    Nonetheless, Unicoin, Moschini, Dominguez, Devlin, and Konanykhin represented that Unicoin had already acquired real estate assets worth far more than this amount.  For example:

- In a February 28, 2024, fireside chat at a summit in Doha, Qatar, Moschini claimed, "We went the regulatory way, we went to address the issues related to traditional cryptocurrencies like the high volatility, backing Unicoin with assets . . . . By now we have $1.5 billion in real estate assets backing the regulated, transparent coin that we built under SEC regulation."

- In the Konanykhin and Dominguez Interview, on February 29, 2024, Dominguez claimed, "[W]e're at about 1.4 billion in real estate that we have actually swapped [for] pre-ICO, Unicoins for real estate all over the world" and further elaborated, "A lot of that real estate, or I'd say almost 100 percent of it, is mortgage- and lien-free.  We have allocated -- I mean, we have obtained that using swaps, so none of those properties we have actually paid hard cash for. There's no liens or mortgages on it, so we could borrow against it, flip that, hold it in our portfolio, and wait for it to grow in value.  So we have got a lot of flexibility moving forward."

- On March 26, 2024, at Unicoin's annual shareholder meeting, Dominguez repeated his earlier claim about Unicoin's purported real estate portfolio, asserting that the Company had closed real estate deals valued at $1.4 billion and that "all that land comes . . . with no liens, no mortgages.  We don't owe anything on these pieces of land."

56

- In its April 1, 2024, PPM offering Unicoin Rights Certificates—which Devlin drafted, and which he and Konanykhin approved—Unicoin told investors, "As of February 27, 2024, we have sold . . . approximately $211,820,000 through our real estate acquisition program."

301.    As Unicoin's 2Q2024 10-Q (which Konanykhin signed) shows, by the end of the second quarter of 2024, Unicoin had acquired less than $1 million of real estate pursuant to the 140% program.

302.    But Unicoin, Konanykhin, and Devlin represented that Unicoin had already acquired real estate assets far exceeding this amount.  For example, in a May 8, 2024, presentation at a family office conference, Konanykhin claimed that "during [sic] last year, roughly, we've done $2.3 billion worth of [real estate] deals." In its April 1, 2024, PPM offering Unicoin Rights Certificates, Unicoin told investors, "During 2023, we launched our '140%' program, through which we have acquired $1.3 Billion worth of real estate around the world, using unicoins at $0.75 each, and paying 140% of the appraised value of the real estate assets."

303.    As shown in Unicoin's 3Q2024 10-Q (which Konanykhin signed), by the end of the third quarter of 2024, Unicoin had acquired less than $9 million of real estate pursuant to the 140% program.

304.    Nonetheless, Unicoin and Moschini represented that Unicoin had already acquired real estate assets far exceeding this amount.  For example:

- In a July 2, 2024, tweet, Moschini claimed, "[W]e have +$3B in real estate assets backing Unicoin!"

- In a July 23, 2024, presentation at a conference in Puerto Rico, Moschini stated that Unicoin had "over $3 billion in real estate assets that have been swapped with Unicoin pre-ICO."

305.    Unicoin's 2023 10-K (which Konanykhin signed) shows that as of year-end 2024, the Company had acquired less than $1.5 million of real estate pursuant to the 140% program—down $6 million from what Unicoin had reported just one quarter earlier. This drop resulted from Unicoin's downward adjustment of the value it recorded for the Argentinian Mining Rights to just $580,000.

306.    Nonetheless, Unicoin and Konanykhin continued to represent publicly that Unicoin already had acquired real estate assets worth billions of dollars. For example, in an April 22, 2025, Investor Update, Konanykhin falsely claimed that Unicoin had "[c]losed over $2.5B of 'Real Estate for unicoins' deals."

307.    The Promoting Defendants knew or recklessly disregarded that their representations regarding the sum of Unicoin's real estate swaps were false because they lacked a basis for these false claims and because of their detailed knowledge of the real estate program, its constituent transactions, and Unicoin's assets, as detailed above.

308.    For example:

- Dominguez ran the 140% program and was responsible for tracking the status of each transaction.

- Konanykhin signed Forms 10-K and 10-Q that consistently reported real estate assets valued at a fraction of the amounts he claimed in his public statements; received regular updates on Unicoin's financial condition, assets, and real estate holdings; and had access to all of the Company's information on real estate transactions.

