UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

    -against-

UNICOIN, INC.; ALEXANDER KONANYKHIN;
MARIA SILVINA MOSCHINI; and ALEJANDRO
DOMINGUEZ,

                    Defendants.

Case No. 1:25-cv-04245-AS

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF
LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

J. Emmett Murphy
Jocelyn Berteaud
Jason Schall
Adam B. Gottlieb
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Tel: 212-336-0078 (Murphy)
Email: murphyjoh@sec.gov
Counsel for the Plaintiff
Securities and Exchange Commission

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

I.   The Company and Its Venture Into Crypto ................................................................ 2

II.  The Individual Defendants ......................................................................................... 3

III. The Unicoin Token PPMs .......................................................................................... 4

IV.  Defendants' Unicoin Token Marketing Blitz ............................................................. 4

V.   The Marketing Campaign Was Fraudulent ................................................................ 5

     A.   Misrepresentations Regarding the Unicoin Tokens and Rights Certificates ...................... 5

     B.   Misrepresentations Regarding Real Estate Acquisitions ................................................. 6

     C.   Misrepresentations Regarding the Company's Sales of Rights Certificates ...................... 8

     D.   Misrepresentations Regarding Unicoin, Inc.'s Financial Condition................................. 9

VI.  All Offers and Sales of Rights Certificates were Unregistered ............................................ 10

LEGAL STANDARD ......................................................................................................... 10

ARGUMENT ..................................................................................................................... 11

I.   The Complaint Adequately Pleads Fraud with Particularity ................................................ 11

II.  The Complaint Sufficiently Pleads All Fraud Elements ...................................................... 12

     A.   Defendants Fraudulently Claimed the Unicoin Token Would Be "Asset-Backed" or
          "Equity-Backed" ................................................................................................ 13

          1.   Falsity ................................................................................................... 13

          2.   Materiality .............................................................................................. 15

          3.   Scienter ................................................................................................. 16

     B.   Unicoin, Inc. and Konanykhin Fraudulently Claimed the Unicoin Tokens Were "SEC-
          registered" and "U.S.-registered" ......................................................................... 16

          1.   Falsity ................................................................................................... 16

          2.   Materiality .............................................................................................. 17

          3.   Scienter ................................................................................................. 18

     C.   Sales of Rights Certificates ................................................................................... 19

          1.   Falsity ................................................................................................... 19

          2.   Materiality .............................................................................................. 20

          3.   Scienter ................................................................................................. 22

     D.   Real Estate Value .............................................................................................. 22

          1.   Falsity ................................................................................................... 22

2. Materiality ................................................................................................. 24

3. Scienter ..................................................................................................... 26

E. Timing of Real Estate Announcements ...................................................... 26

F. Runway ......................................................................................................... 28

III. Offers and Sales of Rights Certificates Violated Section 5 .......................... 29

IV. The Complaint Adequately Alleges That Moschini and Dominguez Received Money or Property .......................................................................................... 34

V. There Is No Basis To Dismiss The SEC's Request For Disgorgement ............... 36

CONCLUSION ..................................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Abrams v. Blackburne & Sons Realty Cap. Corp.*,
  2019 WL 8640656 (C.D. Cal. Dec. 2, 2019)....................................................25

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145 (2d Cir. 2021) ............................15, 18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................10

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) .........................22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...................................................10, 11

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ........................................29

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).......16

*Conflict Int'l, Inc. v. Komorek*, 2024 WL 1347577 (S.D.N.Y. Mar. 29, 2024) ............................37

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ........................................15

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985)..............................................................16

*Gregory v. Daly*, 243 F.3d 687 (2d Cir. 2001) .....................................................11

*Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) ............................30

*Herman v. Legent Corp.*, 1995 WL 115879 (4th Cir. Mar. 20, 1995)...........................................28

*Mabry v. Neighborhood Def. Serv.*, 769 F. Supp. 2d 381 (S.D.N.Y. 2011)....................................30

*In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566 (S.D.N.Y. 2010) ...............................................15

*McMahan & Co. v. Wherehouse Ent., Inc.,* 900 F.2d 576 (2d Cir. 1990) ......................................21

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) .....................................................11

*In re Morgan Stanley Info. Fund Sec. Litig.*), 592 F.3d 347 (2d Cir. 2010)................................15

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)...........................................................16, 19, 22

*Oh v. Hanmi Fin. Corp.*, 621 F. Supp. 3d 1075 (C.D. Cal. 2022).................................................25

*In re Pajaro Dunes Rental Agency*, 174 B.R. 557 (Bankr. N.D. Cal. 1994)................................25

*Rice v. Intercept Pharms., Inc.*, 2022 WL 837114 (S.D.N.Y. Mar. 21, 2022)................................22

*Schick v. Ernst & Young*, 808 F. Supp. 1097 (S.D.N.Y. 1992)................................................27

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2011) ..............................................22

*SEC v. Bronson*, 14 F. Supp. 3d 402 (S.D.N.Y. 2014) ......................................30, 31, 34

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) ............................................30, 31, 32

*SEC v. Cole*, 2015 WL 5737275 (S.D.N.Y. Sept. 29, 2015) ........................................36

*SEC v. Collector's Coffee, Inc.*, 697 F. Supp. 3d 138 (S.D.N.Y. 2023)..........................24

*SEC v. Earle*, 751 F. Supp. 3d 1044 (S.D. Cal. 2024)..........................................32

*SEC v. Farmer*, 2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) ................................36

*SEC v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019) ...........................................37

*SEC v. Genesis Glob. Cap., LLC*, 2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024) ........36

*SEC v. Honig*, 2020 WL 906383 (S.D.N.Y. Feb. 25, 2020)....................................37

*SEC v. Ishopnomarkup.com, Inc.*, 2007 WL 2782748 (E.D.N.Y. Sept. 24, 2007).......31

*SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020).........................34

*SEC v. Liberty*, 2021 WL 664834 (D. Me. Feb. 19, 2021) ....................................36

*SEC v. Longfin Corp.*, 316 F. Supp. 3d 743 (S.D.N.Y. 2018) ................................32

*SEC v. MiMedx Grp., Inc.*, 2022 WL 902784 (S.D.N.Y. Mar. 28, 2022).................35

*SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012) ......................................................16

*SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308 (S.D.N.Y. 2023) ..........................33

*SEC v. Sason*, 433 F. Supp. 3d 496 (S.D.N.Y. 2020) ..........................................30

*SEC v. SeeThruEquity, LLC*, 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) .............12

*SEC v. Shapiro*, 2018 WL 2561020 (S.D.N.Y. June 4, 2018) ...............................35

*SEC v. Sourlis*, 851 F.3d 139 (2d Cir. 2016) .....................................................16

*SEC v. Stoker*, 865 F. Supp. 2d 457 (S.D.N.Y. 2012)..........................................35

*SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240 (N.D.N.Y. Feb. 19, 2014).................31

*SEC v. Syro*n, 934 F. Supp. 2d 609 (S.D.N.Y. 2013)...........................................35

*SEC v. Tellone Mgmt. Grp., Inc.*, 2022 WL 18582314 (C.D. Cal. Dec. 19, 2022) .....36

*SEC. v. Tourre*, 2014 WL 61864 (S.D.N.Y. Jan. 7, 2014) ....................................36

*SEC v. True North Fin. Corp.*, 909 F. Supp. 2d 1073 (D. Minn. 2012) ...................25

*SEC v. Verdiramo*, 890 F. Supp. 2d 257 (S.D.N.Y. 2011) ....................................31

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) .............................................36

*SEC v. Winemaster*, 529 F. Supp. 3d 880 (N.D. Ill. 2021)....................................12

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991)...............................22

## *Regulations*

15 U.S.C. § 77b(a)(3)............................................................................20

15 U.S.C. § 77b(a)(11)..........................................................................32

15 U.S.C. § 77d(a)(1)............................................................................32

15 U.S.C. § 77e(a) ...................................................................................................18

15 U.S.C. § 77q(a)(1) ..............................................................................................11

15 U.S.C. § 77q(a)(2) ..................................................................................11, 34, 35

15 U.S.C. § 77q(a)(3) ..............................................................................................11

15 U.S.C. § 78c(a)(79) ............................................................................................15

15 U.S.C. § 78l(g) .....................................................................................................3

15 U.S.C. § 78u-4 ...................................................................................................29

15 U.S.C. § 78u-5(c)(1) ..........................................................................................30

## *Rules*

17 C.F.R. § 230.502(a) ...........................................................................................34

17 C.F.R. § 230.506. ........................................................................................31, 32

17 C.F.R. § 240.10b-5 ............................................................................................11

Fed. R. Civ. P. 9 (b) ...........................................................................................2, 11

Fed. R. Civ. P. 12(b)(6) ........................................................................10, 13, 15, 21

Fed. R. Civ. P. 15(a)(2) ..........................................................................................37

## *Secondary Sources*

*Sale*, Black's Law Dictionary (12th Ed. 2024) .......................................................20

A MoMent Of Xen Live iHeartRadio & Tv w/t Xen Sams, *Economically Empowering Women & The Power of Unicoin*, at 12:54 (YouTube, Mar. 24, 2024), https://www.youtube.com/watch?v=YgsmZRx_XZc .............................................14

## INTRODUCTION

The SEC's Complaint alleges that, from February 2022 until at least May 2025 (the "Relevant Period"), Defendants[1] engaged in an extensive fraudulent marketing campaign to sell certificates ("Rights Certificates") that purportedly conveyed rights to receive crypto tokens called "Unicoins" ("Unicoin tokens"). Defendants touted Unicoin tokens as exciting "next-generation" crypto assets that, unlike other popular tokens, were "asset-backed" and "SEC-registered." Over social media channels and major media outlets, Defendants touted billions of dollars in real estate acquisitions that they claimed backed the Unicoin tokens, and significant and growing investor demand culminating in "$3 Billion in unicoin sales!" by June 2024.[2] Defendants claimed that the real estate and other assets gave the Company a financial "runway" measured in "decades" or even "centuries."

