**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

   v.

UNICOIN, INC. f/k/a TransparentBusiness,
Inc., ALEXANDER KONANYKHIN,
MARIA SILVINA MOSCHINI, and
ALEJANDRO DOMINGUEZ,

        Defendants.

No. 1:25-cv-04245-AS

---

### REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' <u>MOTION TO DISMISS THE COMPLAINT</u>

Michael B. Homer
Eric S. Rosen
Yusef Al-Jarani (*SDNY admission forthcoming*)
**DYNAMIS LLP**
175 Federal Street, Suite 1200
Boston, Massachusetts 02110
T: (617) 693-9732
mhomer@dynamisllp.com
erosen@dynamisllp.com
yaljarani@dynamisllp.com

*Counsel for Defendants Unicoin, Inc.,*
*Alexander Konanykhin, Maria Silvina*
*Moschini, and Alejandro Dominguez*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 1

   I.   THE COMPLAINT IS IMPROPERLY PLED.................................................. 1

      A.  The SEC Admits It Engaged in Impermissible Group Pleading.................. 1

      B.  The SEC Admits the Complaint Is an Improper Shotgun Pleading............................ 1

  II.  THE COMPLAINT FAILS TO STATE A CLAIM OF SECURITIES FRAUD. ............. 2

      A.  The SEC's "Asset-Backed" Theory Depends on an Implausible Reading of Defendants' Statements. ........................................................................ 2

      B.  The SEC's Registration Theory Collapses the Company Into a Non-Existent Token.  4

      C.  The SEC Repackages an Accounting Dispute Over Rights Sales as Fraud. ................ 5

      D.  The SEC Attempts to Plead Falsity by Recasting Deal Value as Market Value. ......... 7

      E.  The SEC's Acquisition-Timing Theory Is Unsupported. ............................... 9

      F.  The SEC's Runway Theory Ignores the Obvious Forward-Looking Context............ 10

 III. THE § 17(a)(2) CLAIM AND DISGORGEMENT REQUEST FAIL............................ 12

      A.  Moschini and Dominguez Did Not Personally Gain from the Alleged Fraud............ 12

      B.  There Are No Ill-Gotten Gains to Disgorge from Moschini or Dominguez............... 15

 IV. KONANYKHIN'S SALES OF RIGHTS CERTIFICATES WERE EXEMPT. .............. 15

CONCLUSION.................................................................................................................. 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Bostock v. Clayton Cnty., Georgia,*
   590 U.S. 644 (2020) ................................................................................................ 12

*Furlong v. Appiant Techs., Inc.,*
   2005 WL 1213939 (E.D. Mo. Apr. 14, 2005) ........................................................ 6

*In re Advanced Battery Techs., Inc.,*
   781 F.3d 638 (2d Cir. 2015) .................................................................................... 7

*In re Citigroup, Inc. Sec. Litig.,*
   330 F. Supp. 2d 367 (S.D.N.Y. 2004) .................................................................. 11

*In re Gen. Instrument Corp. Sec. Litig.,*
   2000 WL 1742120 (N.D. Ill. Nov. 22, 2000) ......................................................... 7

*In re Gilat Satellite Networks, Ltd.,*
   2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) ..................................................... 11

*In re Infonet Servs. Corp. Sec. Litig.,*
   310 F. Supp. 2d 1080 (C.D. Cal. 2003) ............................................................... 11

*In re Merrill Lynch Auction Rate Sec. Litig.,*
   704 F. Supp. 2d 378 (S.D.N.Y. 2010) .................................................................... 6

*In re Ocugen, Inc. Sec. Litig.,*
   659 F. Supp. 3d 572 (E.D. Pa. 2023) ..................................................................... 6

*LBS Petroleum, LLC v. Demir,*
   2015 WL 12469064 (S.D. Fla. Oct. 28, 2015) ..................................................... 15

*Mart v. Tactile Sys. Tech., Inc.,*
   595 F. Supp. 3d 788 (D. Minn. 2022) ..................................................................... 3

*Repicci v. Jarvis,*
   2020 WL 13200595 (W.D.N.Y. Jan. 24, 2020) ...................................................... 2

*SEC v. DiMaria,*
   207 F. Supp. 3d 343 (S.D.N.Y. 2016) ..................................................... 12, 13, 14

*SEC v. Farmer,*
   2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) ............................................ 14

*SEC v. Farnsworth,*
   692 F. Supp. 3d 157 (S.D.N.Y. 2023) .................................................... 14