- Moschini also received regular updates on Unicoin's financial condition, assets, and real estate holdings.

309.    Devlin knew or should have known that his misrepresentations regarding the sum of Unicoin's real estate swaps were false because he reviewed all of Unicoin's Forms 10-K and 10-Q that contained the correct amounts and had access to documents tracking the status of Unicoin's real estate transactions.

## VI.    THE PROMOTING DEFENDANTS MISREPRESENTED UNICOIN'S FINANCIAL CONDITION

310.    When soliciting investors to purchase Unicoin Rights Certificates, the Promoting Defendants misrepresented the Company's financial stability and its ability to continue to operate in the future without additional investment or financing.

311.    "Runway" is a common term for the length of time a company's current assets can sustain its operations absent additional fundraising.

312.    Throughout the Relevant Period, Unicoin consistently had a runway of under one year, as it acknowledged in periodic filings with the Commission.

313.    At many times in the Relevant Period, Unicoin's runway was no more than four months.

314.    Nonetheless, throughout the Relevant Period, the Promoting Defendants falsely represented to the public that the Company had a "runway" of "decades" or "centuries."

### A.  The Promoting Defendants Knew or Recklessly Disregarded Not Knowing That Unicoin Had a Short Runway

315.    Throughout the Relevant Period, the Promoting Defendants were kept apprised of Unicoin's assets and financial condition through a variety of means—including meetings with the CFO, the Company's periodic SEC filings, internal Company accounting memoranda, and the Promoting Defendants' day-to-day work for Unicoin.

316.    Throughout the Relevant Period, Konanykhin, Dominguez, and Moschini received regular updates about Unicoin's financial condition from Unicoin's CFO.

317.    Unicoin's CFO provided quarterly updates on the Company's finances to Unicoin's board of directors, which included Konanykhin and Moschini for most of the Relevant Period. These quarterly updates included information on the Company's assets.

318.    Additionally, Unicoin's CFO provided monthly updates on the Company's finances to Konanykhin and Moschini.

319.    Unicoin's CFO also provided updates about the Company's finances in weekly executive team meetings that included Konanykhin, Moschini, and Dominguez.

320.    The Promoting Defendants also had knowledge, or at the very least access to knowledge, about Unicoin's financial condition from the Company's periodic filings with the Commission.

321.    Every annual and quarterly report that Unicoin filed with the Commission during the Relevant Period, starting with its first Form 10-K for the year ended December 31, 2021, stated that there was "substantial doubt about the Company's ability to continue as a going concern."

322.    Konanykhin signed each of these annual and quarterly reports.

323.    In February 2024, in preparation for Unicoin's 2023 10-K, an outside firm hired as a technical accountant by Unicoin completed a "going concern" assessment regarding Unicoin's financial condition as of the end of 2023.

324.    The going concern assessment stated that "[Unicoin] management has concluded that substantial doubt exists about the Company's ability to continue as a going concern at least through April 1, 2024, . . . unless substantial additional funding is secured by the Company."

325.    On February 27, 2024, the Company issued a PPM, drafted by Devlin and approved by Konanykhin, that warned investors in Unicoin Rights Certificates of the following: "Although our financial statements have been prepared on a going concern basis, we must raise additional capital to fund our operations in order to continue as a going concern."

326.    Thus, as of February 2024, Defendants knew or recklessly disregarded that, absent additional fundraising, Unicoin lacked assets sufficient to sustain its operations for more than a short period of time.

327.    Additionally, Konanykhin and Dominguez had knowledge of Unicoin's assets through their management of Unicoin's purported acquisition of real estate pursuant to its 140% program.

328.    Konanykhin and Dominguez evaluated every one of Unicoin's significant real estate transactions.

329.    As noted above, Dominguez was primarily responsible for the Company's purported acquisition of real estate, including tracking the status of acquisitions that the Company entered into.

330.    As the Company's CEO, Konanykhin was extensively involved in negotiating several of the Company's purported real estate acquisitions, signed each of the real estate contracts, and was kept apprised of the status of transactions.

331.    As a result of their involvement in the Company's purported acquisitions of real estate, Konanykhin and Dominguez were aware of the status of every significant real estate transaction at Unicoin.