All of these claims (and others alleged in the Complaint) were false and misleading. The Unicoin tokens were not "SEC-registered." Defendants never intended to secure them with any assets, much less billions of dollars in real estate. The Company's real estate was worth but a small fraction of the billions Defendants claimed, and most of the touted deals never actually closed. Sales of Rights Certificates amounted to no more than $110 million, a small fraction of the billions Defendants claimed to have sold. And far from having a "runway" of "decades" or "centuries," Defendants knew that the Company likely did not have sufficient cash to sustain its

---

[1]    "Defendants" refers throughout to Alexander Konanykhin, Maria Silvina Moschini, Alejandro Dominguez (together, the "Individual Defendants") and Unicoin, Inc. ("the Company"). It does not include named defendant and former general counsel Richard Devlin, because he consented to entry of a final judgment against him (entered on May 22, 2025).

[2]    This memorandum attempts to make clear the distinction between the Rights Certificates and Unicoin tokens, although Defendants often referred to them interchangeably.

operations for more than a year. All told, through their fraudulent scheme Defendants raised over $100 million from over 5,000 investors who purchased Rights Certificates.[3]

Defendants' Motion mostly ignores the Complaint's detailed and well-pleaded facts. Defendants first assert the SEC's allegations are impermissibly vague and constitute a "shotgun" pleading. But the Complaint spells out in detail each element of each fraud claim against each defendant, easily satisfying Federal Rule of Civil Procedure 9(b). Defendants similarly attack as insufficient the Complaint's allegations regarding the falsity and materiality of their alleged statements, and that they made them with scienter. Again, Defendants avoid the Complaint's allegations or urge tortured readings of Defendants' plain words, often misconstruing the law in the process and, at best, raising factual disputes inappropriate for resolution at this stage. For the same reasons, Defendants' arguments regarding Konanykhin and Unicoin, Inc.'s violations of the registration requirements, and Dominguez's and Moschini's supposed lack of personal gains, likewise fail. The Motion should be denied.

## STATEMENT OF FACTS

### I.     The Company and Its Venture Into Crypto

The Company began in 2015 as "TransparentBusiness, Inc.," a purported "software-as-a-service" business that provided remote workforce monitoring and management software.[4] Compl. ¶¶ 32, 35. In April 2021, the Company acquired a majority ownership interest in Unicorns, Inc., a media company founded by Konanykhin that produced a streaming reality series called "Unicorn Hunters." *Id*. ¶ 36.

---

[3]     Defendants do not dispute that Unicoin, Inc. offered and sold its Rights Certificates as securities subject to the antifraud and other protections of the federal securities laws.

[4]     For the sake of clarity, this Memorandum refers to both Unicoin, Inc. and Transparent Business, Inc. as "Unicoin, Inc." or "the Company."

"Unicorn Hunters" showcased private companies seeking publicity for their private securities offerings. *Id.* ¶ 37. A "Unicorn" is an industry term for private start-ups valued at over $1 billion. *Id*. ¶ 82. In return for featuring these private companies on its show, Unicorns, Inc. received equity, stock options, or warrants in certain of those companies. *Id*. ¶ 37. In its public financial reporting to the SEC, the Company has never valued its combined interests in these companies at more than $10.2 million, *id.* ¶ 38, and, although Defendants still refer to them as "high-growth 'unicorn' companies," Mot. 1, there was no basis to value any of them anywhere close to $1 billion, Compl. ¶ 38.

In February 2022, the Company changed its name to "Unicoin, Inc." and pivoted to offering and selling Rights Certificates, which purported to grant rights to future crypto assets called "Unicoins." *Id*. ¶ 39. By this point, Unicoin, Inc. had registered its common stock with the Commission—not "voluntarily" as part of "a strategy of transparency, compliance, and responsible innovation," as Defendants' claim, Mot. 1, but because registration was required by the federal securities laws. 15 U.S.C. § 78l(g) (requiring that issuers with more than $10 million in assets register with the Commission any class of securities held of record by 2,000 or more persons). During the Relevant Period, the Company's incoming "cash flows" came primarily from the sale of Rights Certificates, without which the Company consistently warned it would not be able to continue as a going concern. Compl. ¶¶ 16, 321-26.

## II.    The Individual Defendants

Konanykhin has always been the Company's CEO, and since March 2024 he has been chairman of the board. *Id.* ¶ 28. Konanykhin owns 36% of Unicoin, Inc's common stock and controls the Company's operations and decision-making. *Id.*

Moschini was the Company's president and chairwoman of its board from 2015 to March 2024. *Id.* ¶ 29. She left the board in March 2024 and rejoined on or about June 28, 2024. *Id.* Since 2021, Moschini has been CEO of Unicorns, Inc., an operating subsidiary of the Company. *Id.* Moschini owns 36.6% of the Company's common stock.

Dominguez was the Company's chief investment officer from December 2023 through August 2024. *Id.* ¶ 30. He served as the Company's investor relations officer from April 2022 to December 2023, and as vice-president of corporate development from March 2022 to April 2022. *Id.*

## III.    The Unicoin Token PPMs

In February 2022, the Company posted to its website the first in a series of private placement memoranda ("PPMs") detailing the terms of its offer and sale of Rights Certificates. *Id.* ¶¶ 41-43. Konanykhin had authority over the PPMs' content. *Id.* ¶ 54.

According to the initial PPM, the Rights Certificates entitled buyers to "pre-purchase and reserve . . . UniCoins, which are securities tokens being developed for future issuance." *Id.* ¶ 42. The initial PPM priced Rights Certificates at $0.05 per Unicoin token and was the first of many nearly identical PPMs the Company issued—each successive PPM reflecting arbitrary price increases. *Id.* ¶ 43. Each PPM stated that the Rights Certificates were "securities" under the Securities Act of 1933, offered under Regulation D of that Act. *Id.* ¶¶ 47-51.

## IV.    Defendants' Unicoin Token Marketing Blitz

To generate investor interest in the Rights Certificates, the Company embarked on a widespread advertising and public relations campaign consistent with the initial PPM's stated goal of "massive brand visibility." *Id.* ¶ 45. This campaign included: billboards in Times Square and airports in major U.S. cities; advertisements on cable news networks and major news

websites; paid advertisements on popular social media platforms; and paid promotional interviews produced and distributed by a digital media firm. *Id.* ¶ 56.

Each Individual Defendant also personally promoted the Company's offer and sale of Rights Certificates, including through speaking engagements and appearances at investor conferences and Company shareholders' meetings, which they recorded and posted to the Company's website. *Id*. ¶ 58. The Individual Defendants also made hundreds of promotional tweets and posts to Instagram, Facebook, LinkedIn, and the Company's website, all of which were publicly accessible worldwide. *Id*. ¶ 59.

Finally, the Company and Konanykhin regularly issued so-called "Investor Updates": periodic promotional communications that Konanykhin authored, posted on a website owned by the Company, and disseminated to the Company's large email distribution list of actual and potential investors. *Id*. ¶ 60. Konanykhin was responsible for the content of these Investor Updates, and he signed each one with his name and title. *Id*. ¶ 61.

## V.     The Marketing Campaign Was Fraudulent

Defendants' marketing centered on false statements that were part of a multi-pronged fraudulent scheme to portray Rights Certificates as investments in stable, profitable, and highly-sought-after "next-generation" crypto assets. It included four main categories of misrepresentations.