*SEC v. Fiore,*
   416 F. Supp. 3d 306 (S.D.N.Y. 2019) .................................................... 15

*SEC v. Genesis Glob. Cap., LLC,*
   2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024) ........................................ 15

*SEC v. Smith,*
   2005 WL 2373849 (S.D. Ohio Sept. 27, 2005) ......................................... 3

*SEC v. Stoker,*
   865 F. Supp. 2d 457 (S.D.N.Y. 2012) .................................................... 12

*SEC v. Syron,*
   934 F. Supp. 2d 609 (S.D.N.Y. 2013) .......................................... 12, 13, 14

*SEC v. Tourre,*
   2014 WL 61864 (S.D.N.Y. Jan. 7, 2014) ............................................... 14

*SEC v. Wey,*
   246 F. Supp. 3d 894 (S.D.N.Y. 2017) ............................................... 13, 14

*Swartz v. KPMG LLP,*
   476 F.3d 756 (9th Cir. 2007) ................................................................. 1

*Utts v. Bristol-Myers Squibb Co.,*
   251 F. Supp. 3d 644 (S.D.N.Y. 2017) ...................................................... 9

*Yates v. Mun. Mortg. & Equity, LLC,*
   744 F.3d 874 (4th Cir. 2014) ................................................................. 5

*Yellen v. Hake,*
   437 F. Supp. 2d 941 (S.D. Iowa 2006) ..................................................... 9

## INTRODUCTION

The SEC now concedes it advanced allegations about Unicoin and its executives that were misleading or false. Rather than dismissing those allegations or amending its complaint, it has filed an opposition riddled with baseless take-the-government's-word-for-it assertions of fact, strained attempts to inject ambiguity into unambiguous statements, and misstatements of the very laws it is charged with enforcing. There is no special "SEC exception" under the federal pleading standards; the agency must satisfy Rules 9(b) and 12(b)(6) the same as every other litigant. Here, it failed to do so, and for that reason its complaint should be dismissed.

## ARGUMENT

## I.    THE COMPLAINT IS IMPROPERLY PLED.

### A.    The SEC Admits It Engaged in Impermissible Group Pleading.

The SEC does not deny it engaged in group pleading. Opp. 11. It even admits it lumped Moschini and Dominguez into allegations not concerning them. Opp. 17 n.9, 23 n.11. Nevertheless, the SEC argues Defendants ignore its other, "specific allegations." Opp. 11. Simply because a complaint makes particularized allegations in some places does not excuse its failure to do so in others. When a "complaint is shot through with general allegations that the 'defendants' engaged in fraudulent conduct but attributes specific misconduct only to" certain of the defendants, that complaint "patently fail[s] to comply with Rule 9(b)." *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007). The SEC's claims, to the extent premised on such allegations, must be dismissed, particularly with respect to Moschini and Dominguez. *See* Mot. 6 (citing improper group-based allegations).

### B.    The SEC Admits the Complaint Is an Improper Shotgun Pleading.

The SEC does not dispute it engaged in shotgun pleading or argue that all 388 factual allegations in the Complaint are relevant to each count, but it says incorporating them all into each

count is fine because the pleading as a whole puts Defendants on notice. Opp. 12. The two cases the SEC relies on for this position, however—*SeeThruEquity* and *Winemaster*—involved complaints that had only 131 and 143 factual allegations. The Complaint here has nearly *three times* that amount—not the sort of complaint that "is short and straightforward enough that it is sufficiently clear which allegations are intended to support which claims for relief." *Repicci v. Jarvis*, 2020 WL 13200595, at *9 n.8 (W.D.N.Y. Jan. 24, 2020). And as the SEC notes, *Winemaster* found that "grouping multiple defendants together and failing to set out which of the defendants made which of the fraudulent statements/conduct" is improper. Opp. 12. That is precisely what the Complaint does, and why its shotgun pleading is fatal here. *Supra* Section I.A.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM OF SECURITIES FRAUD.