332.    And Konanykhin and Dominguez knew or recklessly disregarded that the Company inflated the value of the real estate they purportedly acquired in the transactions discussed in Section V, above, and knew that most of the transactions were subject to significant outstanding conditions before they could be closed.

**B.  The Promoting Defendants Misrepresented That Unicoin's Runway Could Be Measured in "Decades" or "Centuries"**

333.    Despite their knowledge that Unicoin lacked funds to continue as a going concern absent additional fundraising, the Promoting Defendants nonetheless made numerous false and

misleading statements that the Company's "runway"—or ability to continue operating financially without additional fundraising—could be measured in "decades" or "centuries."

334.    For example, in the Konanykhin and Dominguez Interview on February 29, 2024, discussed above in paragraphs 94-96, the interviewer asked about Unicoin's plans for the upcoming year.  Dominguez responded, "Just to continue to build our asset base and to get ready and fully ready to launch with funds available to do the branding that Alex [Konanykhin] talks about, as well as being prepared in the long run, preparing our runway, which right now, just with the real estate alone, you could measure that in decades."

335.    Dominguez's claim in the preceding paragraph was false and misleading because, as Dominguez knew or recklessly disregarded at that time: (i) the Company's closed real estate transactions had a total value of less than $700,000; (ii) the other real estate transactions that the Company had announced had not yet closed; (iii) additional conditions would need to be satisfied before those additional transactions could be closed;  (iv) serious doubt existed as to whether those conditions would ever be satisfied; and (v) Dominguez vastly overstated the value of the real estate at issue.

336.    On April 2, 2024, the Company filed its 2023 10-K, which Konanykhin signed.

337.    The Company's 2023 10-K stated, "Based on currently available capital resources (cash and cash equivalents on hand as of December 31, 2023), we estimate that at our current cash 'burn rate', the Company will not be able to operate for more than four months."

338.    Nonetheless, in an Investor Update the very next day (April 3, 2024), Konanykhin falsely claimed that "the volume of our 'real estate for unicoins' swap has exceeded $2B.  We expect to get $3B in real estate in this quarter.  Such assets [sic] portfolio will give us a runway measured in centuries."

339.    Konanykhin's claim in the preceding paragraph was false and, as he knew or recklessly disregarded, at that time: (i) the Company's closed real estate transactions had a total value of less than $700,000; (ii) the other real estate transactions that the Company had announced had not yet closed; (iii) numerous conditions would need to be satisfied before those additional transactions could be closed;  (iv) serious doubt existed as to whether those conditions would ever be satisfied; (v) he vastly overstated the value of the real estate at issue; (vi) the Company's accountant provided an analysis to Unicoin in February 2024 that expressed doubt as to whether the Company could continue operating as a going concern for more than four months without substantial additional fundraising; and (vii) the Company's 2023 10-K (which he signed) contained the statement that at its current "burn rate," the "Company will not be able to operate for more than four months."

340.    On May 15, 2024, the Company filed its 1Q2024 10-Q, which Konanykhin signed.

341.    The Company's 1Q2024 10-Q stated, "Our auditors have included an explanatory paragraph in their audit opinion, included as part of our annual report on Form 10-K for the year ended December 31, 2023, that our current liquidity position raises substantial doubt about our ability to continue as a going concern for the next twelve months unless we obtain additional capital."

342.    The Company's 1Q2024 10-Q further stated, "Based on currently available capital resources (cash and cash equivalents on hand as of March 31, 2024)" of approximately $4,345,000, "we estimate that we would be able to conduct our planned operations for approximately four additional months without raising additional equity or debt financing, assuming we do not fail to develop and launch the Unicoin during that period."

343.    Nevertheless, on May 31, 2024, in another "Investor Update" email, Konanykhin claimed, "We are also developing a multi-billion [dollar] portfolio of assets.  I see it as a crucial

element of risk minimization, because such a portfolio will provide us with the resources to continue operating Unicoin for decades, if not centuries, likely outlasting and outperforming other cryptocurrencies."

344.    Konanykhin's claim in the preceding paragraph was false and misleading for the same reasons set forth in paragraph 339, above.