### A.     Misrepresentations Regarding the Unicoin Tokens and Rights Certificates

Defendants misled investors about the fundamental attributes they claimed made these investments so attractive. Each of the Individual Defendants falsely claimed in public forums that Unicoin tokens were "asset-backed"—more specifically, "backed" by billions of dollars' worth of real estate and equity interests in promising pre-IPO companies. For example,

Konanykhin approved the February 2022 PPM's representation that "Coin holders will . . . be stakeholders of a major global fund of innovations and will receive dividends when distributed by UniCoins, Inc.," *id.* ¶ 45, and later stated in a December 2023 interview that "Unicoin is assets-backed, dividend-paying, regulations-compliant, publicly reporting, and audited," *id.* ¶ 91; *see also id.* ¶ 94. Moschini described Unicoin tokens as "backed by real world assets" in a February 2024 interview. *Id.* ¶ 92. Dominguez said at an August 2022 conference that the Unicoin token would be "the first coin that's actually equity backed and pays dividends" and that "we're going to create a bunch of different funds in different industries which are going to back Unicoin." *Id.* ¶¶ 86, 88; *see also id.* ¶ 95. But as Konanykhin, Dominguez, and Moschini later testified, they never intended Unicoin tokens to be backed by assets. *Id.* ¶¶ 98-105.[5]

The Company and Konanykhin also made misleading statements about the token's regulatory status. For example, Konanykhin called the Unicoin token "SEC-registered" in a December 2022 press release, *id.* ¶ 107, and in a January 2025 investor update he circulated an article describing the Unicoin token as "a U.S.-registered, U.S.-audited, and U.S.-regulated cryptocurrency," *id.* ¶ 109. But Konanykhin knew that neither the Unicoin token nor Rights Certificates were ever registered with the SEC. *Id.* ¶¶ 111-13.

### B.    Misrepresentations Regarding Real Estate Acquisitions

Defendants repeatedly and falsely claimed the token was "backed" by real estate worth billions of dollars. But the Company never acquired most of these properties, and Defendants vastly overstated their values.

---

[5]    Unicoin tokens were also described as "asset-backed" in PPMs for the sale of the Company's *stock*, thus misrepresenting the token's characteristics not just to potential token investors but also to investors in Unicoin, Inc. itself. Compl. ¶ 81.

For example, between September 2023 and January 2024, Defendants announced acquisitions of properties in Argentina, Thailand, Antigua, and the Bahamas, reporting appraised values totaling more than $1.4 billion. Defendants claimed to have acquired these properties pursuant to Unicoin, Inc.'s so-called "140%" program, under which Defendants claimed that the Company was swapping real estate for Rights Certificates worth 140% of the real estate's appraised value. *Id.* ¶¶ 158-63. But three of those four transactions never closed, and the actual combined value of the four properties was no more than $300 million.

As to Argentina, the Company and Konanykhin repeatedly represented that the property was valued at $150 million, *id.* ¶¶ 179-85, when they knew the Company had never received an appraisal, *id.* ¶¶ 167-68, 186-89. The Company now values the property at under $600,000. *Id.* ¶ 192.

As to Thailand, the Company and Konanykhin touted a $335 million deal, implying a $241 million appraised value even though the only so-called appraisal they had obtained valued the as-is undeveloped property at less than $10 million. *Id.* ¶¶ 193-94, 199-202, 211-18. Their $241 million figure used the *future cost* of building a resort on the undeveloped land as a proxy for its current, undeveloped value. *Id.* ¶¶ 199-202. In fact, the property was worth no more than $15 million, and the deal never closed. *Id.* ¶¶ 201-20.

As to Antigua, the Company and Konanykhin touted the acquisition as worth $680 million, *id.* ¶¶ 235-38, knowing there was no appraisal to support that figure and ignoring numerous red flags calling it into doubt, *id.* ¶¶ 225-34. The property was worth no more than $89 million. *Id.* ¶ 240. That deal, too, never closed. *Id.* ¶ 242.

As to the Bahamas, the Company, Konanykhin, and Dominguez knew of prior fraud allegations against the sellers. *Id.* ¶¶ 250-55. All Defendants were also aware of concerns about

whether the sellers actually owned the property, yet they conducted little or no due diligence on the issue. *Id.* ¶¶ 257-65. Instead, Konanykhin and Moschini reviewed and approved a press release claiming a $554 million deal value. *Id.* ¶¶ 271-79. Moschini was responsible for social media posts making the same claims, *id.* ¶¶ 280-82, one of which Dominguez reposted on his own LinkedIn page, *id.* ¶ 282, and Konanykhin touted the acquisition as a $554 million deal in investor updates, *id.* ¶¶ 283-84. In reality, the property was not worth more than $132 million, and the deal never closed. Compl. ¶¶ 273, 294.[6]

Based largely on these four transactions, and despite the knowledge afforded by their key role in the 140% program, *id.* ¶¶ 164-68, 171-72, 307-08, each Defendant also repeatedly misrepresented the total value of the Company's closed real estate deals, *id.* ¶¶ 295-306. Konanykhin successively announced that Unicoin, Inc. had closed $1.2 billion, $2.3 billion, and then $2.5 billion in real estate deals. *Id.* ¶¶ 298, 302, 306. Dominguez and Moschini repeatedly made similar claims about a billion-dollar real estate portfolio. *Id.* ¶¶ 298, 300, 304. In reality, the Company had acquired less than $1.5 million in real estate by the end of 2024. *Id.* ¶ 305.

### C.    Misrepresentations Regarding the Company's Sales of Rights Certificates

Throughout the Relevant Period, Defendants repeatedly overstated Rights Certificates sales, *id.* ¶ 119, including in dozens of statements on social media and in investor communications touting fundraising "milestones." For example, Konanykhin claimed in a December 2022 Investor Update that Unicoin, Inc. had sold $250 million in Rights Certificates, *id.* ¶ 125, and Moschini made the same claim in a tweet the next day, *id.* ¶ 124. In fact, by the end of 2022, only $37.5 million in certificates had been sold. *Id.* ¶ 129. Konanykhin, Moschini,

---

[6]    The purported acquisition was also touted in an April 26, 2024, PPM relating to the sale of Unicoin, Inc. common stock, again extending misrepresentations to investors in the Company itself. Compl. ¶ 285.

and Dominguez later claimed on social media that sales exceeded three billion dollars, when only $110 million in Rights Certificates had been sold. *Id.* ¶¶ 134, 136.

Defendants based these false and misleading statements in part on the Company's purported "Five Year Plan," whereby investors could secure a five-year *option* to purchase Rights Certificates by pledging 20% of the total anticipated price as collateral and later making annual payments. *Id.* ¶¶ 137, 139. But investors had no obligation to make the annual payments and could instead decline the purchase and forfeit only their 20% collateral. *Id*. ¶¶ 140-41. Most never made any payments. *Id.* ¶ 143. Each of the Defendants knew that their claims of billions of dollars in Unicoin token sales were, at best, misleading, based on regular briefings they received from Company employees. *Id.* ¶¶ 146-52.

### D.    Misrepresentations Regarding Unicoin, Inc.'s Financial Condition

Defendants misrepresented the Company's financial condition, falsely claiming it had a "runway" measured in "decades" or even "centuries." For example, in February 2024, Dominguez claimed that "just with the real estate alone, you could measure [the Company's runway] in decades." *Id.* ¶ 334. But as he knew as the head of Unicoin, Inc.'s real estate program, *id.* ¶ 308, the Company held less than $700,000 in real estate at the time, *id.* ¶ 335. Konanykhin similarly falsely claimed in April 2024 that Unicoin, Inc. had acquired over $2 billion in real estate, and that getting to $3 billion would give the Company "a runway measured in centuries." *Id.* ¶ 338. The day before, however, he had signed a 10-K stating that the Company might not be able to continue operations for more than four months. *Id.* ¶ 337. And in July 2024 Moschini claimed Unicoin, Inc. had over $3 billion in real estate assets and was planning a September Initial Coin Offering (ICO) "with a runway for centuries." *Id.* ¶ 347. At the same time, the

Company was reporting a runway of no more than four months; Moschini was aware of its financial status because she received regular updates from the Company's CFO. *Id.* ¶¶ 346-48.

## VI.    All Offers and Sales of Rights Certificates were Unregistered

The Company's and Konanykhin's offers and sales of Rights Certificates throughout the Relevant Period were not registered with the Commission. No registration statement was ever in effect as to Rights Certificates. *Id.* ¶ 360. During the Relevant Period, Unicoin, Inc. sold over seven billion Rights Certificates, *id.* ¶ 362, and Konanykhin resold over 37.9 million Rights Certificates the Company had awarded him, *id.* ¶¶ 369-70, including by advertising that he was selling his own certificates in Investor Updates, *id.* ¶¶ 372-74. Konanykhin did not verify the accredited status of investors purchasing his certificates. *Id.* ¶ 383.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a complaint for sufficiency, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (quotations and citation omitted). Dismissal is only appropriate if the factual allegations in the Complaint are insufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## ARGUMENT

### I.     The Complaint Adequately Pleads Fraud with Particularity

Defendants first argue that the Complaint does not sufficiently plead fraud as to each Individual Defendant, ignoring the vast majority of the SEC's specific fraud allegations.[7]

Rule 9(b) requires the SEC to "(1) specify the statements that [it] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). The Complaint has done that for each Defendant. As set forth at pages 2-10 above, the Complaint specifies which fraudulent statements each of the Individual Defendants made, when they each made each of their false statements, and why each statement was false. No more is required.

Defendants' arguments regarding vagueness and impermissible group pleading ignore the dozens of specific allegations against each Individual Defendant and cherry-pick isolated paragraphs that purposely refer to fraudulent statements collectively. Mot. 5. But these examples simply provide context for Defendants' individual false claims that the tokens would be "asset-backed," Compl. ¶ 82; point out that there are many more examples similar to the specific statements cited, *id.* ¶ 90; and conclude a subsection setting forth specific fraudulent statements, *id.* ¶ 145—all of which are entirely proper.