### A.    The SEC's "Asset-Backed" Theory Depends on an Implausible Reading of Defendants' Statements.

Falsity. The SEC argues Defendants "often" ignored the distinction between Unicoin (the Company) and unicoins (the future token) when speaking to investors. Opp. 13. For example, the SEC believes Konanykhin's comparison to bitcoin proves he was discussing the coin. But it is obviously possible to compare a crypto company with a competing crypto token, especially where, as with bitcoin, the token is decentralized and the absence of the backing of a company is the whole point of the comparison. The context confirms that is what Konanykhin was doing. The SEC has no response to his use of "dividend-paying," "publicly reporting," and "audited" (¶ 91)—all of which apply to a company, but could not apply to a digital token. The same is true for Moschini's statement (¶ 92), which was preceded by a graphic with those descriptors (Opp. 13 n.8 (citing https://www.youtube.com/watch?v=YgsmZRx_XZc), at 12:30–37), and accompanied by a graphic stating: "DEDICATED TO ENHANCING VALUE FOR ITS INVESTORS BY CULTIVATING … ASSETS" (*id.* at 12:52–58). A digital token cannot be "dedicated to" or "enhance" or "cultivate"

anything; a company can. The SEC similarly attempts to contort the plain meaning of Dominguez's statement (Opp. 14), where he was clearly referring to sales of unicoins as one of the Company's assets, then proceeds to list another asset in the form of real estate that "we have" (¶ 95).

Where Defendants did say the token itself was "backed" by assets (*e.g.*, ¶ 300), they used its ordinary meaning: "supported by." They disclosed that usage in the PPM every investor received. ¶ 81. The SEC does not dispute unicoins were supported by the Company's assets but flippantly dismisses Defendants' use of the ordinary meaning, refuses to address Defendants' cited case law holding the ordinary meaning of terms presumptively applies, and does not cite any source for its seemingly made-up definition of "asset-backed" meaning "self-liquidating." Opp. 15.

<u>Materiality</u>. The SEC argues that "asset-backed" is important to investors (Opp. 15), but the question is whether investors were aware of *how* Defendants were using it. The SEC's argument is investors weren't aware of what Defendants meant, and if they had known, it would have affected their investment decision. But it was evident from Defendants' statements what was meant by "asset-backed": the common-sense, ordinary usage of the term. Were there any doubt, Defendants disclosed as much to each investor through their offering materials, which "investors are presumed to have read." *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 814 (D. Minn. 2022) (alteration and citation omitted). That Moschini's and Dominguez's statements came during live interviews (particularly for Moschini as a non-native English speaker) further supports that reasonable investors would not have relied on them—certainly not over the offering materials. *See SEC v. Smith*, 2005 WL 2373849, at *7 (S.D. Ohio Sept. 27, 2005) ("[T]he law presumes reasonable investors rely on written materials, not on oral representations").

<u>Scienter</u>. The SEC does not dispute it mischaracterized Defendants' testimony to try to plead scienter. Opp. 16. Instead, it claims that by "plead[ing] that [] statements are both misleading

and material, it also adequately pleads" reckless disregard. *Id.* Defendants' one cited case for this counterintuitive position—*Sourlis*—does not support it. Where the Company indisputably acquired and used its assets to support the value of its future coin (¶¶ 8, 38), and Defendants repeatedly explained that is what "asset-backed" meant (¶ 81), the SEC's theory reduces to disagreement over rhetoric—hardly enough to infer reckless disregard, much less fraudulent intent.

### B.    The SEC's Registration Theory Collapses the Company Into a Non-Existent Token.

<u>Falsity</u>. The SEC now admits Moschini and Dominguez made zero misstatements about SEC registration. Opp. 17 n.9. This claim should be dismissed as to them. As for Konanykhin's statements, the SEC does not dispute the Company was SEC-registered, but argues his statements were about the unicoin tokens. But the SEC ignores his descriptors, "U.S.-based," "U.S.-audited," and "publicly reporting" (¶¶ 108–10), which it does not dispute only makes sense as applied to the Company. His one statement without such descriptors (¶ 107) must be understood in the context of his investor communications as a whole, which were clearly about the Company.

<u>Materiality</u>. The SEC does not allege Defendants sold any Rights Certificates to any unaccredited investors (foreign or domestic), but whether or not Unicoin's investors were sophisticated, the law presumes they are reasonable. Opp. 17. The SEC concedes Konanykhin's statements were "about the future listing of *the Company*," and a reasonable investor would not rely on such forward-looking statements. Opp. 18. The SEC's suggestion that in the same breath Konanykhin was somehow also speaking in the present tense about the tokens isn't credible. Regardless, while securities may be registered "*before* issuance" (Opp. 17), not a single investor here can claim reliance on that fact, because not a single investor bought a unicoin token, because they don't yet exist.