345.    At that time, Konanykhin also knew or recklessly disregarded that: (i) the Company's auditors provided an analysis to the Company in February 2024 that expressed doubt as to whether the Company could continue operating as a going concern for more than four months without substantial additional fundraising; (ii) the Company's 2023 10-K, which Konanykhin signed, stated that at its current "burn rate" the "Company will not be able to operate for more than four months;" and (iii) the Company's 1Q2024 10-Q, which Konanykhin signed, estimated that the Company "would be able to conduct [its] planned operations for approximately four additional months" absent additional fundraising or other developments.

346.    Like Konanykhin, Moschini—as the Company's longtime President and then director—received regular updates from the Company's CFO about the Company's ability to sustain its operations based on its current assets without obtaining additional fundraising.

347.    Nevertheless, on July 23, 2024, while speaking on a panel at the Global Entrepreneurship Conference, Moschini falsely claimed that the Company had "today over three billion dollars in real estate assets that has been swapped with Unicoin pre-ICO.  We plan to do an ICO in September 26 with a runway for centuries . . . ."

348.    Moschini's statement in the preceding paragraph was false and misleading because, as Moschini knew or recklessly disregarded, the Company's 2023 10-K and 1Q2024 10-Q reflected concern from the Company's auditor and the Company about the Company's ability to continue operating financially for more than four months without additional fundraising.

## VII.    THE COMPANY'S AND KONANYKHIN'S UNLAWFUL SALES OF UNICOIN RIGHTS CERTIFICATES

349.    Unicoin and Konanykhin offered and sold Unicoin Rights Certificates to investors in unregistered securities transactions.

350.    During the Relevant Period, Konanykhin was offering and selling through general solicitation the Unicoin Rights Certificates he had received from the Company.

351.    At the time Konanykhin received his Unicoin Rights Certificates from the Company, he held those shares with view toward distribution.  Specifically, and as set forth in detail in paragraphs 367-370, below, Konanykhin began reselling his allotted Unicoin Rights Certificates through general solicitations within months of receiving the Unicoin Rights Certificates.

352.    Unicoin's and Konanykhin's sales of Unicoin Rights Certificates throughout the Relevant Period were part of a single, concerted effort to offer and sell Unicoin Rights Certificates to members of the public (the "Unicoin Rights Offering").

353.    In instant message conversations with the other Promoting Defendants, Konanykhin described his sales as a means of deliberately evading restrictions on Unicoin's direct sales under the federal securities laws by, among other things, targeting unaccredited U.S. investors who had been precluded from buying Unicoin Rights Certificates directly from the Company, and enticing specific individuals to invest large sums at prices below the offering price stated in the operative PPM.

354.    During the Relevant Period, and as a statutory underwriter for the Company, Konanykhin offered and sold Unicoin Rights Certificates through general solicitation; and marketed, offered and sold Unicoin Rights Certificates directly to third parties through such general solicitations.

355.    Konanykhin did not utilize broker-dealers to offer and sell the Unicoin Rights Certificates.

**A. Unicoin and Konanykhin Concurrently Sold Unicoin Rights Certificates to Investors**

356. Since February 2022, and throughout the Relevant Period, the Company offered and sold Unicoin Rights Certificates to investors.

357. The Company and Konanykhin simultaneously offered and sold identical Unicoin Rights Certificates in the same Unicoin Rights Offering.

358. Although the Company purportedly conducted due diligence to limit its sales of Unicoin Rights Certificates to accredited U.S. investors and foreign investors, the Company's sales to Konanykhin resulted in a single unregistered distribution of the certificates to the public through Konanykhin's resales as a statutory underwriter.

359. Both the Company and Konanykhin marketed their Unicoin Rights Certificates with the same advertisements and promotional efforts communicated through the same platforms and even the same specific Investor Updates, which were distributed to the same Unicoin email list.

360. Neither the Company nor Konanykhin registered their offer and sale of Unicoin Rights Certificates with the SEC. No registration statement was filed with the Commission for the offer and sale of Unicoin Rights Certificates and no registration statement was in effect for the offer and sale of Unicoin Rights Certificates at any point during the Relevant Period.

361. Konanykhin was selling on behalf of the Company as a statutory underwriter without a valid exemption or safe harbor. The Company failed to take reasonable steps to guard against Konanykhin's public distribution of the Unicoin Rights Certificates it had awarded him. As a result, the distribution by the Company and Konanykhin constituted a single unregistered offering.

362. According to Unicoin's 2024 10-K, as of year-end 2024 Unicoin had issued Unicoin Rights Certificates conveying rights to acquire more than seven billion Unicoin tokens to more than 5,900 investors.