---

[7]     Defendants' Motion only addresses their fraudulent statements and omissions, which the Complaint alleges were prohibited by Securities Act Section 17(a)(2) and Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b) thereunder; it does not challenge the other elements of the SEC's scheme liability claims under Securities Act Section 17(a)(1), (3) and Rule 10b-5(a), (c). Nor does Konanykhin challenge the Complaint's Exchange Act Section 20 control person claim as to him (other than disputing the primary violations). Therefore, if the Court agrees that the SEC adequately alleges Defendants' fraudulent statements or omissions, the scheme liability and control person claims should proceed as unchallenged.

Defendants also incorrectly claim the Complaint is an improper "shotgun pleading," asserting that they supposedly cannot determine which allegations relate to which of the SEC's alleged statutory violations. Mot. 6-7. Defendants ignore the commonsense rule that "incorporat[ing] by reference each of the preceding factual allegations does not make the complaint an impermissible shotgun pleading, so long as the complaint adequately puts the defendants on notice of the claims against them." *SEC v. Winemaster*, 529 F. Supp. 3d 880, 907 (N.D. Ill. 2021) (quotations omitted); *see also SEC v. SeeThruEquity, LLC*, 2019 WL 1998027, at *3 (S.D.N.Y. Apr. 26, 2019) (rejecting "shotgun pleading" argument where the complaint "readily makes clear which allegations of fact are intended to support which claim(s) for relief . . . describes each defendant's alleged misconduct. . . [and] clearly identifies the specific defendants to which each count applies"). As noted above, this is not a case where the Complaint "is grouping multiple defendants together and failing to set out which of the defendants made which of the fraudulent statements/conduct." *Winemaster*, 529 F. Supp. 3d at 907 (quotations omitted). The Complaint repeatedly identifies which Defendants made which fraudulent statements and why they were fraudulent. Compl. ¶¶ 10, 70, 84, 86-89, 91-97, 107, 109-10, 120-24, 130-35; 151-52; 184; 216; 218; 236; 284; 288; 298; 300; 302; 304; 306; 334-35; 338-39; 347-48. Indeed, Defendants' attempts to rebut those allegations in the remainder of the Motion show their plain understanding of the SEC's claims. Mot. 7-34.

## II.    The Complaint Sufficiently Pleads All Fraud Elements

Defendants next argue that the Complaint fails adequately to allege three fraud elements regarding each alleged misstatement: (1) falsity, (2) materiality, and (3) scienter. As explained below, these arguments either ignore or mischaracterize the Complaint's allegations—which amply allege these elements—as well as the applicable legal standards.

A.    **Defendants Fraudulently Claimed the Unicoin Token Would Be "Asset-Backed" or "Equity-Backed"**

As described at page 6 above, the Complaint alleges numerous false claims that the Unicoin tokens would be "asset-backed" or "equity-backed." Defendants claim that those statements were not misleading or material and that the Complaint does not sufficiently allege scienter. Defendants' arguments either ignore the Complaint's actual allegations or raise fact disputes inappropriate for resolution under Rule 12.

1.    Falsity

Defendants first argue they used the phrase "asset-backed" to refer to the Company rather than its eponymous tokens. Mot. 10. Setting aside that Defendants often ignored the distinction when speaking to investors, the three examples they cite show that this argument is implausible and, at best, raises factual disputes. Complaint paragraph 91 alleges Konanykin claimed that "Unicoin is assets-backed, dividend-paying, regulations-compliant, publicly reporting, and audited," which distinguished Unicoin tokens from bitcoin (another crypto asset). Konanykin's comparison to bitcoin makes clear he was referring to the Unicoin *token*, not the Company. As alleged in Complaint paragraph 92, Moschini referred to "Unicoin" as "backed by real world assets" in the context of an interview where she was clearly referencing Unicoin tokens. Although not specifically alleged in the Complaint, she preceded that statement by describing her vision as "a coin that could address the issues of the traditional crypto currencies."[8] This is consistent with Defendants' pattern of referring to the token as "Unicoin," as where Moschini

---

[8]    The SEC inadvertently omitted the word "tokens" from Paragraph 92 of the Complaint, which should allege that "Moschini described Unicoin ***tokens*** as 'backed by real word assets.'" Defendants do not deny that they frequently used the word "Unicoin" to refer to the token, as opposed to the Company. The referenced interview is no longer accessible on the Company's website but is still available online. *See* A MoMent Of Xen Live iHeartRadio & Tv w/t Xen Sams, *Economically Empowering Women & The Power of Unicoin*, at 12:54 (YouTube, Mar. 24, 2024), https://www.youtube.com/watch?v=YgsmZRx_XZc.

elsewhere stated that "we went to address the issues related to traditional cryptocurrencies like the high volatility, backing Unicoin with assets . . . . By now we have $1.5 billion in real estate assets *backing the regulated, transparent coin* that we built under SEC regulation." Compl. ¶ 300 (emphasis added). And Dominguez's statement about "asset-backed" was preceded by his statement clearly referencing the tokens: "To date, we have already sold over $2 billion worth of Unicoins." Mot. 10; Compl. ¶ 95.

Moreover, the Complaint alleges many similar statements that *indisputably* referred to the token. *E.g.*, Compl. ¶ 85 ("When you buy Unicoin, in essence you are getting a sliver of a portfolio of emerging growth companies, [] an equity stake."); 86 ("Unicoin Tokens are 'going to be the first coin that's actually equity-backed and pays dividends like a traditional stock would.'"); 78 (Konanykhin Investor Update); 79-81 (PPMs).

Defendants claim that any ambiguity about the terms "asset-backed" and "equity-backed" was cleared up by the PPMs' statement that the tokens would be "supported by" company assets. Mot. 11. But this phrase just echoes the "asset-backed" misstatements, or at best is ambiguous. Moreover, the PPMs elsewhere contain similar misleading assertions that token investors would be "stakeholders." *E.g.*, *id.* ¶¶ 45, 79-80. The few supposedly curative PPM statements are therefore insufficient, for the purposes of this motion, to negate Defendants' repeated misrepresentations. *See*, *e.g.*, *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 581 (S.D.N.Y. 2010) ("[C]orrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000))).

Similarly futile is Defendants' resort to the dictionary definition of "backed," which they suggest means "to support." Mot. 10-11 (quoting Merriam-Webster Third International Dictionary (2024)). Defining only half of the compound adjective "asset-backed" and taking it outside of the investment context is not persuasive, let alone dispositive under Rule 12.

  2. <u>Materiality</u>

Defendants argue that their misstatements about the token being "asset-backed" were immaterial because they would have been reasonably understood "to differentiate between the meme coins flooding the market, which have no function or underlying value, with tokens such as unicoins, which 'won't just be thin air based on supply and demand.'" Mot. 12 (quoting Compl. ¶ 88). But this just concedes the term's importance to investors. And the notion of "underlying value" echoes the misrepresentation that coin holders had an equity stake in the underlying assets. Regardless, materiality is a mixed question of law and fact that will "rarely be dispositive in a motion to dismiss." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)). Defendants' question-begging assertions do not establish that the term "asset-backed" was "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id*. (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

Defendants also argue that all of their misstatements can be excused as "forward-looking expressions of optimism." Mot. 12. But Defendants never *intended* to grant investors an equity stake in the underlying assets, Compl. ¶¶ 98-105, and so could not have been expressing "optimism" about the prospect. And these statements were central to Defendants' sales pitch, not "'puffery" that was "too general to cause a reasonable investor to rely upon them." *City of*

*Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (internal quotations and citations omitted).

3.    Scienter

Defendants dispute the Complaint's scienter allegations by criticizing its characterizations of their prior testimony. Mot. 13-14. But even in their Motion, Defendants do not dispute that they never intended to grant investors an equity interest in the assets that supposedly "backed" the tokens. They also do not dispute that they made and/or disseminated the statements alleged. Since the Complaint adequately pleads that those statements are both misleading and material, it also adequately pleads, at the least, Defendants' "reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) (quoting *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)); *see also Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (explaining that "strong inference" of scienter arises when defendants "knew facts or had access to information suggesting that their public statements were not accurate").

**B.    Unicoin, Inc. and Konanykhin Fraudulently Claimed the Unicoin Tokens Were "SEC-registered" and "U.S.-registered"**

Defendants dispute that the Company and Konanykhin misrepresented Unicoin *tokens* as "SEC-registered" or "U.S.-registered," claiming the statements referred to the *Company*, not the token; they again argue the PPMs cleared up any ambiguity. Mot. 14-18. Defendants resist the plain meaning of their words and, at best, raise factual disputes.

1.    Falsity

As explained at pages 6-7 above, the Complaint alleges that Unicoin, Inc. and Konanykhin described the Unicoin token as "an SEC-registered security token" in order to

assure investors that it was a more stable alternative to volatile crypto assets. Compl. ¶ 107. They similarly described the Unicoin token as "the only cryptocurrency that is U.S.-registered, U.S.-based, U.S-regulated," *id.* ¶ 108, and "uniquely positioned as a U.S.-registered, U.S.-audited, and U.S.-regulated cryptocurrency," *id.* ¶ 109, making it preferable to "foreign cryptocurrencies like Bitcoin," *id.* ¶ 110.