The SEC does not dispute that both the Rights Certificate and PPM given to every investor prominently disclosed that the Rights Certificate has "NOT BEEN REGISTERED UNDER THE SECURITIES ACT," and it was only Unicoin's "intention" (with "no guaranty") to register its tokens in the future. Mot. 16–17. Instead, it chalks up one of the most conspicuous disclaimers one could make to a fact issue. Opp. 18. But it is implausible that a reasonable investor who read these materials could have taken away anything other than: unicoins don't exist yet, aren't registered, and may never be registered. Only an especially dim view of investors would counsel differently.

Scienter. Because the SEC insists the statements were about a token, it assumes Defendants "knew" they were false. Opp. 18. But the statements clearly were about the Company. Further, Defendants' prominent disclosures rebut any inference of scienter. *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 892–94 (4th Cir. 2014) (affirming dismissal of securities-fraud claims because defendant's disclosures evidenced good faith).

### C. The SEC Repackages an Accounting Dispute Over Rights Sales as Fraud.

Falsity. The SEC does not dispute that sales and proceeds are distinct, or that Unicoin's reporting of "proceeds from sales" in its SEC filings was accurate. Mot. 19. Its argument rests on its assertion that unpaid balances under the Five Year Plan deferred-payment program should not have been included as "sales" in Defendants' milestone announcements. Yet, the SEC's appeal to the dictionary meaning of "sales" shows they can include both "transfers" *and* "agreements" to transfer. Opp. 20. An option contract is the agreement to transfer upon exercise of the option.

The SEC quibbles that installment contracts are not identical to option contracts, but both involve contractual commitments with an element of value that may never be realized—whether because an installment is missed or an option is not exercised. Yet, while the SEC does not contest that the full contract value of installment agreements may be reported as sales notwithstanding the risk of nonpayment, it takes issue with doing the same for "option contracts" despite similar risk.

The SEC also does not dispute that the Five Year Plan incentivized exercise through the risk of forfeiting collateral, or that many investors exercised their options. It thus concedes the "option contracts" had real value. At most, then, the SEC suggests some discount for non-exercise risk may have been appropriate—not that the contracts could not be reported as sales. Again, this is an accounting dispute, not fraud.

Materiality. The SEC argues an announcement by Konanykhin did not clarify that Defendants' sales announcements included Five Year Plan agreements (Opp. 21), but it plainly did. He stated the sales figure included over $100 million in "Accounts Receivable, secured by collateral," and two sentences later described the Five Year Plan's collateral component, clearly indicating the Accounts Receivable included Five Year Plan sales. Ex. G at 1.

Regardless, the SEC does not dispute Defendants directed investors to accurate, itemized sales figures in their SEC filings. Mot 20; Opp. 21. "Courts frequently place reasonable investors on notice of SEC filings." *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 401 (S.D.N.Y. 2010), *aff'd*, 671 F.3d 120 (2d Cir. 2011). And "disclosures present in SEC filings are sufficient to alert reasonable investors to relevant risks and render purported 'omissions' immaterial." *In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. 3d 572, 592 n.15 (E.D. Pa. 2023), *aff'd*, 2024 WL 1209513 (3d Cir. Mar. 21, 2024). Even if "an affirmative misstatement was alleged" in a press release (Opp. 21 n.10), a reasonable investor would rely on corrective disclosures in more authoritative SEC filings and offering documents. *See, e.g.*, *Furlong v. Appiant Techs., Inc.*, 2005 WL 1213939, at *6 (E.D. Mo. Apr. 14, 2005) (no materiality where "all of the alleged false statements are directly contradicted by both [the company]'s … SEC public filings and the written contract which the investor Plaintiffs entered into pursuant to the Offering").

Scienter. The SEC does not rebut Defendants' authorities holding that where a fraud claim is premised on alleged accounting irregularities, it must show Defendants were reckless in not knowing the accounting was wrong. Mot. 21. But all the SEC alleges is Defendants were in a WhatsApp chat where someone said most investors were not "planning" to pay their first installment (¶ 148); it does not say Defendants read the message. Regardless, this cannot establish recklessness. Mot. 27. Even failure to "appreciate the significance of" or perform "due diligence" in response to perceived accounting errors is not enough for scienter. *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 646 (2d Cir. 2015).

      **D.**      **The SEC Attempts to Plead Falsity by Recasting Deal Value as Market Value.**

Falsity. The SEC now admits Moschini and Dominguez made no false statements about the Argentina, Antigua, or Thailand properties. Opp. 23 n.11. And it has no response to the fact that all Moschini and Dominguez did with respect to the Bahamas property was share a press release accurately reporting the deal value. Mot. 23. This claim should be dismissed as to them.