363.     According to Unicoin's 2024 Form 10-K, as of year-end 2024 Unicoin had sold approximately 1.85 billion Unicoin Rights Certificates to investors unaffiliated with the Company (i.e., investors other than shareholders, employee or officers, service providers, or counterparties to real estate or corporate acquisitions), for "fair value exchanged as consideration for rights to receive unicoins" of approximately $43.5 million.

364.     According to the 2024 Form 10-K, as of year-end 2024 Unicoin had distributed at least an additional 521 million Unicoin Rights Certificates to Unicoin employees, contractors, and directors as compensation, including as discretionary bonuses.

365.     According to the 2024 Form 10-K, as of year-end 2024 Unicoin had distributed more than 273 million additional Unicoin Rights Certificates—which the Company valued at more than $37 million—to service providers, influencers, and employees as payment for services rendered to the Company.

366.     In offering and selling Unicoin Rights Certificates, the Company claimed that its offers and sales were exempt from registration under the federal securities laws.

367.     Between February 2022 and May 2022, the Company awarded more than 282 million Unicoin Rights Certificates to Konanykhin.

368.     Specifically, the Company awarded Konanykhin 15 million Unicoin Rights Certificates on February 18, 2022; one million Unicoin Rights Certificates on April 7, 2022; and more than 266 million Unicoin Rights Certificates on May 3, 2022.  Konanykhin subsequently received 237,000 Unicoin Rights Certificates on February 28, 2023, and another 47,000 Unicoin Rights Certificates on December 28, 2023.

369.     Between July 2022 and March 2024—while the Company was offering and selling Unicoin Rights Certificates—Konanykhin was also offering and selling Unicoin Rights Certificates

that he had received from the Company, which were indistinguishable from those the Company offered and sold directly to others.

370.    As shown in the table below, Konanykhin started selling his own Unicoin Rights Certificates within months of receiving them from the Company.  And Konanykhin ultimately sold more than 37.9 million of his own Unicoin Rights Certificates to more than 180 investors during this period, including to U.S. investors, for total proceeds of more than $2.6 million.

### KONANYKHIN'S PERSONAL SALES OF UNICOIN RIGHTS CERTIFICATES

| Date | Unicoin Rights Awarded | Total Unicoin Rights Sold by Date | Remaining Unicoin Rights |
|---|---|---|---|
| 2/18/2022 | 15,000,000 | | 15,000,000 |
| 4/7/2022 | 1,000,000 | | 16,000,000 |
| 5/3/2022 | 266,250,911 | | 282,250,911 |
| 7/14/2022 | | 13,505,000 | 268,745,911 |
| 7/29/2022 | | 1,785,000 | 266,960,911 |
| 8/12/2022 | | 100,000 | 266,860,911 |
| 8/19/2022 | | 1,690,000 | 265,170,911 |
| 8/30/2022 | | 100,000 | 265,070,911 |
| 9/22/2022 | | 1,390,000 | 263,680,911 |
| 9/30/2022 | | 100,000 | 263,580,911 |
| 10/12/2022 | | 50,000 | 263,530,911 |
| 10/26/2022 | | 450,000 | 263,080,911 |
| 11/8/2022 | | 1,060,000 | 262,020,911 |
| 11/17/2022 | | 500,000 | 261,520,911 |
| 12/8/2022 | | 200,000 | 261,320,911 |
| 2/28/2023 | 237,000 | | 261,557,911 |
| 3/8/2023 | | 8,033,500 | 253,524,411 |
| 3/22/2023 | | 1,000,000 | 252,524,411 |
| 4/12/2023 | | 100,000 | 252,424,411 |
| 5/2/2023 | | 170,001 | 252,254,410 |
| 5/8/2023 | | 26,667 | 252,227,743 |
| 5/30/2023 | | 60,000 | 252,167,743 |
| 7/19/2023 | | 3,334 | 252,164,409 |
| 10/18/2023 | | 50,000 | 252,114,409 |
| 11/7/2023 | | 850,000 | 251,264,409 |
| 11/8/2023 | | 660,000 | 250,604,409 |
| 11/9/2023 | | 1,125,000 | 249,479,409 |