Defendants claim these statements referred to "Unicoin (the company), not unicoins (the future cryptocurrency)." Mot. 14. In other words, they argue the words "SEC-registered security token," *id.* ¶ 107, could not reasonably be understood to refer to a token. Defendants' argument contradicts the plain language of the statements, and again raises a factual dispute at best.[9]

        2.    <u>Materiality</u>

Defendants also challenge the materiality of these false statements. Mot. 16-18. As noted above, materiality is a mixed question of law and fact rarely appropriate for resolution on a motion to dismiss. *Altimeo*, 19 F.4th at 151. Defendants' arguments at best raise an issue of fact as to whether the false statements were material.

First, Defendants declare it "unfathomable" that accredited investors could believe a crypto asset would be registered with the SEC before being distributed, Mot. 16, ignoring that non-exempt securities must be registered with the SEC *before* issuance, 15 U.S.C. § 77e(a). The Company also sold Rights Certificates to foreign investors who may not have been accredited, Compl. ¶ 358, and Defendants therefore do not dispute materiality as to those investors.

---

9    As Defendants note, the Complaint does not allege specific statements by Dominguez or Moschini on this issue. It does, however, specifically allege many other misstatements by Dominguez and Moschini sufficient to state its fraud claims against them. *See, e.g., infra* at 19-22 (discussing Moschini and Dominguez's misstatements relating to the amount of Rights Certificates sold); 23-28 (misstatements relating to real estate sales); 28-30 (misstatements relating to Unicoin, Inc.'s runway).

Defendants also claim these are inactionable forward-looking statements. Mot. 17. But Konanykhin's present-tense statements appear on their face to describe present, rather than future, characteristics. *See* Compl. ¶¶ 107-10. Defendants' misdirection concerning statements about the future listing of *the Company*, Mot. 16-17, do not negate Konanykhin's present-tense statements about Unicoin *tokens*, Compl. ¶¶ 107, 109-10.

Finally, Defendants again claim the PPMs corrected any misperception about the Unicoin token being "SEC-registered." Mot. 16. Whether such statements were sufficient to cure repeated misrepresentations is an issue of fact. Nor can the misstatements be cured by irrelevant disclosures of "risk[s] associated with Unicoin's unregistered offerings," Mot. 17, since the SEC's fraud allegations are not based on undisclosed investment risks, but rather on fraudulent affirmative statements.

        3.   <u>Scienter</u>

Defendants argue that the Complaint does not adequately plead scienter regarding these false statements. Mot. 18. But Defendants essentially concede that any representation that *the token*, as opposed to *the company*, was "SEC-registered" or "U.S.-registered," would have been false. Unsurprisingly, Defendants do not claim Unicoin, Inc. and Konanykhin had a good-faith belief that the tokens were SEC-registered when they described the tokens as "SEC-registered." *See*, *e.g.*, Compl. ¶¶ 352-53, 382-85. Should the Court agree that the statements identified in the Complaint would be reasonably understood to describe the token (as they plainly would have been), and that the false representation was material (as it plainly was), the Complaint's allegations sufficiently show that the Company and Konanykhin recklessly made these false statements. *See Novak*, 216 F.3d at 311.

### C.    Sales of Rights Certificates

As described at page 9 above, Defendants exaggerated Rights Certificates sales to deceive investors into believing the token was far more successful than it was. At one point, the Company claimed "$3 Billion in unicoin sales!" when in fact it had sold $110 million in Rights Certificates. Compl. ¶¶ 134-36. Defendants' claim was based in part on their "Five Year Plan" program, whereby investors could use their existing Rights Certificates as collateral to reserve an *option* to purchase five times as many certificates. *Id*. ¶¶ 137-41. In a steady stream of announcements, Defendants claimed the full 5x multiple of the collateral was sold, despite investors having purchased a mere option to buy the Rights Certificates, and even though the Company had not received, and the investors had no obligation to make, those payments. *Id*. ¶¶ 141-46. Defendants continued to make these representations even after learning that numerous investors were not planning to exercise their option. *Id*. ¶¶ 147-52.

Defendants wave away these detailed allegations as a mere "accounting dispute." Mot. 19. In doing so they once again mischaracterize the allegations, which turn not on accounting principles but on the reasonable understanding of investors. Defendants also again prematurely raise a factual dispute by invoking insufficient curative disclosures.

### 1.    Falsity

Defendants argue the sales announcements were accurate because "it is common practice for businesses to report the unrealized value of installment contracts as sales." Mot. 19. But the Five Year Plan contracts were not "installment contracts." As Defendants' own brief describes them, the contracts gave "an *option to purchase* [] Rights Certificates by pledging 20% of the purchase prices as collateral" and making annual payments thereafter. Mot. 18 (emphasis added).

19

By contrast, Defendants elsewhere acknowledge that sales are "*commitments* to purchase." Mot. 19 (emphasis added).

Defendants' own authorities confirm that the Five Year Plan did not accomplish "sales." The Securities Act provision they cite deems the future right to subscribe to a security a sale only "upon the exercise of such right." 15 USC § 77b(a)(3). Similarly, Black's Law Dictionary defines a sale as "The transfer of property or title for a price" and "The agreement by which such a transfer takes place." *Sale*, Black's Law Dictionary (12th ed. 2024). Here, Defendants did not transfer title to the future tokens or the tokens themselves, but merely the option to consummate such sales in the future.

Even if it were technically accurate to label these options "sales"—and it was not— touting billions in such "sales" was at least materially misleading by omission. *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("[D]isclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."). Defendants announced tens of millions of dollars of new sales every few weeks, without disclosing that they often involved no new money coming in or that investors were not required to pay these sums. Compl. ¶¶ 119-36. Even worse—and left unaddressed in the Motion—Defendants continued misleadingly reporting token sales *after* learning that investors were not planning to make payments on their Five Year Plan transactions. Compl. ¶¶ 147-52.

    2.    Materiality

Defendants argue that certain "clarifying information" dispelled any misunderstanding about the sales announcements, but these inadequate and late disclaimers do not help their case, let alone resolve the issue of materiality for purposes of Rule 12.

Defendants first claim that one iteration of one of the fourteen sales announcements, Compl. ¶¶ 120-34, disclosed that the sales number included Five Year Plan payments, Mot. 20 (quoting Compl. ¶ 121). But the announcement did no such thing, evidenced by the fact that their quotation grafts the middle of one sentence to the end of another from a different paragraph, thus changing the thrust of the message. *Compare* Mot. 20 (announcement "conspicuously disclosed that the amount included over $100 million in 'Accounts Receivable, secured by collateral,' from buyers 'taking advantage of our Buy Now, Pay Later terms.'"), *with* Mot. 20 Ex. G at 1 (noting in one paragraph that "[o]ur portfolio of Accounts Receivable, secured by collateral, now exceeds $100M," and two paragraphs further down that "you can still acquire *unicoins* at the introductory 10c/u pricing, taking advantage of our Buy Now, Pay Later terms"). In any event, this one statement would not cure fraud in the other thirteen announcements. At best, the "disclosure" raises an issue of fact.

Defendants next claim they pointed investors to correct sales figures in their quarterly Commission filings. Mot. 20-21. But again, this is at best an issue of fact because "not every mixture with the true will neutralize the deceptive." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991). Moreover, Defendants' supposed curative disclosures consistently post-dated their fraudulent announcements. Compl. ¶¶ 119-36.[10]

---

[10] *In re Bank of Am. AIG Disclosure Sec. Litig.*, is inapposite because the investors there were aware of the allegedly omitted information and no affirmative misstatement was alleged. 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014). Similarly, *Rice v. Intercept Pharms., Inc.*, stands for the simple proposition that "disclosure [] made in the middle of an SEC filing, rather than at the beginning, does not render that disclosure 'buried.'" 2022 WL 837114, at *18 (S.D.N.Y. Mar. 21, 2022).

3.      Scienter

Defendants' scienter argument is based on the false premise that "[t]his is an accounting dispute, not a fraud claim." Mot. 19. Not so. Defendants knew that investors were not obligated to purchase Rights Certificates beyond the 20% collateral they pledged, Compl. ¶¶ 141-46, and eventually knew those investors did not plan to make further payments, *Id*. ¶¶ 147-48. Defendants nonetheless repeatedly claimed that those Rights Certificates had been sold in full. *Id*. ¶¶ 119-36, 149-52. These allegations sufficiently plead scienter. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2011) ("Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." (citing *Novak*, 216 F.3d at 308)).

**D.      Real Estate Value**

Defendants urge dismissal of claims based on their statements about the value of the Company's alleged real estate acquisitions because the Complaint fails adequately to allege falsity, materiality, and scienter. These familiar arguments likewise fall flat.

1.      Falsity

Defendants contend that their statements concerning the Company's real estate transactions were not false because they reported "deal value" or "investment value"—that is, "the *price* at which the property was purchased, measured in the value of unicoins swapped for the land." Mot. 22. This ignores the SEC's fraud theory and the scores of Complaint allegations spelling it out.