As for Konanykhin's statements, the SEC does not dispute deal value is distinct from market value or that he accurately reported deal value. But it argues he implicitly promoted the market value of the properties because the 140% Program was promoted as paying 140% of the appraised value and, when calculated at roughly 71% of the deal value, the result did not line up with the appraisals. Opp. 22–23. This new (and convoluted) theory is nowhere alleged in the Complaint, which asserts that the reported value of the properties was false because it did not match up with the appraisals. Now, the SEC concedes that the reported value was facially true, but once investors whipped out an abacus, they could work backwards and figure out the appraised value, which was false. That is absurd, and also impermissible. "[N]ew theories require new complaints and a plaintiff may not amend his complaint via arguments made in opposition to a …

motion." *In re Gen. Instrument Corp. Sec. Litig.*, 2000 WL 1742120, at *3 (N.D. Ill. Nov. 22, 2000).

 <u>Materiality</u>. No reasonable investor could have been misled about either market or deal values. Konanykhin's announcements explained how the deal values were calculated: the number of Rights Certificates swapped for the property multiplied by the then-offering price of the Rights Certificate. *E.g.*, ¶¶ 181, 214; Ex. I at 3. Unicoin's SEC filings disclosed both the market values and the methodology for calculating the deal values. Mot. 24. Even if investors ignored those disclosures and simply assumed the values being announced were the appraised values, the SEC accepts that appraisals are subjective and that it must show Defendants either disbelieved the appraisals or omitted material information about them. Opp. 24. It shows neither.

 *First*, the SEC claims Defendants did not believe the announced values for the Argentina and Antigua deals because they did not have appraisals at the time. In fact, the Antigua property did receive an appraisal. ¶¶ 227–28. And Defendants had a report supporting a $76 million valuation for the Argentina property. ¶¶ 188–89. The SEC also misconstrues the cost approach for measuring the value of the Thailand property (Opp. 24–25), which is not limited to valuing improvements. *See* THE APPRAISAL OF REAL ESTATE 32 (3d ed.) ("cost approach" values a property as the "amount by which he can obtain by purchase of a site and construction of a building … a property of equal desirability and utility"). The SEC makes no argument Defendants lacked a genuine belief in the valuation of the Bahamas property. In any case, no appraisal was necessary to calculate the deal value for any of these properties, which is what was announced. The SEC's cited cases—*Collector's Coffee* and *Truth North Financial*—are thus distinguishable because there, what was announced *was* the appraisal value. Opp. 24.

*Second*, the SEC claims there were material omissions about the appraisals for Antigua and the Bahamas (but not for Argentina and Thailand). Opp. 25. The SEC does not contend information about the sellers' history alone was material, only when "coupled" with other factors. *Id.* As to Antigua, the SEC does not dispute Defendants had no obligation to disclose a list of comparables, only that they were seeking a second opinion, which came in lower. *Id.* But the SEC cites nothing to show Defendants had an obligation to disclose a competing appraisal, nor explain how a valuation "opinion" could "correct" any of their statements. As to the Bahamas, the SEC says Defendants should have disclosed doubts about the seller's title. But the SEC ignores that Unicoin made closing the deal subject to its completion of due diligence and disclosed as much.[1] A reasonable investor would know that doing so meant there may be "doubts" about the deal. *Cf. Yellen v. Hake*, 437 F. Supp. 2d 941, 968 (S.D. Iowa 2006) (no materiality where not disclosing "doubts … did nothing to alter the 'total mix' of information").

<u>Scienter</u>. The SEC bases its entire claim of scienter on the existence of doubts (Opp. 26), but fails to address any of the cases cited by Defendants showing the mere harboring of "doubts" is insufficient to establish scienter.

**E.    <u>The SEC's Acquisition-Timing Theory Is Unsupported.</u>**

<u>Falsity</u>. The SEC says it based this claim on statements that the property acquisitions had "closed." Opp. 26. But only one of the Complaint paragraphs it cites quotes the use of that word—and Richard Devlin was the drafter, not Defendants. ¶ 298. The rest of the paragraphs "merely paraphrase[] the assertions … without providing the exact content of the statements," which "fail[s] to meet Rule 9(b)'s heightened pleading standard." *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 681 (S.D.N.Y. 2017), *aff'd*, 919 F.3d 699 (2d Cir. 2019).

---

[1] Unicoin, Current Report (Form 8-K) (Feb. 1, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001740742/000182912624000699/unicoininc_8k.htm.