| Date | Unicoin Rights Awarded | Total Unicoin Rights Sold by Date | Remaining Unicoin Rights |
|---|---|---|---|
| 11/29/2023 | | 1,400,000 | 248,079,409 |
| 12/1/2023 | | 363,333 | 247,716,076 |
| 12/8/2023 | | 1,111,120 | 246,604,956 |
| 12/14/2023 | | 840,000 | 245,764,956 |
| 12/18/2023 | | 125,000 | 245,639,956 |
| 12/28/2023 | | 60,000 | 245,579,956 |
| 12/29/2023 | 47,000 | | 245,626,956 |
| 1/4/2024 | | 440,000 | 245,186,956 |
| 3/25/2024 | | 500,000 | 244,686,956 |
| 6/5/2024 | | 100,000 | 244,586,956 |

**B.   Konanykhin and Unicoin Evaded the Price Terms of Unicoin's Offering Through the Sale of Konanykhin's Unicoin Rights Certificates**

371.    At times, Konanykhin sold his Unicoin Rights Certificates at a lower price than the Company was offering in the Unicoin Rights Offering.

372.    While actively marketing the Company's Unicoin Rights Offering in his role as the Company's CEO, Konanykhin also offered and sold his own Unicoin Rights Certificates through his Investor Updates—which were sent to a wide audience of individuals by email and by publication on one of Unicoin's websites.

373.    These Investor Updates show that Konanykhin offered and sold his own Unicoin Rights Certificates at least in part to attract investors by offering better pricing than the Company itself was offering in the Unicoin Rights Offering.

374.    For example, on June 28, 2022, Konanykhin wrote the following in an Investor Update:

> Some shareholders even asked me if they could still take advantage of our pre-public round pricing of 5¢/ú [Unicoin token].  That round ended in early March and we have since raised millions of dollars at 10¢/ú. . . .  Our company may not offer any 'special deals' on unicoins and deviate from the terms of the current round.  What I can do is to release 10 million of my own unicoins at 5¢/ú to those shareholders who request them by July 5th, 2022.  Simply

respond with the amount of the desired purchase and I'll respond while the supply lasts.

375.    From this date until July 29, 2022, Konanykhin sold more than fifteen million Unicoin Rights Certificates for five cents each.

376.    Similarly, in January 2023, when Unicoin was selling Unicoin Rights Certificates for 20 cents each at some quantities, Konanykhin explained to an employee that the Company could not offer a discount of $0.05 per Unicoin Rights Certificate to entice an individual investor, noting: "sorry it'd be illegal.  It's a discount on purchase and the law bars us from deviating from the published terms."

377.    Minutes later, Konanykhin suggested that instead of the Company selling Unicoin Rights Certificates at a discount, Konanykhin himself could offer the contemplated discount by selling his own Unicoin Rights Certificates.

378.    Konanykhin wrote, "I own about 250M ú [Unicoin tokens] and can sell him $1.2M at 15 ¢/ú."  He added, "It is NOT my preference, as I try to increase the value of unicoins to sell mine later at a much higher price, but if [the potential investor] says '15¢/ú or I don't invest', I'd rather use my personal unicoins than lose this deal."

379.    Konanykhin ultimately completed the sale of 8,033,500 Unicoin Rights Certificates at the contemplated discount of $0.15 per Unicoin Rights Certificate, for total proceeds of $1.2 million. This was Konanykhin's single largest sale, which was also larger than any of the Company's sales to unaffiliated investors.

380.    Konanykhin continued to sell Unicoin Rights Certificates for prices ranging from five cents to thirty cents each at least through June 5, 2024.

381.    Throughout this time period, Unicoin was selling Unicoin Rights Certificates directly to investors for prices higher than those paid by investors purchasing the certificates directly from Konanykhin.

**C. Konanykhin Sold Unicoin Rights Certificates to Investors to Evade Restrictions on the Company's Offering**

382.    Because Unicoin attempted to rely on the Rule 506(c) exemption in Regulation D [17 CFR § 230.506(c)] to sell Unicoin Rights Certificates, it was required to take reasonable steps to verify the accredited status of investors purchasing these certificates.

383.    Konanykhin sold his Unicoin Rights Certificates without verifying the accredited status of investors purchasing these certificates.

384.    In an internal WhatsApp communication on December 22, 2022, Konanykhin asked Dominguez for a "list of everybody whom we refused to sell unicoins due to unaccredited status," explaining that "[t]here was unsatisfied demand" and that he did not "want to just let it go nowhere."