As explained at pages 7-9 above, the Company claimed to have purchased real estate under its 140% program, which, as the name suggests and the Company took pains to emphasize,

tied the price of each property purchase to "140% of its *appraised* value." Compl. ¶ 158 (emphasis added); *see also id.* ¶¶ 159-63; Mot. Ex. J at 42-43 (showcasing social media and airport advertising). Konanykhin explained that the program would allow the Unicoin token to be backed by assets "of unquestionable value," which would "further differentiate [it] from . . . assetless cryptocurrencies." *Id.* ¶ 160. Therefore, any deal announced under the 140% program necessarily implied an underlying appraisal for ~71% of the deal value. Defendants acknowledge as much. *See* Mot. 22 (citing disclosure of the "method for calculating th[e] value" of each deal). Several of Defendants' misstatements made this explicit. *See* Compl. ¶¶ 181; 214; *see also* Mot. Ex. J at 18-20.

The Complaint's detailed allegations show Defendants had no reasonable basis to support the reported valuations. The Company announced a $150 million appraised value for mining rights in Argentina when it had no appraisal at all. Compl. ¶¶ 179-87. The Company also had no appraisal for the Antigua property when Konanykhin announced that deal for property "valued at US$680M." *Id.* ¶ 236. The Company indicated that the Thailand property was appraised for $241 million when the seller's own so-called "appraisal" showed an as-is value of less than $10 million. *Id.* ¶¶ 202, 211-18. And it announced the acquisition of Bahamas property "valued at $554 million" when appraisers could not even confirm title or explain why government buildings were on the supposedly "vacant" property. *Id.* ¶¶ 257-63.[11] These Complaint allegations, along

---

[11]    Defendants argue no false statements as to Argentina, Antigua, or Thailand are attributed to either Moschini or Dominguez, and thus that no claim can be brought against them. As discussed *supra* at 17 n.9, the Complaint alleges many other misrepresentations by Moschini and Dominguez, which amply support the fraud claims against them. And they can be held liable for taking part in the broader scheme to defraud investors, which Defendants have not otherwise challenged. *See supra* at 11 n.7.

with allegations that the properties were indeed worth much less than the stated value, *see id*
¶¶ 192, 201, 240, 273, are more than sufficient to show the stated values were false.

        2.    <u>Materiality</u>

Defendants argue that misstatements as to property value were immaterial because
appraisals are inherently subjective opinions, and therefore that the SEC must show Defendants
"either (a) did not believe them, or (b) omitted material information about them." Mot. 24. On
the first, Defendants' doubts about their own appraisals are discussed below in connection with
scienter; and on the second, the Complaint clearly alleges material omissions. And Defendants'
supposed curative disclosures are no help to them.

First, it was obviously material that *no* appraisals existed for the Argentina and Antigua
deals at the time they were announced. Compl. ¶¶ 187-88, 227-28; *see, e.g.*, *SEC v. Collector's
Coffee, Inc.*, 697 F. Supp. 3d 138, 167 (S.D.N.Y. 2023) (finding false statement of contract value
purportedly based on appraisal that defendant did not actually have to be material); *see also Oh v.
Hanmi Fin. Corp.*, 621 F. Supp. 3d 1075, 1086 (C.D. Cal. 2022). Same for allegations that
Defendants had documents suggesting the Argentina property was worth half of what the
Company and Konanykhin advertised. Compl. ¶¶ 188-89; *see, e.g.*, *SEC v. True North Fin.
Corp.*, 909 F. Supp. 2d 1073, 1108 (D. Minn. 2012) (finding genuine dispute of fact on
materiality where defendant only possessed $46M appraisal but claimed assets were worth
$78M); *see also Abrams v. Blackburne & Sons Realty Cap. Corp.*, 2019 WL 8640656, at *9
(C.D. Cal. Dec. 2, 2019).

As to the Thailand property, Defendants argue there was no material misstatement or
omission because the "cost of construction" method was an appropriate measure of value. Mot.
25. But Defendants' own authorities explain that "cost of construction" accounts for the cost of

improvements *that have been built*. *In re Pajaro Dunes Rental Agency*, 174 B.R. 557, 587 (Bankr. N.D. Cal. 1994). Here, Defendants claim the property's $241 million valuation was materially accurate because it would *cost $241 million to build a resort on that vacant land*. Needless to say, Defendants cite no authority for this point, which defies all common sense.

Finally, as to Antigua and the Bahamas, Defendants argue there was no duty to disclose indications of the sellers' representatives' checkered history, *see* Mot. 25-26, as if those were the only bases for the SEC's fraud claims. But when coupled with the many other allegations relating to valuation of those properties, the materiality of the sellers' checkered history becomes at least an issue of fact. As to Antigua, Dominguez admitted to doubting the claimed $680M value, Compl. ¶ 225; Dominguez and Konanykhin had other listings suggesting a lower valuation, including a $40M listing for potentially the exact same property a few years prior, *id.* ¶¶ 229-30; and the Company hired a third party to value the property in light of those concerns, *id.* ¶¶ 231, 239. Konanykhin and the Company decided to announce the deal even as that price opinion was pending. *Id.* ¶¶ 235-39. What was required was not for Defendants to disclose the list of comparables, as they suggest, *see* Mot. 25, but rather to make truthful representations when relying on that list to tout the property's valuation. Instead, the Company and Konanykhin touted the $680M value as a fact. When the price opinion came in much lower, Compl. ¶ 239, they failed to correct their misstatements. As to the Bahamas, the appraisals raised significant doubts as to ownership of the properties, *id.* ¶¶ 259-63, which Dominguez echoed in a message to the other Defendants, *id.* ¶ 264. Defendants cannot seriously contend it would be immaterial to investors whether the purported sellers actually owned the property in question.

3.    Scienter

Defendants only half-heartedly challenge allegations of their scienter, arguing that they

"[a]t worst . . . relied on shaky appraisals by third-parties [Defendants] weren't entirely sure of."

Mot. 26. The argument ignores the many allegations of scienter in the Complaint, including their

own doubts cited above. Konanykhin had a key role in the 140% program, Compl. ¶¶ 164, 167-

68, and knew the Company lacked appraisals for the Argentina and Antigua properties, *id.*

¶¶ 187-88, 227-28. He was directly involved in the negotiation for the Thailand and Antigua

deals, *id.* ¶¶ 196-98, 224-25, and knew of significant issues with both, *id.* ¶¶ 205, 226-31.

Finally, every Individual Defendant was involved in the Bahamas negotiation, received the shaky

Bahamas appraisals, and was informed of concerns about title for the property. *Id.* ¶¶ 247-48,

257-64.

### E.    Timing of Real Estate Announcements

Defendants argue it was not misleading to tout property deals that had not yet closed.

Mot. 27. That is not what the Complaint alleges. Rather, it alleges Defendants affirmatively

represented that the deals *had* closed when they had not.

The Complaint alleges many such false statements. Compl. ¶¶ 245-46, 291, 298, 300.[12]

Defendants challenge materiality by claiming their misstatements were corrected by the fact that

the underlying contracts were available for all to see in contemporaneously-filed 8-Ks and

elsewhere. Mot. 27-28. But as discussed *supra* at 15, occasional disclosures cannot cure a flood

of misrepresentations. Defendants also ignore that Dominguez announced over a billion dollars

---

[12]    *Schick v. Ernst & Young*, 808 F. Supp. 1097 (S.D.N.Y. 1992), is completely inapposite, as it simply stands for the proposition that the omission of a contingent liability on a balance sheet, *with no additional evidence*, only points to negligence. *See id.* at 1103-04.

in closed transactions *after* the 8-Ks relating to the Argentina, Thai, and Antigua transactions were filed. *See* Compl. ¶ 300. Similarly, the Company falsely claimed that the Bahamas transaction was closed in a PPM issued several weeks *after* the 8-K disclosing the contractual requirements. *See id.* ¶ 285 (pointing to April 26, 2024, PPM); Mot. 27 n.10 (identifying 8-K dated April 4, 2024). And while Moschini disclosed that "most" real estate deals were still in the process of closing, she claimed in the same breath that the Company already had "assets in real estate that are exceeding $1.2 billion," Mot. 28, thus implying closed transactions worth that amount. In reality, by the end of 2023 the company had not closed *any* deal. Compl. ¶ 297. Defendants also creatively reimagine Moschini's statements as forward-looking, while ignoring her actual words—that the Company was "*now in a position* to tokenize and list Unicoin [tokens], with … assets in real estate that *are exceeding* $1.2 billion." *Id.* ¶ 298.

Finally, the Complaint sufficiently alleges Defendants were at best reckless. Konanykhin and Dominguez were intimately involved in the negotiation of each of the deals and knew that none of the four large acquisitions referenced in the Complaint closed through mid-2025. *Id.* ¶¶ 165-68, 187-88, 196-210, 223-34, 247-64. And Konanykhin and Moschini received monthly financial updates from the Company's CFO, and thus knew the deals were not closing as each month went by. *Id.* ¶¶ 316-18.[13]

---

[13] *Herman v. Legent Corp.*, 1995 WL 115879 (4th Cir. Mar. 20, 1995) is easily distinguishable. There the Fourth Circuit held that there was no evidence for a jury to conclude that an executive's characterization that a company had closed $2M in deals in the UK when the company had closed $2M in deals in Europe as a whole, with just $200k in the UK, was intended to deceive the market. *Id.* at *8. We are far from trial here, and the Complaint alleges specific facts as to knowledge.