<u>Materiality</u>. The SEC does not dispute that all the acquisition contracts were published in Unicoin's 8-K filings; it responds only with the *ipse dixit* that "occasional disclosures cannot cure a flood of misrepresentations." Opp. 26. These were not "occasional disclosures" but the *entire substance* of the agreements at issue, including any contingencies for closing. The SEC cites a single statement in a PPM that the Bahamas deal had closed as somehow contradicting an earlier 8-K disclosing contractual requirements. Opp. 27. The SEC has it backwards. It might have been a contradiction had Unicoin announced a deal closed, *then* disclosed contingencies outstanding, but here it disclosed contingencies and then, once those were satisfied, announced closing.

The SEC also now admits Moschini disclosed that most of the deals were only in the process of closing. Opp. 27. But it changes tack and targets as contradictory her statement that Unicoin was "now in a position to tokenize and list Unicoin, with … assets in real estate that are exceeding $1.2 billion." ¶ 298. The SEC argues "now in a position" shows she was speaking in the present tense, but it's the opposite. If you are now in a position to do something, it means you haven't done it yet but are positioned to do so in the future.

<u>Scienter</u>. To argue Defendants knew the deals had not closed, the SEC cites Konanykhin's and Dominguez's involvement with the deals. Opp. 27. But the allegations only show involvement in the negotiations, not the closings. It then points to updates Konanykhin and Moschini received from the CFO. *Id.* But these only generically encompassed Unicoin's "finances," not whether deals had closed. ¶ 318.

### F.    **The SEC's Runway Theory Ignores the Obvious Forward-Looking Context.**

<u>Falsity</u>. The SEC's "runway" claim hinges on conflating "going concern" with "runway," which are distinct. Opp. 28. A going-concern disclosure asks whether the company can survive the next twelve months *absent execution of its plans*; Defendants' runway statements addressed

how long the company could operate *if those plans succeeded*. Thus, Unicoin's going-concern qualifications are not dispositive of Defendants' statements about runway.

<u>Materiality</u>. The SEC argues three statements about Unicoin's runway were present-tense, isolating words like "right now" and "today," but ignores their context. Opp. 28–29. Konanykhin stated Unicoin was "developing" a portfolio that "will provide" resources for decades. ¶ 343. Dominguez's remarks were made in response to questions about future plans and were saturated with forward-looking language about "launching" and "preparing our runway." ¶ 334. Moschini expressly tied runway to a planned ICO. ¶ 347.

Regarding safe harbor, the SEC is confused. Defendants rely on the common-law bespeaks caution doctrine but occasionally cite PSLRA safe-harbor opinions because the safe harbor is a (narrower) codification of the common-law rule. *See In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *11–12 (E.D.N.Y. Sept. 19, 2005). Unlike the PSLRA safe harbor, the bespeaks caution doctrine does not require that an oral statement reference a written disclosure, rendering the SEC's single authority inapposite. *See In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1092 (C.D. Cal. 2003).

<u>Scienter</u>. The SEC's only legs to stand on as to scienter are reports from the CFO on Unicoin's finances and Konanykhin's signature on SEC filings. Opp. 28. But the SEC cannot escape *In re Citigroup, Inc. Sec. Litig.*, which made clear scienter cannot be inferred from general awareness of a company's finances or signatures on SEC reports. 330 F. Supp. 2d 367, 381–82 (S.D.N.Y. 2004).

III.     THE § 17(a)(2) CLAIM AND DISGORGEMENT REQUEST FAIL.

A.     Moschini and Dominguez Did Not Personally Gain from the Alleged Fraud.

The SEC cites a split within this District as to what is required to satisfy the "obtain money or property" element of Section 17(a)(2), and argues that the Complaint's allegations satisfy both lines of cases as to Moschini and Dominguez. Opp. 34–35. The SEC is wrong.

*First*, now-Circuit Judge Sullivan's reasoning in *Syron* is more persuasive than Judge Rakoff's in *Stoker*, and the SEC does not argue otherwise—nor could it. The Supreme Court "has explained many times over many years that, when the meaning of the statute's terms is plain, [a court's] job is at an end." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 673–74 (2020). The court in *Syron* followed that interpretive mandate; the court in *Stoker* did not.