385.    In response, Dominguez stated that selling to unaccredited investors who had been precluded from purchasing directly from Unicoin could "create a secondary market with these guys for the coins," and assured Konanykhin that he had asked a Unicoin employee to compile such a list.

386.    Under Unicoin's standard practices, investors who wished to transfer their Unicoin Rights Certificates to third parties had to complete online transfer forms, which then had to be approved by the Company's management and recorded in the registry the Company used to track the ownership of Unicoin Rights Certificates.

387.    But Konanykhin never asked anyone in the Company's legal department to review or approve his personal sales of Unicoin Rights Certificates and the Company did not do so, though the sales were recorded on Unicoin's registry.

388.    The Company, including Devlin as its General Counsel, was aware of Konanykhin's individual sales of Unicoin Rights Certificates.

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(1) – (a)(3)
### (Unicoin, Konanykhin, Moschini, and Dominguez)

389.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 388.

390.     Unicoin, Konanykhin, Moschini, and Dominguez, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

391.     By reason of the foregoing, Unicoin, Konanykhin, Moschini, and Dominguez, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Unicoin, Konanykhin, Moschini, and Dominguez)

392.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 348.

393.     Unicoin, Konanykhin, Moschini, and Dominguez, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to

defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

394.    By reason of the foregoing, Unicoin, Konanykhin, Moschini, and Dominguez, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)(2) and (a)(3)**
**(Devlin)**

395.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 388.

396.    Devlin, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (2) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

397.    By reason of the foregoing, Devlin, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Sections 17(a)(2) and 17(a)(3) [15 U.S.C. § 77q(a)(2) and (a)(3)].

## FOURTH CLAIM FOR RELIEF
### Violations of Securities Act Sections 5(a) and (c)
### (Unicoin and Konanykhin)

398.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 388.

399.    Defendants Unicoin and Konanykhin, directly or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

400.    By reason of the foregoing, Defendants Unicoin and Konanykhin violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

## FIFTH CLAIM FOR RELIEF
### Violation, as a Control Person, of Section 10(b) and Rule 10b-5 Thereunder,
### Pursuant to Exchange Act Section 20(a)
### (Konanykhin)

401.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 388.

402.    As alleged in the Second Claim for Relief above, Unicoin violated Exchange Act Section 10(b) and Rule 10b-5 thereunder.  By engaging in the acts and conduct described in this Complaint, Unicoin, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a

national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

403.    During the Relevant Period, Konanykhin participated in, and exercised control over, the operations of Unicoin, and also possessed the power and ability to control the acts constituting Unicoin's violations of the securities laws alleged herein.

404.    Konanykhin was a culpable participant in Unicoin's violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

405.    By reason of the foregoing, Konanykhin, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], is jointly and severally liable with, and to the same extent as, Unicoin for its violations of Exchange Act Section 10(b) and Rule 10b-5 and, unless enjoined, will again act as a "controlling person" in connection with such violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Defendants Unicoin and Konanykhin and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 5(a) and (c) and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**II.**

Permanently enjoining Defendants Moschini and Dominguez, and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**III.**

Permanently enjoining Defendant Devlin, and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a)(2) and (a)(3) [15 U.S.C. § 77q(a)(2) and (a)(3)].

**IV.**

Ordering Defendants Unicoin, Konanykhin, Moschini, and Dominguez to disgorge all ill-gotten gains they received, directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)], and as to Konanykhin, ordering him jointly and severally liable with Unicoin;

**V.**

Ordering Defendants Unicoin, Konanykhin, Moschini, and Dominguez to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**VI.**

Ordering Defendant Devlin to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)];

## VII.

Permanently prohibiting Defendants Konanykhin, Moschini, and Dominguez from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

## VIII.

Granting any other and further relief this Court may deem just and proper.

### JURY DEMAND

The Commission demands a trial by jury.

Dated: May 20, 2025

/S/ Adam B. Gottlieb
Adam B. Gottlieb
Russell J. Feldman
W. Bradley Ney (*pro hac vice* to be filed)
Jason D. Schall (*pro hac vice* to be filed)
Jocelyn Berteaud (*pro hac vice* to be filed)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
(202) 551-8299 (Gottlieb)
gottlieba@sec.gov