### F.    Runway

Defendants argue that their misrepresentations about the Company's runway were not false, material, or made with scienter, mostly by again arguing those statements were merely "forward-looking" and by pointing to disclosures in PPMs and SEC filings. Mot. 28-30. Defendants are wrong on all counts.

Defendants first repeat their arguments that the real estate holdings were not objectively overvalued, and claim that Defendants lacked scienter if they were, Mot. 28, 30.  Both claims are untrue. *See supra* at 23-26. Even assuming Defendants' arguments were accurate, however, their statements about the Company's runway were still misleading. As alleged, Defendants' representations of decades or centuries of runway were objectively false, as Unicoin, Inc. consistently lacked funding to last for more than a year, *see* Compl. ¶¶ 321-48, which Defendants knew because the CFO frequently updated them on company finances, *id.* ¶¶ 317-19, and Konanykhin signed the company's periodic reports, *id.* ¶¶ 320-22. Defendants cite to *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004), but that case only says that one's position in a company, *alone*, is insufficient to establish scienter, *see id.* at 382.

Defendants' statements were also not forward-looking. Konanykhin made his May 31, 2024, statement after he and Dominguez had repeatedly claimed that the Company had completed over $2B in Unicoin token sales in the previous months, *e.g.*, Compl. ¶¶ 150-51, 302, making it reasonable to interpret his statement about "a multi-billion [dollar] portfolio of assets" that "will provide us with the resources to continue operating Unicoin for decades, if not centuries" as a representation of Unicoin, Inc.'s current asset portfolio, Mot. 28 (quoting Compl. ¶ 343). Dominguez and Moschini's statements about runway would similarly be reasonably (if not unmistakably) interpreted as referring to current assets. Dominguez stated that "*right now*, just

with the real estate alone, you could measure [Unicoin, Inc.'s runway] in decades." *Id.* ¶ 334 (emphasis added). Likewise, Moschini claimed that Unicoin, Inc. "*today* [has] over three billion dollars in real estate assets that has been swapped with Unicoin pre-ICO." Compl. ¶ 347 (emphasis added). And once again, Defendants concede materiality as to one of Konanykhin's statements by ignoring it. *See id.* ¶ 338.

Defendants' citation to other disclosures again fails to dispose of the claim. Whatever effect the quarterly reports had on previous misrepresentations, they were shortly followed by more misrepresentations. *See* Compl. ¶¶ 334-48. Nor does any cautionary language in the Company's PPMs and SEC filings vindicate the Defendants "as a matter of law." Both of the cases Defendants cite for that proposition involved the safe harbor from private litigation under the PSLRA, to which the SEC is not subject. *See* 15 U.S.C. § 78u-4. And even if the PSLRA were applicable, the statements at issue would not be covered by its safe harbor, both because they were anchored in present representations about the Company's assets and because Defendants' false oral statements did not refer to the Company's written disclosures. *See* 15 U.S.C. § 78u-5(c)(1); *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *5 (N.D. Cal. Nov. 16, 2020).

## III.    Offers and Sales of Rights Certificates Violated Section 5

The Complaint alleges that Konanykhin personally collected more than $2.6 million from unregistered sales of his own Rights Certificates in violation of Section 5 of the Securities Act, 15 U.S.C. § 77e. Defendants—who do not dispute that both Konanykhin's and the Company's offers and sales were unregistered—now argue that such offers and sales were exempt from the Securities Act's registration requirements, misconstruing the applicable law and ignoring the Company's and Konanykhin's burden to establish that an exemption applied.

Section 5 requires offers and sales of securities to be registered with the SEC. *SEC v. Cavanagh*, 445 F.3d 105, 111 (2d Cir. 2006). "To state a cause of action under Section 5, one must show '(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale.'" *Cavanagh*, 445 F.3d at 111 n.13 (quotation omitted). "Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption." *SEC v. Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014) (quoting *Cavanagh*, 445 F.3d at 111 n.13). On a motion to dismiss, "courts may only dismiss § 5 claims based on a registration exemption if the exemption's applicability is clear *on the face of the complaint*," *SEC v. Sason*, 433 F. Supp. 3d 496, 514 (S.D.N.Y. 2020) (citing *Bronson*, 14 F. Supp. 3d. at 411-12) (emphasis added), and then only if it "appears *beyond doubt* that the plaintiff can prove no set of facts . . . that would entitle him to relief," *Bronson*, 14 F. Supp. 3d at 411 (quoting *Mabry v. Neighborhood Def. Serv.*, 769 F. Supp. 2d 381, 395 (S.D.N.Y. 2011)). "Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public," *Cavanagh*, 445 F.3d at 115, and "Section 5 imposes strict liability on offerors and sellers of unregistered securities regardless of any degree of fault, negligence or intent," *Bronson*, 14 F. Supp. 3d at 408 (quoting *SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 263–64 (N.D.N.Y. Feb. 19, 2014)).

The Complaint adequately alleges *prima facie* violations of Section 5 by both Konanykhin and the Company. Specifically, the Commission alleges that (i) no registration statement was filed or in effect for the offer and sale of Rights Certificates at any point, Compl. ¶ 360; (ii) Unicoin, Inc. sold over seven billion Rights Certificates, and Konanykhin sold more than 37.9 million of his own Rights Certificates, Compl. ¶¶ 361-62, 370; and (iii) such sales

made use of interstate commerce, Compl. ¶ 399. *See SEC v. Verdiramo*, 890 F. Supp. 2d 257, 268 (S.D.N.Y. 2011) (denying motion to dismiss where allegations that no registration statement was filed or in effect "clearly has established a prima facie violation of Section 5"). As a result, "the burden shifts to the defendant to prove an applicable exemption." *SEC v. Ishopnomarkup.com, Inc.*, 2007 WL 2782748, at *3 (E.D.N.Y. Sept. 24, 2007). Defendants have not done so.

Contrary to Defendants' arguments, neither Unicoin, Inc.'s nor Konanykhin's sales were exempt from registration under Rule 506(c) of Securities Act Regulation D, which exempts only "transactions not involving any public offering" where the issuer takes reasonable steps to verify that each purchaser is an accredited investor. 17 C.F.R. § 230.506. As an initial matter, on its face Rule 506(c) exempts only "offers and sales by an *issuer*," *id.* (emphasis added), and thus cannot exempt Konanykhin's resales of his own Rights Certificates. Moreover, Defendants nowhere assert, let alone conclusively establish based on facts alleged on the face of the Complaint, that the Company or Konanykhin took *any* steps, reasonable or otherwise, to verify the accredited status of Rights Certificates purchasers.

Defendants claim only that the offering materials and the Rights Certificates themselves contained language purporting to limit sales to accredited investors, while inferring from the allegations against the Company's general counsel that counsel "presumably sanctioned them." Mot. 32. Neither argument meets Defendants' burden to establish their entitlement to an exemption under Rule 506(c), at best raising fact issues inappropriate for resolution on a motion to dismiss. Further, relying upon the purchaser to self-certify by checking a box that they are an accredited investor is not sufficient to demonstrate that the issuer took reasonable steps to verify accredited status. *E.g.*, *SEC v. Earle*, 751 F. Supp. 3d 1044, 1053 (S.D. Cal. 2024) ("[R]el[ying]

on investors' own representations . . . cannot alone show that Defendants took reasonable steps to verify that the purchasers were indeed accredited.").

Defendants next claim that "Konanykhin's sales were exempt under Section 4(a)(1) of the Securities Act, which exempts 'transactions by any person other than an issuer, underwriter, or dealer.'" Mot. 32 (quoting 15 U.S.C. § 77d(a)(1)). But Defendants do not dispute the Complaint's allegations that Konanykhin held his Rights Certificates with a view toward distribution, Compl. ¶ 351, and thus acted as an "underwriter" when he resold his Rights Certificates to other investors, Compl. ¶¶ 354, 358, 361, *see* also Securities Act § 2(11) [15 U.S.C. §77b(a)(11)] (defining underwriter). Konanykhin is thus ineligible for the Section 4(a)(1) exemption. *See, e.g.*, *SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 757 (S.D.N.Y. 2018) (4(a)(1) exempts sales "by an ordinary investor rather than by an issuer, underwriter, or dealer"). In addition, as CEO and controlling shareholder, Konanykhin has at all times been a Unicoin, Inc. "affiliate," which independently precludes him from relying upon the Section 4(a)(1) exemption. *See Cavanagh*, 445 F.3d at 111 ([A]n 'affiliate' of the issuer— 'such as an officer, director, or controlling shareholder'—'ordinarily may not rely upon the Section 4(1) exemption.'" (quoting *SEC v. Cavanagh*, 155 F.3d 129, 134 (2nd Cir. 1998))).