The term "obtain" in Section 17(a)(2) is undefined, so the court in *Syron* looked to its ordinary meaning and found that "to obtain an object is to gain possession of it." *SEC v. Syron*, 934 F. Supp. 2d 609, 638 (S.D.N.Y. 2013). It thus concluded that while the statute authorizes liability where a defendant gains possession "indirectly," "that final step, whereby the defendant personally gains money or property from the fraud, is essential." *Id.* at 639–40. Conversely, the court in *Stoker* thought that requiring a defendant to "obtain the funds personally or directly" would be contrary to the statute's "directly or indirectly" modifier, and therefore believed it could suffice for a defendant to "obtain[] money or property for his employer." *SEC v. Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012). But as the court in *Syron* pointed out, this makes no sense, because a defendant can come into personal possession of funds directly *or* indirectly in a "roundabout manner." 934 F. Supp. 2d at 639. The *Stoker* court thus conflated "personally" and "directly." *See SEC v. DiMaria*, 207 F. Supp. 3d 343, 358 (S.D.N.Y. 2016) ("Judge Sullivan's ruling does not read the word 'indirectly' out of the statutory text"). That likely stemmed from the fact that it did not interpret the meaning of "obtain" at all and instead concerned itself primarily with the statute's

"purpose"—an improper consideration given its meaning is plain. *Stoker*, 865 F. Supp. 2d at 463; *see Syron*, 934 F. Supp. 2d at 639 (rejecting "*Stoker*'s resort to purposive analysis" because the "text" of Section 17(a)(2) was not "ambiguous").

The two unpublished opinions the SEC cites on the split—*MiMedx Group* and *Shapiro*—do nothing to bolster *Stoker*'s position; they simply adopt it without explanation. Thus, the Court should reject the argument that simply because Moschini and Dominguez may have made money for Unicoin, even if they made none for themselves, they can still somehow be liable under Section 17(a)(2).

*Second*, the SEC does not at all satisfy the *Syron* cases' "personal gain" requirement. The SEC's argument for why it does is: Moschini and Dominguez were paid "salary" and "bonuses" by Unicoin; Unicoin "was able to operate only through fraudulently raising capital from investors"; therefore, Moschini and Dominguez must have benefited from the fraud. Opp. 34. This is a tortured reading of its own complaint.

None of the paragraphs the SEC cites for this argument say Unicoin could "only" operate through capital raises. Nor has the SEC alleged Unicoin's "entire business model was fraudulent," such that any receipt of funds from the business must have derived from fraud. Opp. 35. On the contrary, the Complaint acknowledges Unicoin held upwards of $10 million in equity positions in pre-IPO companies and $300 million in real estate interests that were legitimate and not the product of any fraud, and from which all of Moschini's and Dominguez's earnings easily could have derived. ¶¶ 8, 38. The Complaint further acknowledges that some if not all of the "compensation" and "bonuses" employees were paid was in the form of Rights Certificates, which did not require raising any capital from investors. ¶¶ 364–65. There is no allegation anyone was even paid a cash "salary." Opp. 35. We also do not know from the Complaint what Moschini's

and Dominguez's compensation was before the alleged fraud began in February 2022, and thus have no idea whether it even increased—whether as a result of the "fraud" or anything else.

Thus, "[v]ery little can be learned from the complaint about [Moschini's and Dominguez's] compensation and how any false statement may have benefited [them]." *SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017). "There are no allegations that [their] compensation was increased in any way," let alone "as a result of the alleged misconduct." *DiMaria*, 207 F. Supp. 3d at 358. Ultimately, "the SEC has only vaguely alleged that [Moschini] and [Dominguez] obtained 'bonus payments' and '[] compensation,'" and "has not offered any insight into how the compensation could be linked directly or indirectly to the fraud." *SEC v. Farnsworth*, 692 F. Supp. 3d 157, 191 (S.D.N.Y. 2023). That is "insufficient." *Id.* (dismissing Section 17(a)(2) claim).

The SEC suggests it need not link a defendant's personal gain to the fraud, but the cases it relies on say the opposite. *See SEC v. Farmer*, 2015 WL 5838867, at *8 (S.D. Tex. Oct. 7, 2015) (noting Section 17(a)(2) "requires some 'causal relationship' between the fraudulent statement or omission and the defendant's acquisition of money" and finding "[w]ithout [corporation]'s misleading Registration Statement, [corporation] could not have made an IPO … that culminated in Defendant walking away with $4.1 million" (quoting *Syron*, 934 F. Supp. 2d at 637)); *SEC v. Tourre*, 2014 WL 61864, at *4 (S.D.N.Y. Jan. 7, 2014) (noting "the statute clearly states[] the SEC must prove that [defendant] obtained money or property by means of a material misstatement or omission," but finding "no evidence … [defendant] would have been paid nothing—or even anything less—had he not engaged in the work he performed on the [fraudulent] transaction").