Defendants next argue that the Rights Certificates Konanykhin sold were not securities under *SEC v. Ripple Labs, Inc.*, because purchasers of Konanykhin's Rights Certificates "could not have known if their payments of money went to [the Company]" as opposed to Konanykhin personally, and thus "did not invest their money at all." Mot. 32 (quoting *Ripple*, 682 F. Supp. 3d 308, 328-29, 331 (S.D.N.Y. 2023)). But *Ripple* does not apply to the facts at hand. *Ripple* concluded that certain offers and sales of a crypto asset were not securities transactions because the purchasers lacked a reasonable expectation of profit from the offeror/seller's efforts, which

the court found based on evidence that the purchasers (1) bought through blind bid/ask transactions on crypto asset trading platforms and thus did not know the identity of the offeror/seller and (2) lacked the sophistication to parse the offeror/seller's representations about its efforts. 682 F. Supp. 3d at 328-30. Such reasoning has no bearing on Konanykhin's sales of Rights Certificates directly to known investors, none of which involved blind bid/ask transactions on crypto asset trading platforms. Moreover, Defendants' claim that investors who purchased from Konanykhin were somehow less sophisticated than those who purchased directly from the Company makes no sense, because Konanykhin publicly offered his own Rights Certificates to the very same people, through the very same Investor Updates, that he and Unicoin, Inc. used to solicit purchases directly from the Company.

Finally, Defendants' argument disputing the Complaint's allegations that Konanykhin targeted unaccredited U.S. investors otherwise precluded from buying directly from the Company, Mot. 31, does not present a basis for dismissal. The Commission need not allege or prove that Konanykhin or the Company acted with scienter (or specifically targeted unaccredited U.S. investors) to establish violations of Section 5. *See Bronson*, 14 F. Supp. 3d at 408. As such, although the Complaint quotes company communications that in context suggest Konanykhin "deliberately evad[ed] restrictions on Unicoin's direct sales . . . by . . . targeting unaccredited U.S. investors," Compl. ¶ 353, the Court need not consider these allegations in ruling on Defendants' Motion.

In sum, Defendants have established no valid basis to exempt Konanykhin's Rights Certificates resales from Section 5's registration requirements. Because Konanykhin's resales and the Company's direct sales were both "part of a single, concerted effort to offer and sell Unicoin Rights Certificates to members of the public" in a "single unregistered offering," Compl.

¶¶ 352, 358, 361, Unicoin, Inc. cannot take advantage of any exemption that might otherwise have applied to the Company's sales. *See, e.g., SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 181 (S.D.N.Y. 2020) ("All sales that are part of the same Regulation D offering must meet all of the terms and conditions of Regulation D." (quoting 17 C.F.R. § 230.502(a)).

## IV.    The Complaint Adequately Alleges That Moschini and Dominguez Received Money or Property

Defendants contend that the Complaint does not adequately plead Dominguez and Moschini "obtained money or property" related to their false statements and material omissions, an element of Securities Act Section 17(a)(2). That argument ignores both applicable case law and the Complaint's allegations.

Section 17(a)(2) makes it illegal, in the offer or sale of securities, "directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact or [material] omission." 15 USC § 77q. The Complaint alleges that Moschini and Dominguez obtained money or property in at least two ways: (1) they helped the Company obtain financing, which Defendants do not deny; and (2) the Company was only able to stay afloat through its sale of securities, and it used those proceeds to pay Moschini's and Dominguez's salaries and bonuses, Compl. ¶¶ 1, 13, 73, 321-48. The complaint also alleges that Moschini owns 36% of the Company. *Id.* ¶ 29. This is sufficient to adequately plead the "money or property" element of Section 17(a)(2).

"[T]here is a split of authority in this District as to whether a defendant must have personally gained money or property, or whether it is sufficient to have obtained money or property on behalf of an employer, in order to be liable under Section 17(a)(2)." *SEC v. MiMedx Grp., Inc.*, 2022 WL 902784, at *10 (S.D.N.Y. Mar. 28, 2022) (sufficient for SEC to allege that defendant obtained money or property on behalf of his employer); *compare SEC v. Stoker*, 865 F.

Supp. 2d 457, 463 (S.D.N.Y. 2012), *and SEC v. Shapiro*, 2018 WL 2561020, at *8 (S.D.N.Y. June 4, 2018) (allegation of employer's gain through defendant's fraud sufficient to satisfy Section 17(a)(2)), *with SEC v. Syron*, 934 F. Supp. 2d 609, 639-40 (S.D.N.Y. 2013) (personal benefit required). Defendants ignore this split and assume the latter line of cases controls. Mot. 34. In any event, the Complaint satisfies both standards.

Defendants do not dispute that the Complaint sufficiently alleges Moschini and Dominguez obtained money and property for their employer, which is sufficient under the *Stoker* line of cases, 865 F. Supp. 2d at 463. *See, e.g.*, Compl. ¶¶ 1-2, 13, 16.

The Complaint also satisfies the *Syron* line of cases, under which a defendant's receipt of a salary or bonus from her employer—even if indirectly through the defendant's securities fraud—is sufficient to satisfy the "money or property" element. *See Shapiro*, 2018 WL 2561020, at *8; *SEC v. Tourre*, 2014 WL 61864, at *3-4 (S.D.N.Y. Jan. 7, 2014) ("Section 17(a)(2) does not require the SEC to show that [the defendant] received some sort of additional 'fraud bonus' on top of his base salary in order to establish liability."); *see also SEC v. Farmer*, 2015 WL 5838867, *8 (S.D. Tex. Oct. 7, 2015); *but see SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017). This is particularly so when "the SEC has plausibly alleged that the Defendants' entire business model was fraudulent," which inherently ties defendants' compensation to the fraud. *SEC v. Liberty*, 2021 WL 664834, *8 (D. Me. Feb. 19, 2021).

Here, the SEC alleges that Unicoin, Inc. paid Moschini and Dominguez salary and bonuses, Compl. ¶ 73, and that the Company was able to operate only through fraudulently raising capital from investors, Compl. ¶¶ 1, 13, 323-25, 333-48. That is sufficient under all interpretations of the "obtain money or property" requirement. *See Liberty*, 2021 WL 664834 at *8. Additionally, this element can be satisfied through a defendant's ownership of the company

that received money or property. *See*, *e.g.*, *SEC v. Cole*, 2015 WL 5737275, at \*7 (S.D.N.Y Sept. 29, 2015); *SEC v. Tellone Mgmt. Grp.*, 2022 WL 18582314, at \*12 (C.D. Cal. Dec. 19, 2022). The Complaint alleges that Moschini owned 36.6% of Unicoin, Inc.'s common stock. Compl. ¶ 29. Therefore, even putting aside her salary and bonuses, she was the beneficiary of over a third of Unicoin, Inc.'s capital raises.

**V.     There Is No Basis To Dismiss The SEC's Request For Disgorgement**

Defendants' two-sentence argument seeking dismissal of the SEC's request for disgorgement from Moschini and Dominguez is predicated entirely on their argument with respect to the "money or property" element, Mot. 34, and fails because, as noted above, the SEC pleaded Moschini and Dominguez's ill-gotten gains. It is also premature; the Complaint need not set forth evidence establishing the SEC's entitlement to any specific equitable relief. *See*, *e.g.*, *SEC v. Genesis Glob. Cap., LLC*, 2024 WL 1116877, at \*17 (S.D.N.Y. Mar. 13, 2024); *see also SEC v. Fiore*, 416 F. Supp. 3d 306, 332 (S.D.N.Y. 2019).

## CONCLUSION

Accordingly, Defendants' motion to dismiss the Commission's Complaint should be denied.[14]


Dated:  December 12, 2025                    Respectfully submitted,


                                             /s/ J. Emmett Murphy
                                             J. Emmett Murphy

                                             Jocelyn Berteaud
                                             Jason Schall
                                             Adam B. Gottlieb
                                             Securities and Exchange Commission
                                             100 F Street, NE
                                             Washington, DC 20549
                                             Tel: 212-336-0078 (Murphy)
                                             Email: murphyjoh@sec.gov
                                             *Counsel for Plaintiff*
                                             *Securities and Exchange Commission*

---

[14]   If the Court finds that any of the SEC's claims should be dismissed, the SEC respectfully requests leave to amend its complaint pursuant to Federal Rule of Civil Procedure 15(a)(2). *See Conflict Int'l, Inc. v. Komorek*, 2024 WL 1347577, at *18 (S.D.N.Y. Mar. 29, 2024) (granting leave to amend); *SEC v. Honig*, 2020 WL 906383, at *13 (S.D.N.Y. Feb. 25, 2020) (allowing SEC to file "Second Amended Complaint").

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify, as counsel for Plaintiff Securities and Exchange Commission, that the foregoing

memorandum of law in opposition to Defendants' motion to dismiss contains 10,874 words,

excluding the portions of the memorandum exempted from the word-count limitation pursuant to

Local Civil Rule 7.1(c), in compliance with the 11,000 word limit set by the Court's August 26,

2025, Order Granting Defendants' Letter Motion for Leave to File Excess Pages.


Dated: December 12, 2025                    /s/ J. Emmett Murphy
                                            J. Emmett Murphy