*Third*, the SEC tosses in a fallback argument—which only applies to Moschini—that says her equity in a Unicoin means she personally benefited from its capital raises. Opp. 34–35. "But, one is left to guess … how financially significant" her "equity stake in the firm" was. *Wey*, 246 F.

Supp. 3d at 915. The SEC does not even allege that the "stock [] increased in value as a result of the alleged misconduct." *DiMaria*, 207 F. Supp. 3d at 358. The SEC's two cited authorities on this point are distinguishable. In *Tellone Management Group*, the defendant was a 100% sole proprietor who paid himself from fees collected by his investment management company that allegedly defrauded investors. In *Cole*, it was "undisputed" that the defendant was paid $28,000 for the work he individually billed to the specific audit alleged to have been fraudulently conducted. Thus, in both cases, there was no question the defendant's compensation was directly attributable to the alleged fraud. Not so here.

### B.     There Are No Ill-Gotten Gains to Disgorge from Moschini or Dominguez.

The SEC's only argument against dismissal of its disgorgement request as to Moschini and Dominguez is that it "need not set forth evidence establishing the SEC's entitlement to" disgorgement at this stage. Opp. 36. It is not that the SEC must proffer *evidence* but *allegations* that, if true, would plausibly entitle it to the remedy. In neither of the SEC's cited cases did the court outright reject the defendants' arguments for dismissal, but rather scrutinized each complaint for allegations that would plausibly give rise to disgorgement. *See SEC v. Genesis Glob. Cap., LLC*, 2024 WL 1116877, at *17 (S.D.N.Y. Mar. 13, 2024) (complaint must show "disgorgement would be appropriate if the SEC prevails in its case-in-chief" (quotations and citation omitted)); *SEC v. Fiore*, 416 F. Supp. 3d 306, 332 (S.D.N.Y. 2019) (the SEC "adequately pled facts supporting entitlement to the remedy"). The Court here, too, must consider whether the SEC's allegations are sufficient as to Moschini and Dominguez. Because the Complaint alleges no ill-gotten gains that could be disgorged from either defendant, they are not.

## IV.     KONANYKHIN'S SALES OF RIGHTS CERTIFICATES WERE EXEMPT.

The SEC argues Konanykhin was not an "issuer" under Rule 506(c). Opp. 31. But the Complaint says his sales were "on behalf of" Unicoin, an issuer. ¶¶ 358, 361. Further, each investor

"made an express representation of its status as an accredited investor." *LBS Petroleum, LLC v. Demir*, 2015 WL 12469064, at *6 (S.D. Fla. Oct. 28, 2015).

The SEC argues Konanykhin is an underwriter outside Section 4(a)(1). Opp. 32. But underwriters distribute *securities*—here, investment contracts. Unlike people who bought from Unicoin, purchasers from Konanykhin had no reasonable expectation he would reinvest rather than keep their money. Mot. 32–33. In *Ripple Labs*, the blind transactions were only relevant to show purchasers did not know whether their payments went to the issuer promising to reinvest. Here, they knew the seller was *not* the issuer.

## CONCLUSION

The Court should dismiss the SEC's Complaint with prejudice.

Dated: January 12, 2026

Respectfully submitted,

/s/ *Michael B. Homer*
Michael B. Homer
Eric S. Rosen
Yusef Al-Jarani (*SDNY admission forthcoming*)
**DYNAMIS LLP**
175 Federal Street, Suite 1200
Boston, Massachusetts 02110
T: (617) 693-9732
mhomer@dynamisllp.com
erosen@dynamisllp.com
yaljarani@dynamisllp.com

*Counsel for Defendants Unicoin, Inc.,
Alexander Konanykhin, Maria Silvina
Moschini, and Alejandro Dominguez*

## **CERTIFICATE OF COMPLIANCE**

I certify, as counsel for Defendants Unicoin, Inc., Alexander Konanykhin, Maria Silvina Moschini, and Alejandro Dominguez, that the foregoing memorandum of law contains 5,000 words, excluding the portions exempted by Local Civil Rule 7.1(c), which complies with the word-count limitation of the Court's January 8, 2026, Order. ECF No. 46.

Dated: January 12, 2026

*/s/ Michael B. Homer*
Michael B. Homer